Sheldon Karasik (*Pro hac vice application forthcoming*)
244 Fifth Avenue, Suite Q249
New York, New York 10001 (917) 587-8153
Email: sheldon@karasiklawoffices.com

Christopher Dunn
Dunn Employment Law, LLC
P.O. Box 4124
Madison, CT 06443
(203) 903-7650
cdunn@dunnemploymentlaw.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| BETH FABER and ALLISON WILLIAMS, | Case No.: |
| Plaintiffs, | |
| vs. | **COMPLAINT AND JURY DEMAND** |
| ESPN PRODUCTIONS, INC., ESPN, INC., and THE WALT DISNEY COMPANY | |
| Defendants | |

Plaintiffs BETH FABER AND ALLISON WILLIAMS, by and through their attorneys,

LAW OFFICES OF SHELDON KARASIK, P.C., as and for her Complaint against Defendants,

THE WALT DISNEY COMPANY, ESPN, INC., AND ESPN, PRODUCTIONS, INC states as

follows:

## **PARTIES**

1.     Plaintiff BETH FABER ("Faber") is an individual residing in Erie County, New

York.

2.     Plaintiff ALLISON WILLIAMS ("Williams") is an individual residing in San

COMPLAINT AND JURY DEMAND - 1

Diego County, California.

3.  Defendant ESPN Productions, Inc. ("ESPN") is an entity incorporated in the State of Delaware with its principal place of business located at 935 Middle St, Bristol, CT 06010.

4.  Defendant ESPN, Inc. ("ESPN, Inc.") is an entity incorporated in the State of Delaware with its principal place of business located at 935 Middle St, Bristol, CT 06010.

5.  Defendant The Walt Disney Company ("Disney") is an entity incorporated in the State of Delaware, is headquartered and has its principal place of business located at 500 S. Buena Vista Street, Burbank, California 91521, and is doing business in Connecticut.


## JURISDICTION AND VENUE

6.  Jurisdiction in this Court is based upon 28 U.S.C. §1331 as it involves a federal question pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII") and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq*. ("ADA"). Further, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1391(c)(2) and (d).

7.  Venue is proper in this district as one or more of Defendants' acts and those events complained of occurred herein, pursuant to 28 U.S.C. § 1391.

8.  The Plaintiff Williams and Defendant consented to the exclusive jurisdiction and venue in this Court in the Plaintiff's employment contract.

### Beth Faber

9.  Plaintiff Beth Faber was hired in December 1991 and worked for Defendants for

COMPLAINT AND JURY DEMAND - 2

just shy of 31 years, working as a Producer from 2014-2021. Plaintiff carried out her duties in an exemplary manner. At no time did Defendants have grounds to, nor did it, prior to Plaintiff's assertions of her rights to be exempt from a vaccination, discipline or take any adverse action against the Plaintiff.

10.     On May 27, 2021, Defendants' Amanda Gifford, Vice President, Content Strategy & Audio, informed Plaintiff via email that she was required to receive a Covid-19 vaccination by July 31, 2021, and she was also notified that preferential treatment would be given to the fully vaccinated for work location assignments beginning the end of June. No process or provision for religious exemption requests was mentioned in the correspondence.

11.     On the very same day, within hours, May 27, 2021, concerned, Plaintiff responded to Gifford stating her objections, which included as her basis, in her own words, "VERY strong religious beliefs," and asked how she should proceed. Faber also shared other concerns, but she noted that her opposition was "most importantly" based on her religious objections.

12.     On May 28, 2021, Gifford responded to Faber, copying and directing her to Julie Walden, Employee Relations, or Human Resources.

13.     On June 1, 2021, Walden sent via email to Faber an accommodation request form in advance of a scheduled call the two had.

14.     On or about June 1, 2021, Plaintiff had a conversation with HR Representative Julie Walden, who rather than objectively stating the steps to take, when Plaintiff expressed her sincere beliefs about the role God plays in her life and the basis for her religious objection,

COMPLAINT AND JURY DEMAND - 3

threateningly told Plaintiff that "maybe God has led you to a new career, when God closes a door, he opens another."

15.    On June 15, 2021, Plaintiff surfaced her concern about Walden's comment. Subsequently, ESPN made no efforts whatsoever to address Walden's comment. Its silence belies its tacit approval for the comment and is consistent with its overall disfavor with accommodations for religious exemptions, disfavor exhibited throughout its dealing with Plaintiff.

16.    On June 15, 2021, Plaintiff applied for exemption from vaccination on grounds of religion. Plaintiff's sincerely held religious beliefs prohibit her from being vaccinated. In Plaintiff's application, Plaintiff expressed her perception of, and concern regarding, Walden's diminishing and threatening statement, and asserted her religious belief.

   a.    Plaintiff informed Defendants in writing that she was a devout Catholic and that her sincere and heartfelt religious belief prohibited her from being vaccinated.

   b.    Plaintiff cited numerous scriptural passages in support of her sincerity.

   c.    She informed Defendants that she engaged in "hours and hours of prayer and re-reading scripture" as part of her decision-making process.

   d.    She informed Defendants of "the personal direction" she "received from God through prayer" as informing her decision.

   e.    She informed Defendants that she could not accept the vaccination due to its reliance on fetal cell lines for its development and how such is "AGAINST

COMPLAINT AND JURY DEMAND - 4

what God wants" her to put in her body.

    f.   She informed Defendants that she did not consider it consistent with her religious faith to rely upon an immune system other than the one provided by her God, which she describes as "the perfect immune system he put in my body before I was ever born."

    g.   She further informed Defendants that "God and the immune system he has entrusted to me has protected me through more than 1550 remote events, millions of miles in airline travel, and countless numbers of nights in various hotels throughout this country and the world. I will not turn my back on God's protection, and violate my sincere personal religious beliefs."

    17.   Despite these clear articulations of sincerely held religious beliefs in support of her opposition and request for an exemption, ESPN *found* reason to continue to question her sincerity.

    18.   On June 30, 2021, Walden sent Faber an email correspondence indicating ESPN's concerns about the religious nature of her request, seeking the pastoral reference and challenging Plaintiff's sincerity on the basis of her other personal concerns. Defendants identified and utilized specious criteria and methodology for determining her sincerity: a) they would identify Plaintiff's other concerns relative to her religious concerns and then weigh the two; and b) they would seek evidence or support from her parish as to their beliefs to validate her beliefs. This methodology was reflective more of an antipathy toward religious accommodation than a search for truth.

COMPLAINT AND JURY DEMAND - 5

19.     On June 30, 2021, extremely noteworthy is that Walden's email correspondence solicited not Faber's objection or inquiry into Faber's sincerity, but rather the name of her parish representative "to discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view."

20.     On July 1, 2021, in response to Walden's diminishment of Plaintiff's faith, Plaintiff responded recognizing Defendants' antipathy: "I do not even know how to respond to this other than to say that my sincere personal religious beliefs are my OWN. My religious beliefs have grown, changed and evolved all of my life, as my relationship and connection with God continues to grow, change and strengthen. I do not expect to be cross examined or to have to bring in an "expert" on my own personal religious beliefs for anyone to judge me or my belief in God's will for me. My sincerely held religious beliefs preclude me from taking the COVID-19 vaccine. I believe the Bible. I believe in their guidance I receive thru prayer and scripture. Have a good day."

21.     On July 12, 2021, Defendants' Walden, via email, denied Plaintiff's religious exemption request, stating, "You have not provided sufficient documentation to support your accommodation request, and your request is denied." Plaintiff, according to Defendants had failed the balancing test Defendants had devised for weighing expressions of other concerns (HIPPA, human rights, and safety of the new mRNA technology) against her religious concerns, and she had failed to provide and meet their external support criterion, validation from a priest as to the priest's and / or the church's beliefs.

22.     The July 12, 2021 email from Walden set the date to be vaccinated or terminated

COMPLAINT AND JURY DEMAND - 6

by August 1, 2021.

> As we discussed today, I have reviewed the documentation you provided and I have also reviewed your subsequent responses to my further questions. You have not provided sufficient documentation to support your accommodation request, and your request is denied.

> It is an essential qualification of your role as a Remote Radio Producer to be fully vaccinated by August 1, when the vaccination requirement becomes effective for all Remote workers. If you choose not to be fully vaccinated by that date, your employment with the Company will end. You are welcome to apply for any open positions with the Company that do not require vaccination at that time, however. Please let us know your intentions by July 14, 2021.

23.     The July 12, 2021 email included a request for Plaintiff to let Defendants "know your intentions by July 14, 2021."

24.     On July 15, 2021, Plaintiff expressed her dismay at the Defendants' behavior making an issue of her sincerity, and reiterated in answer to the threat of termination, "I stand by my convictions."

25.     On July 16, 2021, Walden, as if she were a salesperson trying to meet a quota – and not understanding Plaintiff's July 15 decision to not take the vaccination – attempted again to meet her goal:

> Please inform us by no later than Monday, July 19, as to whether you will comply with Remote Operation's mandatory COVID 19 vaccination requirement, or have chosen to remain unvaccinated. As we have discussed at length, being fully vaccinated by August 1 is an essential qualification of your role because of safety & health and logistical reasons. Many leagues have already imposed requirements that all crew members working events are vaccinated, and we anticipate others will implement such requirements in the near future with little or no advance notice to ESPN. If you fail to inform us of your intentions by Monday, July 19, The Company will not be able to schedule you to work assignments after August 1, and will separate you from employment at that time.

COMPLAINT AND JURY DEMAND - 7

26.     In light of what happened next, we can see that last set of communications as being, from the standpoint of the Defendants, a game of chicken, with the issue of Plaintiff's sincerity as merely one milestone on the path toward an ultimate end, the chopping block, vax or be terminated, religious believers need not apply (for an exemption). One way or another the Defendants would meet their actual goal.

27.     ESPN did not go through with the termination on the scheduled date. It changed course.

28.     ESPN stated it was going to defer on ascertaining her sincerity.

29.     Defendants explained, in so many words, Why execute the firing on such a basis as opposing the sincerity of Plaintiff's exemption request when you can instead, as it stated: "beg[in] examining whether it would even be possible to accommodate her. After all, ESPN need not accommodate her professed beliefs if 'doing so would cause' it 'to suffer an undue hardship.'"

30.     After threatening to fire Plaintiff, on the doorstep of her termination they then begin to attempt to examine whether accommodating her was even possible. At least that is what the Defendants state they did.

31.     In fact, Defendants did not do anything of the sort.

32.     Defendants failed to take the most basic measure they had readily available to them, which was to send out an *en masse* communique to their venues indicating that they had personnel whom they afford religious and / or medical exemptions and seeking the venues'

COMPLAINT AND JURY DEMAND - 8

cooperation in extending the same. The personnel would be taking other precautionary measures. Defendants cannot claim it was an undue burden to accommodate Plaintiff without their having taken the most basic step to ascertain the extent to which exemptions were or were not available to them.

33.    Moreover, had it taken such a step, it would find that no undue burden existed whatsoever, as reporting shows.

34.    At the time of Plaintiff's termination, for the upcoming fall 2021 season practically *no* NFL team was excluding the unvaccinated.[1] With only two exceptions, *no* NFL team for the whole fall 2021 season excluded the unvaccinated.

35.    For the fall 2021 season no, or next to no, college football teams excluded the unvaccinated.

36.    Defendant, themselves, reported on the fact that the unvaccinated were not excluded. For example, ESPN reports, August 26, 2021, of the SEC, "Now, unvaccinated

_____

[1] *See e.g.*, Mike Gavin, *NBC Latest NFL rules on COVID, fan vaccinations and positive cases,* NBC SPORTS (Aug. 3, 2022) https://www.nbcsports.com/chicago/bears/latest-nfl-rules-covid-fan-vaccinations-and-positive-cases (inaccurately stating, "In 2021, only a handful of NFL teams required proof of vaccination for entry into their stadiums. That included, in some form, the Buffalo Bills, Seattle Seahawks, New Orleans Saints and Las Vegas Raiders."). The actual requirement was in fact vaccination or a negative test, except for two teams. The more accurate report was: "The Seahawks and Saints are accepting proof of a negative test within 72 hours of the game, but the Raiders and Bills are not," as reported by News10. Nick Veronica, 258 fans turned away at Bills-Dolphins game as full vaccine mandate goes into effect, NEWS 10, Nov 1, 2021 / 03:44 PM EDT, Updated: Nov 1, 2021 / 06:52 PM, https://www.news10.com/sports/buffalo-bills/258-fans-turned-away-at-bills-dolphins-game-as-full-vaccine-mandate-goes-into-effect/.

COMPLAINT AND JURY DEMAND - 9

student-athletes, coaches and support staff will undergo weekly surveillance testing -- regardless of how much of the rest of the team is vaccinated -- and they are required to wear masks in the athletic facilities."[2] No mention of an exclusion, quite the contrary. Similarly, of the NCAA, ESPN reports, "Earlier this month, the NCAA recommended that unvaccinated college athletes should be tested weekly for COVID-19, wear masks in most situations and be quarantined if exposed to the virus, while vaccinated individuals can avoid routine testing."[3] No exclusion for the unvaccinated. In case the Defendants were not paying attention to its own reporting, CNN widely reported the fact that exclusions were not the rule. For example, CNN reported "Some of the country's biggest powerhouses – including Georgia, Alabama, Ohio State and Oklahoma, to name a few – are hosting games to full capacity on Saturday. And fans who attend these games won't have to prove their vaccination status, won't be required to social distance and won't have

_____

[2] Heather Dinich, *The 2021 college football COVID protocols -- Requirements, attendance, forfeits and more,* ESPN, Aug. 26, 2021, https://www.espn.com/college-football/story/_/id/32084177/the-2021-college-football-covid-protocols-requirements-attendance-forfeits-more.

[3] ESPN also reported:

> "A Big 12 spokesman told ESPN on Tuesday that none of the schools in the conference are currently requiring fans to show proof of vaccination before attending games, and all of them are planning for full-capacity crowds."

Also:

> "Earlier this month, the NCAA recommended that unvaccinated college athletes should be tested weekly for COVID-19, wear masks in most situations and be quarantined if exposed to the virus, while vaccinated individuals can avoid routine testing."

*Id.*

COMPLAINT AND JURY DEMAND - 10

to wear masks in their seats."[4] Some stadiums had different rules for the media, but in reality only a small number of schools whose games Plaintiff covered required vaccination for the media.

37.     ESPN conjured up a burden that simply did not exist and one that did not jibe with reality.

38.     ESPN's communications with Plaintiff were consistent with other public statements by Disney executives and with Disney communications directly to Plaintiff, all indicating effectively no tolerance for being unvaccinated. Disneycareers.com, periodically posted positions on its career board for ESPN positions, often noting, "This position is with ESPN Productions, Inc, which is part of a business we call Disney Media & Entertainment Distribution." None of the positions would accommodate Plaintiff's exemption.

39.     On September 2, 2021, after no serious attempt at accommodation, it again demanded that Plaintiff be vaccinated (first dose) or be terminated by September 8, 2022.

40.     On September 9, 2021, Defendants terminated Plaintiff Faber.

41.     On February 4, 2022, Plaintiff Faber filed a charge of employment discrimination (Charge No. 525-2022-00229) against Defendants with the U.S. Equal Employment Opportunities Commission ("EEOC").

_____

[4] Eric Levenson, *College football fans and traditions are back, even with Covid-19 still here*, CNN, September 11, 2021, https://www.cnn.com/2021/09/11/us/college-football-fans-covid/index.html.

COMPLAINT AND JURY DEMAND - 11

42.     On October 14, 2022, the EEOC issued a "right to sue" letter to Plaintiff Faber. This action is filed pursuant thereto.

**Allison Williams**

43.     Plaintiff joined Defendants as a Reporter / Host in August 2010 working at college and professional sporting events and carried out her duties in an exemplary manner. At no time did Defendants have grounds to, nor did they, prior to Plaintiff's assertions of her rights to be exempt from a vaccination, discipline or take any adverse action against the Plaintiff.

44.     On August 1, 2017, the parties signed a three-year employment agreement.

45.     On August 15, 2020 Plaintiff's contract was renewed for one year.

46.     On April 1, 2021, Plaintiff, like other employees, received a communication from Disney regarding Disney's vaccination expectations. She regularly received Disney communications.

47.     In or about June, 2021, Defendants' Chandon Hudgins informed Plaintiff via email that Plaintiff was required to receive a Covid-19 vaccination or receive a religious exemption by August 1, 2021.

48.     On August 13, 2021, the parties extended for thirty days Williams's contract which was set to expire on August 14, 2021.

49.     On August 13, 2021, Plaintiff Williams applied to Defendants for exemption from vaccination on grounds of disability. Plaintiff was undergoing in vitro fertilization and was concerned about the potential unknown effects the vaccination would have on the fetus.

COMPLAINT AND JURY DEMAND - 12

a.  Plaintiff lives in California where medical licenses are threatened if doctors provide a medical exemption and she was therefore unable to obtain a doctor's letter in support of her legitimate concerns.

b.  In or about July 2022, Plaintiff and her husband welcomed their second child into the world.

50.  On or about August 31, 2021, Plaintiff applied for an exemption from vaccination on grounds of religion, submitting her application to Walden. Plaintiff's sincerely held religious beliefs prohibit her from accepting vaccination.

a.  Plaintiff informed Defendants in writing that she was a Christian and that her sincerely held and heartfelt religious beliefs prohibited her from being vaccinated.

b.  She informed Defendants that she could not accept the vaccination to "honor the creation and conception of a child" referring in part to the vaccination being due to its reliance on fetal cell lines for its development.

c.  She further informed Defendants that she did not consider it consistent with her religion to rely upon an immune system other than the one provided by her God, by referring to her belief in "protect[ing] the sanctity of my body."

51.  On or about September 2, 2021, Thomas Carroll, Employee Relations, requested additional information.

COMPLAINT AND JURY DEMAND - 13

52.     On or about September 3, 2021, Plaintiff Williams spoke with Natasha Finch, Employee Relations Associate. Plaintiff explained to Finch that:

    a.   "We are created perfectly and any intervention in the absence of disease would go against that" as it "shows distrust in the process of creation";

    b.   her two-year old had not received any vaccinations; and

    c.   she had not received any vaccines since she was 12 after "she got a bad reaction to one."

53.     Defendants made no effort to accommodate Plaintiff Williams.

    a.   Plaintiff Williams indicated that she would test regularly and mask;

    b.   Plaintiff Williams also had had Covid-19 and had natural immunity;

    c.   Plaintiff Williams also offered to host shows remotely or in-studio.

54.     Defendants allege that no accommodation was possible because their venues demanded vaccination and would not extend medical or religious exemptions, however, Defendants made no efforts to either inquire as to how many would grant exemption or to assert that they had employees whom were entitled by law to exemption.

55.     As with Plaintiff Faber, paragraphs 34-37, Defendants failed to properly acknowledge the reality.

    a.   At the time of Plaintiff's termination, for the upcoming fall 2021 season

practically *no* NFL team was excluding the unvaccinated.[5] With only two

exception, *no* NFL team for the whole fall 2021 season excluded the

unvaccinated.[6]

   b.   For the fall 2021 season no college football team excluded the unvaccinated.

   c.   Defendants themselves reported on the fact that the unvaccinated were not

excluded. For example, ESPN reports, August 26, 2021, of the SEC, "Now,

unvaccinated student-athletes, coaches and support staff will undergo weekly

surveillance testing -- regardless of how much of the rest of the team is

vaccinated -- and they are required to wear masks in the athletic facilities."

No mention of an exclusion, quite the contrary. Similarly, of the NCAA,

ESPN reports, "Earlier this month, the NCAA recommended that

unvaccinated college athletes should be tested weekly for COVID-19, wear

masks in most situations and be quarantined if exposed to the virus, while

vaccinated individuals can avoid routine testing." No exclusion for the

unvaccinated. In case the Defendants were not paying attention to its own

reporting, CNN widely reported the fact that exclusions were not the rule.

For example, CNN reported "Some of the country's biggest powerhouses –

---

[5] *Id.*
[6] *See supra* note 1.

COMPLAINT AND JURY DEMAND - 15

including Georgia, Alabama, Ohio State and Oklahoma, to name a few – are

hosting games to full capacity on Saturday. And fans who attend these games

won't have to prove their vaccination status, won't be required to social

distance and won't have to wear masks in their seats."

    d.   ESPN conjured up a burden that simply did not exist and one that did not

jibe with reality.

56.    On September 14, 2021, the parties further extended Plaintiff Williams's contract.

57.    ESPN's communications with Plaintiff throughout the process were consistent with other public statements by Disney executives and with Disney communications directly to Plaintiff, all indicating effectively no tolerance for being unvaccinated. Disneycareers.com, periodically posted positions on its career board for ESPN positions, often noting, "This position is with ESPN Productions, Inc, which is part of a business we call Disney Media & Entertainment Distribution." None of the positions would accommodate Plaintiff's exemption.

58.    On or about October 13, 2021, Plaintiff Williams was informed by Finch that her request was denied and she had one week to receive the Covid-19 vaccine or she would be terminated. She chose not to be vaccinated.

59.    On October 19, 2021, Defendants terminated Plaintiff Williams.

60.    On June 29, 2022, Plaintiff Williams filed a charge of employment discrimination (Charge No. 523-2022-02211) against Defendants with the U.S. Equal Employment Opportunities Commission ("EEOC").

61.    On January 5, 2023, the EEOC issued a "right to sue" letter to Plaintiff Williams.

This action is filed pursuant thereto.

## STATE ACTION

62.    Defendants' actions were not merely as per a private corporation's policy, they were state action, governed by the state action doctrine. In its justification for the company mandate, Defendants referred to the Biden Administration's Executive Order expecting companies with greater than 100 employees to mandate the vaccination, however, it is on a far greater basis that state action is being asserted.

63.    Defendants were encouraged sufficiently by the government, and Defendants were jointly involved with the government, in sufficiently significant ways, apart from the business mandate, to warrant that the state action doctrine be applied. Defendants had additional reasons beyond the business mandate. There was such a web of relationships, including significant business incentives, and joint activity between the government and Defendants, such that there was a close nexus between the state and the actions of the Defendants and such that there was pervasive public entwinement[7] in Defendants' management or control as pertains to

---

[7] Entwinement, of course, is an essential criterion in state action determinations. The Supreme Court in *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* was clear that the test was not whether each, or a combination, of several criteria were present, entwinement alone is enough:

> "Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards;"

COMPLAINT AND JURY DEMAND - 17

the Disney/ESPN mandate.[8]

    a. Defendant ESPN is 80% owned by Disney.

    b. Disney has a symbiotic relationship with the Defense Department, which has

       a joint relationship with the CDC and the HHS[9], whose policies were

_____

…

> Entwinement is also the answer to the Association's several arguments offered to persuade us that the facts would not support a finding of state action under various criteria applied in other cases. These arguments are beside the point, simply because the facts justify a conclusion of state action under the criterion of entwinement, a conclusion in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts.

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 302 (2000).

[8] The specifics of Disney's Defense Department relationship are paramount to the case, but it's important to note that there is a historical relationship between the Defense Department and filmmakers that significantly dates back to Franklin Delano Roosevelt. Associate Editor at Vanity Fair, writing for MRonline, explains:

> "In 1942, President Franklin D. Roosevelt created the Office of War Information (OWI) in an effort to better inform the public about the Second World War via newspapers, radio, and film. The Bureau of Motion Pictures, one of the many bureaus that operated under the OWI, worked directly with every major Hollywood studio to promote the war. Of the 1700 films distributed by Hollywood from 1942 to 1945, the OWI had their hand in about five hundred, all of which contained war-related material.
>
> After the war was over, the OWI dissolved and, in its stead, the Pentagon established an entertainment liaison office in 1948, which continues to operate directly out of Los Angeles."

Jon Skolnik, *Hollywood and the Pentagon are cheating on the American public*, MRONLINE (Jul. 03, 2020) https://mronline.org/2020/07/03/hollywood-and-the-pentagon-are-cheating-on-the-american-public/.

[9] Lisa Simunaci, *Operation Warp Speed Refines Vaccine Delivery Plan*, U.S. DEPARTMENT OF DEFENSE, (Nov. 23, 2020), https://www.defense.gov/News/News-Stories/Article/Article/2423700/operation-warp-speed-refines-vaccine-delivery-plan/ (noting, "'Operation Warp Speed,' will hasten the delivery of that vaccine by conducting steps concurrently that normally would be conducted sequentially, senior administration officials said. Operation Warp Speed is a partnership among components of the Department of Health and Human Services, as well as the Defense Department.").

COMPLAINT AND JURY DEMAND - 18

advancing the uptake of the vaccine in the government sector differently than could be done in the private sector.[10] Such did not prevent the Defense

_____

[10] The government had the power, through Executive Orders, to mandate for the military and government employers and contractors, power that was greater than that over the private sector. The Biden Administration's announcement on September 9, 2021, went beyond its role as employer to create a unity of interest between government and business, a unity that was at odds with a large percentage of workers and with laws, such as Title VII. The leading Human Resource organization, the Society for Human Resource Management (SHRM) captured the interplay between the government and business, and particularly the role of government as facilitator, and encourager, of business mandates, again, at odds with a large percentage of workers, as described below. Notably in the article, SHRM was careful to advise of the rights of individuals to receive medical and religious exemptions, something President Biden in his speech deliberately left out, except with very general language: "to the extent consistent with applicable law" and "with exceptions only as required by law." SHRM was more specific, referring to the ADA and Title VII specifically, in its overall reporting on views as to the interplay between government and business, and mandates:

> "Research from the Society for Human Resource Management (SHRM) found that 28 percent of employed Americans say they won't get the COVID-19 vaccine even if it costs them their job.
>
> The presidential announcement 'is a real game changer for many employers,' said Steve Bell, a partner at the international law firm Dorsey & Whitney in Denver. 'The fact that the largest employer in the U.S. is mandating vaccines will **give comfort to** private employers that have been hesitant to require vaccines. It may also **set the standard** for what a reasonable employer should be doing in the face of this continuing epidemic.'
>
> Chelsea Smith, a labor and employment attorney in the Oklahoma City office of Hall Estill, added that private-sector employers should seek legal advice and be sure to craft a mandatory vaccine policy that provides for exemptions for people with qualified disabilities, as defined under the Americans with Disabilities Act, and for people with sincerely held religious beliefs, as defined under Title VII of The Civil Rights Act.
> 'This is the first vaccine mandate ever applicable to private employers,' said Kathryn Bakich, health compliance practice leader and senior vice president at employee benefits consulting firm Segal in Washington, D.C. 'Employers are moving toward mandatory vaccination policies at great speed. Those that are not mandating vaccines are considering whether they can implement premium differentials in their health plans to penalize employees who won't get the vaccine. Wellness regulations currently permit incentives and penalties for taking legitimate health-related steps, so a COVID-19 vaccination incentive should be permissible. I would expect that the Biden administration would move **to help employers by explicitly issuing guidance to permit these incentives**.'"

Roy Maurer, *Biden Orders Vaccination Mandates for Larger Employers, Federal Workforce, Under upcoming rule, companies with more than 100 employees must require vaccinations or weekly testing, SHRM*, (September 9, 2021)

COMPLAINT AND JURY DEMAND - 19

Department from working closely and jointly (which is one of the criteria of

the state action doctrine) with private entities, including monoliths, or

behemoths, like Disney.

     i.   It is no secret that the Government worked with Disney during World

War I and World War II – it was a significant part of the war effort in

both wars. There was joint involvement. Their partnership continues

to this day in overt and covert ways (encouragement, whether overt

or covert, is also one of the criteria for finding state action).[11]

    ii.   Nothing about the fact that covert involvement is involved makes

them impervious to treatment as a state actor.

   iii.   Covert involvement is not the same as a conspiracy.

   iv.   It is well-known that the Defense Department has exercised direct

editorial control over Disney's content. That control does not stop at

content but extends to direct, indirect and covert encouragement as it

pertains to policies and practices, such as vaccination requirements.

    v.   The symbiotic relationship includes the fact that the Defense

Department occupies and maintains land, land it owns, at Walt

_____

https://www.shrm.org/resourcesandtools/hr-topics/talent-acquisition/pages/federal-vaccine-mandate.aspx.
[11] *Brentwood Academy*, *infra* note 36.

COMPLAINT AND JURY DEMAND - 20

Disney World, Orlando Florida. It is the only Armed Forces Recreation Center in the continental United States.

vi.  Consistent with this symbiotic relationship, and reflective of the deep ties, is the fact that retired United States Army Major General, Joe Potter, was recruited and oversaw the construction of Walt Disney World.

1. Joe Potter's military experience was stellar and significant, as pertains to the joint relationship between the military and Disney.

   a. The Walt Disney Archies explains the significant role and involvement between Disney and the Defense Department, describing Potter's unique qualifications, suited for a clearly interconnected relationship.

   "Walt Disney recruited the retired United States Army major general," Joe Potter "to oversee the early construction of Walt Disney World..." In this task he "transform[ed] 300 acres of Florida land into the Magic Kingdom…."

   Joe was not your "average Joe." As the archives explain, "Born in Oshkosh, Wisconsin, on July 17, 1905, Joe graduated from the United States Military Academy at West Point, the Massachusetts Institute of Technology and the National War College in

Washington, D.C." The archives further explain his

role and the unique fit for an essentially military

private partnership:

> "During World War II, he directed logistical planning for the invasion of Northern France.... After the war he served in Washington, DC, as assistant chief of engineers for Civil Works and Special Projects.
>
> In 1956, President Dwight D. Eisenhower appointed Joe to serve as the governor of the Panama Canal Zone."
>
> ...
>
> Soon after his 'retirement,' he became executive vice president of the 1964-65 New York World's Fair, charged with construction of the federal and state attractions. These included 26 state pavilions and the $17-million United States pavilion.
>
> During this time he met Walt Disney, joining the Company in 1965 as its vice president of Florida Planning. In that role, Joe oversaw construction of the Park's entire infrastructure; this included underground utilities and sewer, power, and water treatment plants that were considered revolutionary at the time. He also developed drainage canals for the entire property, which were known as 'Joe's ditches.'"

    b.   Joe Potter worked with another military notable on the

project.

2.   Another not so average Joe. While Joe Potter prepared the

land, Joe Fowler oversaw the construction "and went on to

manage its operations after it opened."[12] According to Walt

Disney Archives, Joe Fowler was another distinguished

military man, a Navy Rear Admiral.

    a.   "Born on July 9, 1894, in Lewiston, Maine, Joe graduated second in his class at the U.S. Naval Academy in 1917. He graduated from Massachusetts Institute of Technology with a master's degree in naval architecture in 1921. A veteran of both world wars, Joe designed and supervised the building of gunboats in Shanghai, China, during the 1920s; he later designed and built aircraft carriers, including the U.S.S. Lexington and the U.S.S. Saratoga, which were the largest aircraft carriers of World War II. He was also in charge of all U.S. Navy work conducted in the West Coast shipyards during World War II."[13]

    b.   Prior to his work with Disney, "in 1952 President

Harry S. Truman appointed him civilian director of the

Federal Supply Management Agency with a mandate

to root out waste in the military."[14]

3.   That Disney utilized military men in the construction and

management of its parks is not in and of itself sufficient to

---

[12] Walt Disney Archives, WALT DISNEY, https://d23.com/walt-disney-legend/joe-fowler/ (last visited Jan. 6, 2023).
[13] *Id*.
[14] Wolfgang Saxon, *Joseph Fowler, 99, Builder of Warships And Disney's Parks*, N.Y. TIMES, Dec. 14, 1993, https://www.nytimes.com/1993/12/14/obituaries/joseph-fowler-99-builder-of-warships-and-disney-s-parks.html.

COMPLAINT AND JURY DEMAND - 23

justify state action, however, it is relevant evidence as part of an overall contextualization of the interworkings between the defense department and the private business Disney, **particularly since the military owns land in Disney World**. (See Paragraph 60 (b) (v)).

vii. Walt Disney, himself, was a government actor, and though his government role ultimately changed it did not change the essential relationship between the "World" and the Government.

1. Walt Disney was an FBI informant.[15] Walt Disney was made a 'full Special Agent in Charge Contact' in 1954."[16]

2. The relationship was far more than the actions of a private person. It was a business government partnership, even in this role: "What Hoover got in return. In return for Disney's information, J. Edgar Hoover, the Director of the bureau, allowed Disney to film in F.B.I. headquarters in Washington.

---

[15] Herbert Mitgang, *Disney Link To the F.B.I. And Hoover Is Disclosed*, N.Y. TIMES, May 6, 1993, https://www.nytimes.com/1993/05/06/movies/disney-link-to-the-fbi-and-hoover-is-disclosed.html (noting: "From 1940 until his death in 1966, Walt Disney served as a secret informer for the Los Angeles office of the Federal Bureau of Investigation, according to documents that have come to light under the Freedom of Information Act.").
[16] *Id*.

COMPLAINT AND JURY DEMAND - 24

For his part, Disney allowed Hoover access to some Disney scripts, and made slight changes in a few lesser-known movies and an episode of 'The Mickey Mouse Club' television show to mollify the director."[17]

viii.  Disney's current involvement with the Defense Department includes the same kind of involvement revealed in the FOIA documents regarding Walt Disney. These documents show significant influence over content.[18] Much as Hoover was allowed content influence through Walt Disney, today the Defense Department is responsible for hundreds of millions of dollars in Disney revenue, because of the military's involvement in Marvel feature films. It has been reported that without the Defense Department's provision of military equipment the Marvel films would not have been made. Air

_____

[17] *Id.*
[18] Professor Roger Stahl writes in an LA Times Op Ed: "Until recently, the scholarly consensus had been that this phenomenon was isolated to perhaps a couple of hundred films. In the past five years, however, my small group of researchers has acquired 30,000 pages of internal Defense Department documents through Freedom of Information Act requests and newly available archives at Georgetown University, which show that the Pentagon and the Central Intelligence Agency have exercised direct editorial control over more than 2,500 films and television shows." Roger Stahl, *Op-Ed: Why does the Pentagon give a helping hand to films like 'Top Gun'?*, LA TIMES, May 30, 2022 3:15 AM PT, https://www.latimes.com/opinion/story/2022-05-30/top-gun-maverick-memorial-day-tom-cruise-pentagon-propaganda.

COMPLAINT AND JURY DEMAND - 25

University (Air University is the U.S. Air and Space Force's center for professional military education (PME)) reports: "Tom Secker, the author of National Security Cinema and an expert on US military-Hollywood relations, states that 'without the Pentagon's support, it is possible that the Marvel Universe wouldn't have become the world's biggest film franchise. The first two Iron Man films benefited from large-scale production assistance from the USAF."[19] This was no small role. Disney's purchase of Marvel has led the company to have "more than quadrupled its money."[20]

64.     There can be no doubt that the government benefits from its symbiotic relationship.[21]

_____

[19] Frank Martinez, *Reaching a New Audience: Strengthening the US Air Force through the Marvel Cinematic Universe*, AIR UNIVERSITY, Jul. 12, 2022, https://www.airuniversity.af.edu/Aether/Perspectives/Article-Display/Article/3090461/reaching-a-new-audience-strengthening-the-us-air-force-through-the-marvel-cinem/#:~:text=Tom%20Secker%2C%20the%20author%20of,the%20world's%20biggest%20film%20franchise.

[20] Jane Kleinman, *13 Years Ago, Disney Bought Marvel — and Changed Movies Forever, In 2009, Disney swooped in and bought the nascent Marvel Cinematic Universe for $4B.*, INVERSE, Sep. 1, 2022, https://www.inverse.com/entertainment/why-did-disney-buy-marvel. *See also*, Samuel Pennifold, *Disney and the US Department of Defense – weaponising streaming*, KING'S BUSINESS REVIEW, Jul. 14, 2021, https://kingsbusinessreview.co.uk/weaponising-streaming (noting: "The purchase of Marvel in 2009 has been a masterstroke, with global box office ticket revenue of the Marvel Cinematic Universe equating to more than $23 billion alone. Under Iger's leadership, Disney's market capitalization also increased from $48 billion to $257 billion."). (King's Business Review is a publication of King's Business Club, the largest student led business and finance society in London.)

[21] As an example, it is reported that recruitment shot up following the Defense Department's "partnership" with Paramount Pictures:

"[F]or the Navy, Top Gun was more than just a movie. It was a recruitment bonanza.

COMPLAINT AND JURY DEMAND - 26

65.      The Defense Department's relationship to Disney is not a backdrop, and it is not a collateral matter. The United States government has gone to great lengths to bring the vaccine to the whole United States citizenry. A relationship as strong and intertwined as that between the Defense Department and Disney, who owns 80% of ESPN, qualifies Defendants for treatment as a state actor.[22]

---

Military recruiting stations were set up outside movie theaters, catching wannabe flyboys hopped up on adrenaline and vibes. Others enlisted on their own. Interest in the armed forces, primarily the Navy and the Air Force, rose that year, though it's unclear just how much. Naval aviator applications were claimed to have increased by a staggering 500 percent."

Alissa Wilkinson, *The long, long, twisty affair between the US military and Hollywood, For the Pentagon, films like Top Gun: Maverick are more than just a movie*, VOX, May 27, 2022, 8:00am EDT, https://www.vox.com/23141487/top-gun-maverick-us-military-hollywood.

Paramount is one of Disney's competitors. The implied message is that Disney is competing for the Defense Department's favor.

[22] Disney's importance to the government's objective can be seen in the placement of Disney CEO Bob Chapek at Biden's important business meeting with top CEOs, September 15, 2021, one week after announcing the Administration's rules intending to require vaccination or testing for companies with more than 100 employees. Chapek is seated separated from Biden by only Kaiser CEO and council to the president. Access and optics are, of course, important indicators of the existence, extent and importance of joint relationships. *See e.g.*, Christina Wilkie, *Biden touts employer vaccine mandates at meeting with top execs from Microsoft, Walgreens and others*, CNBC, Sep. 15, 2021, 9:47 AM EDT Updated, Wed. SEP 15 20215:27 PM EDT, https://www.cnbc.com/2021/09/15/biden-to-push-vaccine-mandates-in-meeting-with-top-execs-from-microsoft-walgreens-others.html. Noteworthy, in this regard, Kaiser also has extensive ties to the Defense Department, and to Disney and the Defense Department. Henry J. Kaiser, who is the co-founder of Kaiser Permanente, was instrumental in World War II, and is regarded as the father of modern American shipbuilding. Kaiser and Disney worked together significantly with the Defense Department. Kaiser describes the relationship as:

"The historic connections between Kaiser (Kaiser Industries and Kaiser Permanente) and Disney (Walt Disney Studios and Disneyland) are longer than the bobsled ride down the iconic Matterhorn.

COMPLAINT AND JURY DEMAND - 27

66.     The policies and procedures are being dictated and implemented based on this overarching relationship.[23] CEO Bob Chapek's presence at the Biden Administration's business summit reflects the active involvement of the highest level of management.[24]

67.     Additional management at Disney came directly from the Biden Administration, and from the Biden Administration's vaccine effort. For example, Kristina Schake, who headed the Covid-19 vaccine education campaign of the Biden Administration, was selected by Disney as its new executive vice president of global communications. Disney's own website refers to her

_____

During World War II, when Henry J. Kaiser was building hundreds of ships for the war effort, Walt Disney Studios was producing posters for the War Manpower Commission encouraging home front workers to be productive."

Kaiser Permanente, *Kaiser and Disney — spreading fun and health since World War II*, ABOUT.KAISERPERMANENTE.ORG, Jan. 3, 2017, https://about.kaiserpermanente.org/who-we-are/our-history/kaiser-and-disney-spreading-fun-and-health-since-world-war-ii (last visited Jan. 6, 2023).



President Joe Biden meets with CEOs at the Eisenhower Executive Office building at the White House complex.
(Photo by Oliver Contreras/Sipa USA)(Sipa via AP Images)

Photo credit: *Id*. The optics and the reality is this is a war effort, a government business joint action.
[23] It is one thing to work together to build ships and put out encouraging posters during war time, it's another to work together using the same tactics to force inoculations to the point of denying a religious exemption.
[24] *Id*.

COMPLAINT AND JURY DEMAND - 28

as "working at the *nexus* of government, media, business, entertainment, and technology."[25]

(emphasis added). The close nexus continues, of course, when she works on the private side of

the house. Disney describes Schake's important role, noting she is "responsible for Disney's

worldwide communications strategy and operations, and serves as lead spokesperson for the

Company."[26] The close nexus also includes Disney's naming of former Pentagon Press Secretary

Geoff Morrell, "to the newly created position of chief corporate affairs officer, overseeing

corporate communications, government relations and global public policy."[27]

68.     The vaccine policy was set at a level of management where this Defense

_____

[25] The Walt Disney Company, https://thewaltdisneycompany.com/leaders/kristina-schake/.
[26] Schake's government involvement is not insignificant:

> "Prior to joining Disney in April 2022, Ms. Schake spent three decades working at the nexus of government, media, business, entertainment, and technology. Most recently, she was appointed by President Biden to lead the nationwide COVID-19 vaccine campaign, managing the federal government's $1 billion national public education initiative. Prior to that, Ms. Schake was Global Communications Director for Instagram, where she served as a primary advisor to the company's founder and CEO, and oversaw the communications and digital divisions in North America, Latin America, Europe and Asia.

> Ms. Schake has served at the highest levels of government, as Communications Director for First Lady Michelle Obama and Deputy Communications Director for Secretary Hillary Clinton's 2016 presidential campaign. Previously, she spent several years as the senior communications strategist for California First Lady Maria Shriver, the California Women's Conference, and the California Endowment's Building Healthy Communities Initiative. Additionally, Ms. Schake co-founded the American Foundation for Equal Rights, which led the successful bipartisan public awareness campaign and legal challenge to restore marriage equality in California. She began her career as a speechwriter for Los Angeles Mayor Richard J. Riordan."

*Id.*
[27] Dawn Chmielewski, *Disney names former Pentagon press secretary as corporate affairs head*, REUTERS, Dec. 7, 20212:43 PM EST. https://www.reuters.com/business/media-telecom/disney-names-former-pentagon-press-secretary-corporate-affairs-head-2021-12-07/.

COMPLAINT AND JURY DEMAND - 29

Department relationship was an integral part of all decision making. More broadly, the government was an integral part of decision making as pertains to the vaccine. The very same day that the Biden Administration "called on leaders in the private and public sector to implement vaccine requirements, saying it will push millions more Americans to get vaccinated," [28] Bob Chapek responded to Biden's call. Biden had stated, or ordered, "If you're a business leader, a nonprofit leader, a state or local leader, who has been waiting for full FDA approval to require vaccinations, I call on you now to do that. Require it,"[29] Chapek, on Jim Cramer's Mad Money that very day stepped up, and Cramer noted something already making the rounds.

> "Cramer: I understand that you have a very tough policy on vaccinations."[30]

Apparently, word was getting around in the media industry. Cramer mentioned another CEO's requirement, and then repeated:

> "Frankly, I'm hearing you are being *very*, *very* adamant on vaccinations."[31]

Chapek replied by noting that, "We have about a quarter of a million cast members that we'd

---

[28] Kate Sullivan, CNN, *Biden encourages Americans who have been waiting for full FDA approval to get their Covid vaccination: 'Get it today'*, Aug. 23, 2021, CNN, https://www.cnn.com/2021/08/23/politics/biden-fda-approval-covid-remarks/index.html.
[29] *Id*.
[30] Sarah Whitten, *Disney World reaches deal with unions to require Covid-19 vaccinations for unionized employees*, CNBC, Aug. 23, 2021, https://www.cnbc.com/2021/08/23/disney-world-to-require-covid-19-vaccinations-for-unionized-employees-.html.
[31] *Id*.

COMPLAINT AND JURY DEMAND - 30

love to see vaccinated."[32] He clearly is including all of Disney's employees, including ESPN employees, as that would be the top number of employees Disney had. If Disney's Chapek wanted to send a message to all employees, subsidiaries and divisions included, using the top end number would be the way to do it. Notably, Disney regarded its Connecticut operations as significant. It features, in its 2021 Annual Financial Report, Connecticut as one of only three centers it set up nationwide, as part of its Covid-19 policy, noting that it: "Provided the ability for our employees to get vaccinated by offering on-site distribution in California, Florida, and Connecticut."[33]

69.    ESPN's spokesperson Mike Soltys stated publicly that the Disney vaccine policy applies to ESPN employees.[34]

70.    The idea of questioning the interaction between government, particularly, the Defense Department, and the entertainment industry is not a novel or even outside the mainstream exercise: the relationship is frequently reported and questioned.[35] There are clearly

_____

[32] *Id*.

[33] The Walt Disney Company, *2021 Annual Financial Report*, 5 (2021) https://www.sec.gov/Archives/edgar/data/1744489/000174448921000220/dis-20211002.htm.

[34] *See* Justin Muszynski, *ESPN employees included in decision by Walt Disney Co. to mandate covid-19 vaccine*, The Bristol Press, Aug. 2, 2021, http://www.bristolpress.com/BP-Bristol+News/394140/espn-employees-included-in-decision-by-walt-disney-co-to-mandate-covid19-vaccine.

[35] As an example, The Guardian notes:

    "Marvel and Disney's long histories of collaborating with the US government, in particular the FBI and the Pentagon, to create propaganda – in exchange for military equipment, location access and consultation – is reason for concern."

cases that fall outside of the intertwined nature that exists between Disney and the Defense Department. However, when the nature is intertwined, and there is a "close nexus" between the state and the action in question then the state action doctrine is applicable.

71.     To be clear, bias is at issue with both the portrayal of the military by Disney for symbiotic gain and also with the vaccination uptake for symbiotic gain.

72.     In April 2022, the Department of Defense announced it would be holding the Defense Department Warrior Games at the ESPN Wide World of Sports Complex at Walt Disney World Resort. In August 2022, it was the first time the event was ever held there since the inception of the Games in 2010. The event was scheduled to be held at the ESPN Disney Complex in 2021, but the 2021 event was cancelled due to Covid-19 restrictions. The timing of the grant of the Games to the Disney venue is not insignificant in light of the relationship

---

Akin Olla, *Is WandaVision ... Pentagon propaganda?*, THE GUARDIAN, Mar. 9, 2021 06.15 EST, https://www.theguardian.com/commentisfree/2021/mar/09/wandavision-pentagon-propaganda-marvel-disney-fbi.

The bias is apparent. For instance, Harper's editor Lewis Lapham describes the Pentagon's preference for positive treatment:

> "'ABC News reporters were not able to go anywhere near the war in Afghanistan,' Lapham said with some exaggeration, but ABC's parent, the Walt Disney Co., hired Hollywood producer Jerry Bruckheimer to make a 13-part series on the war 'with the full cooperation of the Pentagon.'
>
> 'The media always wants to reduce it to a fairy tale,' he said. 'You can't tell the difference between the war in Afghanistan and "The Fellowship of the Ring." Even the names are similar.'"

Dan Fost, *Harper's editor laments rise of corporate news purveyors*, SFGATE, Apr. 24, 2002, https://www.sfgate.com/business/article/Harper-s-editor-laments-rise-of-corporate-news-2847683.php.

COMPLAINT AND JURY DEMAND - 32

between the Defense Department, Disney, ESPN and the vaccine policies.

73.    There is no dispute that the Defense Department was looking to partner with private business in its effort to vaccinate. At what point does partnership go beyond independent entities working voluntarily toward a shared mission to entwinement, such that they can be considered a state actor: The answer is clear, when there are sufficient facts that suggest independence is lost, and that personal career success and the private business' success is dependent upon being in lockstep with the government. The latter is the case here.[36]

74.    The facts show that, additionally, the backdrop is the delegation of a public function to a private enterprise: Disney was entrusted and given a task of responsibility by the government to perform this traditional government function. Disney has over 220,000 employees. While the number of people under its control is not the size of a small state, sitting at

―――――――――――――――――

[36] Cases referring to the criteria of: "significant encouragement, either overt or covert"; "willful participant in joint activity with the State or its agents"; "entwined with governmental policies," and others are cited in the seminal state action case:

> "Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of 'coercive power,' *Blum*, 457 U. S., at 1004, when the State provides 'significant encouragement, either overt or covert,' *ibid.*, or when a private actor operates as a 'willful participant in joint activity with the State or its agents,' *Lugar, supra*, at 941 (internal quotation marks omitted). We have treated a nominally private entity as a state actor when it is controlled by an 'agency of the State,' *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U. S. 230, 231 (1957) (*per curiam*), when it has been delegated a public function by the State, cf., e. g., *West v. Atkins, supra*, at 56; *Edmonson v. Leesville Concrete Co.*, 500 U. S. 614, 627-628 (1991), when it is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control,' *Evans v. Newton*, 382 U. S. 296, 299, 301 (1966)."

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 296 (2000).

COMPLAINT AND JURY DEMAND - 33

just under one half of the smallest state Wyoming, its reach is far broader. Its revenue is, of course, far greater than that of the government of Wyoming, which has just over $10 billion in revenue. Disney's revenue for 2022 was $82.72 billion[37] making it larger than 47 of the 50 United States, ranking it third behind only California and New York. (Everything's bigger in Texas – except Disney revenue, just beating it out, and the revenue of California and New York.). It's no wonder that the federal government turns to a behemoth like Disney, with long established ties to the Defense Department to delegate this public function.[38] And, is Disney what it is today because it turns to the government since its inception, jointly working together to create a real magic kingdom with the power of government - and a palace, to boot.[39]

75.     Whether little governments and kingdoms on earth - with policies and procedures of little kingdoms and big governments - or fantasy worlds in the movies featuring military heroes, Disney is entwined with the military and the Defense Department.

76.     The creator of Marvel Comics, and ultimately the Disney blockbuster movie series, began his career writing for the military, a common path to comic book and film success.

_____

[37] companiesmarketcap.com, *Revenue for Walt Disney (DIS),* https://companiesmarketcap.com/walt-disney/revenue/#:~:text=According%20to%20Walt%20Disney's%20latest,sale%20of%20goods%20or%20services (last visited Jan. 6, 2023).
[38] The importance of the activity being a traditional public function is discussed in *Brentwood Academy. See Brentwood Academy, supra* note 36.
[39] This point is apart from the point that The Walt Disney Company, by virtue of its total control and ownership over Florida public entity and governmental agency, the Reedy Creek Improvement District (RCID), a special governing district, is also state agency.

COMPLAINT AND JURY DEMAND - 34

Stan Lee, born Stanley Martin Lieber, joined the United States Army in early 1942 as a member of the Signal Corps, which is the department responsible for the Army's entire systems of communications. He began there repairing telegraph poles and other military communications equipment. After being transferred to the Training Film Division, he wrote for the military, mostly manuals, training films, and slogans, along with some occasional cartooning. He was given the title "playwright." a rare title in the U.S. Army. This led to his ultimate success in essentially launching the largest comic book series in United States history. Making its blockbuster debut for Disney - just in time for the run up to World War 3?[40]

_____

[40] This is a serious point. Not hyperbole. Major news outlets are reporting just how close we may be to World War III. For example, senior political reporter for the Washington Post, Aaron Blake made this point about the Biden Administration's attempts to ensure the public that the U.S. does not have any interest in letting its involvement in Ukraine escalate to World War III:

> "Of course, to make that point, you must continually reinforce that this is a possibility that's real enough to be talking about in the first place. When asked about Biden's comments on the risk of World War III by NBC News on Wednesday, Zelensky didn't disagree — but instead suggested perhaps it's unavoidable or has already begun.

> 'Nobody knows whether it may have already started,' Zelensky said, 'and what is the possibility of this war if Ukraine will fall?'

> And it also means that any such actions you might later feel compelled to take — no matter how hard you try to rule them out now — will be difficult to play off as anything less than indicative of that kind of historic escalation."

Aaron Blake, *Why Biden and the White House keep talking about World War III*, WASHINGTON POST, Mar. 17, 2022 at 4:57 p.m. EDT https://www.washingtonpost.com/politics/2022/03/17/why-biden-white-house-keep-talking-about-world-war-iii/; *see also, e.g.*, Niall Ferguson, *Op-Ed, All Is Not Quiet on the Eastern Front, 2022 was the year in which war made a comeback. But Cold War II could become World War III in 2023 — with China as the arsenal of autocracy*, BLOOMBERG, Jan. 1, 2023 at 12:00 AM EST., https://www.bloomberg.com/opinion/articles/2023-01-01/victory-over-russia-in-ukraine-may-bring-world-war-3-niall-ferguson; Susan B. Glasser, *What if We're Already Fighting the Third World War with Russia? Putin's latest provocations once again put Washington in an awful*

COMPLAINT AND JURY DEMAND - 35

77.    Co-Chair of Disney Media Networks and ESPN's Chairman James Pitaro's wife, actress Jean Louisa Kelly, was awarded a significant acting role[41] in the 2022 blockbuster movie *Top Gun: Maverick*. Though the movie was a Paramount Pictures release, Disney's team was not without a reward and stake in the success of the movie. The movie was one of only six that grossed over $700 million in North America alone, grossing $1.5 billion worldwide, as of December 1, 2022, making it the number one all time grossing movies worldwide. The military involvement in the Top Gun sequel was significant to say the least, and dated back to 2018.

78.    Another Disney Defense Department entwinement, the Chairman and former CEO of Marvel Entertainment and one of the largest shareholders of Disney, Isaac Perlmutter, a veteran of the Six-Day War in 1967,[42] went on to be investigated by Congress[43] in 2021 for being allegedly a shadow head of the Department of Veteran Affairs during the Trump Administration.[44] Perlmutter and two others were involved in "all manner of policy and

———————————————

*bind.*, THE NEW YORKER, Sept. 29, 2022; Maura Reynolds, *'Yes, He Would': Fiona Hill on Putin and Nukes, Putin is trying to take down the entire world order, the veteran Russia watcher said in an interview. But there are ways even ordinary Americans can fight back.*, POLITICO, Feb. 28, 2022 01:45 PM EST (noting former NSA Advisor Fiona Hill stated, "We are already … in the middle of a third World War, whether we've fully grasped it or not.")
[41] Iceman's wife.
[42] Forbes Profile, *Isaac Perlmutter, Chairman, Marvel Entertainment*, https://www.forbes.com/profile/isaac-perlmutter/?sh=47583df56caf (last updated Jan. 6, 2023).
[43] Kevin Breuninger, Marvel Entertainment chairman, others accused of breaking law in Veterans Affairs scheme under Trump, CNBC Sep. 27, 2021, 11:41 AM EDT, Updated Sep. 28, 2019 9:06 AM, https://www.cnbc.com/2021/09/27/marvel-chairman-accused-of-breaking-law-in-va-scheme-under-trump.html
[44] Isaac Arnsdorf , *Inside Trump's VA, The Shadow Rulers of the VA, How Marvel Entertainment chairman Ike Perlmutter and two other Mar-a-Lago cronies are secretly shaping the Trump administration's veterans policies*, Aug. 7, 2018, 6:29 p.m. EDT, https://www.propublica.org/article/ike-perlmutter-bruce-moskowitz-marc-sherman-shadow-rulers-of-the-va.

COMPLAINT AND JURY DEMAND - 36

personnel decisions."[45] Among the reported events: "Perlmutter convened a series of conference calls with executives at Johnson & Johnson, leading to the development of a public awareness campaign about veteran suicide."[46] Perlmutter later appeared with executives from Disney who "joined Johnson & Johnson as sponsors of the Veterans Day event at the stock exchange. [Former VA secretary David] Shulkin rang the closing bell standing near a preening and flexing Captain America, with Spider-Man waving from the trading pit, and Marvel swag distributed to some of the attendees. 'Generally the VA secretary or defense secretary don't shill for companies,' the leader of a veterans advocacy group said."[47]

79.     As crazy as it may seem, when the dividing lines between government and business become so blurred, when the distinctions become so muddled, the divisions erased, it is likely not because "it just happens" or "it's no big deal," but rather because it's by design: cross-sector social interactions is a thing. It is a real thing. The Disney Defense Department interaction meets the definition of a cross-sector partnership. Professors Clarke and Crane state the reality: "Cross-sector partnerships—by which we mean relatively intensive, long-term interactions between organizations from at least two sectors (business, government, and/or civil society) aimed at addressing a social or environmental problem—are now a fixture in management

_____

[45] *Id*.
[46] *Id*.
[47] *Id*.

COMPLAINT AND JURY DEMAND - 37

research and practice."[48] Not everyone of them results in the performance of a public function by a private entity, but when one does, as is the case here, it warrants treatment of the private business as a state actor.

80.    As the noted social scientist, communications expert, and consultant to the U.S. government Harold Lasswell explained in a 1927 publication entitled *Propaganda Technique in the World War*:

> During the war-period, it came to be recognized that the mobilization of men and means was not sufficient; there must be a mobilization of opinion. Power over opinion, as over life and property, passed into official hands. Indeed, there is no question but that government management of opinion is the unescapable corollary of large-scale modern war. The only question is the degree to which the government should try to conduct its propaganda secretly.[49]

81.    After all, a one page dictate to 220,000 people doesn't simply engender nearly 100%[50] obedience without an effort to shape opinion. A massive effort. The kind of effort that

_____

[48] Clarke, A. and Crane A., *Cross-Sector Partnerships for Systemic Change: Systematized Literature Review and Agenda for Further Research*, J BUS ETHICS 150, 303–313 (2018). https://doi.org/10.1007/s10551-018-3922-2.
[49] Harold Lasswell, *Propaganda technique in the world war,* 14-15 (2013).
[50] The number of ESPN employees who took the vaccine is unknown, however the major professional sports associations have been very public in reporting their extraordinary uptakes. *See e.g.,*

> "Around 67% of eligible Americans are fully vaccinated, according to the Centers for Disease Control and Prevention. Meanwhile, leagues such as the NBA, NFL and MLS have rates greater than 90%, with the NHL and WNBA at over 99%."

Meredith Deliso, *How professional sports leagues got most players vaccinated -- without mandates, A small number of holdouts have made headlines for not getting the shot.* ABC NEWS, Oct. 21, 2021, 5:48 AM, https://abcnews.go.com/Sports/professional-sports-leagues-players-vaccinated-mandates/story?id=80668945.

requires government and private business entwinement.

82.   The September 9, 2021 termination of Beth Faber, exactly on, and of Allison Williams shortly after, the date of President Biden's announcement of a business mandate, are more than just symbolic, they are part of a very orchestrated and choreographed partnership

_____

**Health Care Workers Have the Highest Vaccination Rate**



Latest survey conducted between Dec. 6 and 12, 2022, among 27,450 U.S. adults, with a margin of error of +/-0.6%.
Figures may not add up to 100% due to rounding

Of course, funding for professional sports comes from the leaders in the communications industry, leaders such as ESPN and ABC Sports owned by Disney. For example, ESPN reportedly pays to the NBA $2.6 billion per year. "This nearly triples what the NBA currently makes off of TV and digital rights." KPCC, *New NBA TV deal is a cash injection for league and players,* Jun. 8, 2014, https://www.kpcc.org/show/take-two/2014-10-07/new-nba-tv-deal-is-a-cash-injection-for-league-and-players. There is obviously a ripple effect with the influence of the government relationship on Disney and ESPN flowing to the sports leagues that depend upon them. The Disney/ESPN clout with and influence over the NBA was increased during the Covid-19 pandemic. Disney/ESPN teamed up with the NBA, of course, to bring the playoffs to "the Bubble" as it was called, where the NBA held the final regular season games and playoffs of the 2020-2021 season, utilizing the ESPN Wide World of Sports Complex at Walt Disney World for games and Disney hotels for the players to stay.

COMPLAINT AND JURY DEMAND - 39

between government and business – nowhere did the Biden Administration say that exemptions would not be granted, nor that they would be disfavored, though nowhere did the Biden Administration extend such assurances to people such as Beth Faber and Allison Williams that they would not be wrongfully ousted or that there would be severe penalties for such egregious behavior on the part of private businesses that discriminate.[51]

83.     If you, as the government, are going to dole out such fabulous rewards to unique agents, such as Disney, you most certainly must also dole out significant protections to individuals against medical and religious discrimination, or you leave your private partners in the position of being exposed to treatment as a state actor.

84.     Defendants erred in their zeal to be the shining star of the government's arsenal to implement vaccine mandates by going too far. As merely one example of the pervasive insensitivity of the rights of individuals to seek religious and medical exemptions, endorsed by Defendants', ESPN's top pundit, Steven A. Smith, paid $12 million per year, engaged in a public debate with LeBron James, who Smith trips over himself to praise, except for James's unwillingness to disclose whether he was vaccinated, in May 2021. Interviewed on CNN, by Don Lemon, Smith was careful not to say James should get vaccinated – Lemon did that work

_____

[51] *See supra* note 10.

COMPLAINT AND JURY DEMAND - 40

for him, as they double-teamed against James.[52] Smith kept his criticism to the fact that James

would not say whether he was or wasn't and to minimizing any legitimate opposition that might

exist in the world.[53] From every angle, whether the executives, the management staff, the highest

---

[52] CNN, Stephen A. Smith criticizes LeBron James' vaccination comments, see, CNN, *Stephen A. Smith criticizes LeBron James' vaccination comments,* May 25, 2021, https://www.youtube.com/watch?v=aQNUPzfvSMo.

Smith also acknowledges that "optics matter" in his aggressive campaign to influence people to take the vaccine. Smith made the point, stating "optics matter," as he chided NBA superstar LeBron James, who is normally outspoken on issues, for James's not sharing his vaccination status when asked. Smith certainly wasn't saying in this segment James should come out and say he was not vaccinated, and to express some legitimate reason, such as a religious exemption – no mention whatsoever that there might be a legitimate reason for not taking the vaccine. Smith's tone and everything about the segment acted as if there could be no good reason for opposing the vaccine. Shaping the optics, shaping the way things look, was a massive part of delivering on the Defense Department's objectives.

[53] Smith later, January 18, 2022, shares his Covid-19 brush with death, a story that shares the horrors of Covid-19 but also serves to continue to advance the narrative "take the vaccine":

> "I had 103 degree fever every night. Woke up with chills and pool of sweat. Headaches were massive, coughing profusely and it got to a point, that right before New Year's Eve, I was in the hospital New Year's Eve into New Year's Day, that's how I brought in the new year. And they told me, had I not been vaccinated, I wouldn't be here. That's how bad I was."

New York Post Sports, Stephen A. Smith details scary COVID-19 battle | New York Post, Jan. 18, 2022, https://www.youtube.com/watch?v=2ESLGQ2t0Xk.

Note, Smith does acknowledge publicly, October 13, 2021, "You do have a right not to take the vaccine… everybody has the right to take it or not take it …," in the context of a discussion where he concludes about Kyrie Irving, who didn't take the vaccine, "to me he's being selfish." ESPN, *Stephen A. questions Kyrie Irving's stance on the vaccine mandate | First Take*, Oct. 13, 2021, https://www.youtube.com/watch?v=eh7d1r63-2A.

Smith becomes the ESPN spokesperson taking on those who oppose the vaccination. Rarely did he discuss the issue of religious or medical objection. When he did, he apologized, as when he mistakenly said that Jehovah's Witnesses were anti-vaccine while discussing Andrew Wiggins, who initially opposed the vaccination. *See, e.g.,* Lindsey Ellefson, *ESPN's Stephen A. Smith Apologizes to Jehovah's Witnesses For Falsely Suggesting They Are Anti-Vax; Smith suggested a basketball player was hesitant to get the jab because of his religion*, THE WRAP, Feb. 3, 2022, 10:06 AM, https://www.thewrap.com/espn-stephen-a-smith-jehovahs-witnesses-apology/. The silence was deafening as to his views on those who rightfully oppose on the grounds of religion.

COMPLAINT AND JURY DEMAND - 41

paid pundit, it was a full court press, backed by the strength of the U.S. Defense Department on

its Operation Warp Speed mission – a mission that engulfed, not only entwined the private

company Disney, but engulfed it.[54]

_____

[54] Not all of the blurring of the lines between what the government does and what the private entity does crosses into state action. For instance, it is natural that there will be some overlap in the use of resources. As an example, Danny Hillis, who invented one of the world's first supercomputers (by inventing parallel processing) and had the Defense Advanced Research Projects Agency (DARPA) as his first customer later went on to work for Disney. Disney created a brand-new position for him in 1996, Disney Fellow, and Vice President, Research and Development, at Disney's Imagineering. Disney, like the Defense Department, needs and uses supercomputers for the vast amount of data they manipulate. Moreover, they recognized Hillis as a key resource. "'Integration of science and technology as part of our creative process has always been a key element in creating the Disney magic,' said Michael D. Eisner, Disney's chairman and CEO" in announcing Hillis's joining Disney. HPCwire, *Danny Hillis Named First Member of Disney Fellows Program*, May 17, 1996, https://www.hpcwire.com/1996/05/17/danny-hillis-named-first-member-of-disney-fellows-program/.

Disney, as Hillis tells the story, of how and why he went to Disney, was lucky to have him available as he was looking for some downtime with his young children. Hillis went on to work for Disney for five years, and then years later, after leading-edge technology work, was appointed by Secretary of Defense Ash Carter to the Defense Department's Innovation Board. U.S. Department of Defense, Secretary Carter Names Additional Members of Defense Innovation Advisory Board, Jul. 26, 2016, https://www.defense.gov/News/Releases/Release/Article/857710/secretary-carter-names-additional-members-of-defense-innovation-advisory-board/.

It's natural that business and government will overlap in their needs and use of resources. Hillis, who went to MIT as an undergraduate, and developed software for children, also later, as a graduate student at MIT Computer Science and Artificial Intelligence Laboratory, designed both "tendon-controlled robot arms" and a "touch-sensitive robot skin." *See e.g.*, W. Daniel Hillis, *A High-Resolution Imaging Touch Sensor*, Volume 1, Issue 2, Jul. 2, 2016. https://doi.org/10.1177/027836498200100202.

One curious overlap between the pandemic-related PCR test and Hillis's work is referred to in a 2010 TEDMED Talk he does in which he refers to the PCR technology, and its inventor, Kary Mullis, in regards to the PCR test's value for cancer research. TEDMED, *Danny Hillis at TEDMED 2010*, https://www.youtube.com/watch?v=J85O5F7dVuU. The PCR test became the most widely used test during the Covid-19 pandemic for detecting Covid-19. Apparently, Hillis's work spans robotics, Artificial intelligence, computer programing, software and hardware design, supercomputing and genetics.

Hillis co-founded "Applied Proteomics, a company designed to help map proteins within the human body and determine their interactions with cancerous cells and vice versa." Of Hillis's company and work, Datanami, a data science news outlet, explains:

COMPLAINT AND JURY DEMAND - 42

85.     To fully appreciate the entwinement, it's helpful to recognize the connection between Disney Imagineering and the Defense Department. This LA Times article sums it up:

> "Disney Research Chief Joins U.S. Spy Agency
>
> Eric Haseltine is moving from one top secret organization to another.
>
> Walt Disney Co.'s chief of research and development is leaving to become head of research for the National Security Agency, which uses sophisticated technology to gather intelligence, break codes and protect sensitive government information systems.
>
> Haseltine worked for a decade at Walt Disney Imagineering, the company's design and development group. As such, he would seem an unlikely choice for his new government mission. But the worlds of the NSA and Disney Imagineering aren't so dissimilar. Both include a diverse group of top-level scientists and share

---

"It is tough for computers—even those equipped to handle big data—to get their servers around proteins. Sequencing DNA is relatively easy because it operates on a similar foundation to computers—there are four nucleic acids repeating themselves in a random pattern much like information codes itself through ones and zeros.

On the other hand, proteins throw a wrench in this model due to a process known as protein folding. In its mRNA form, each protein exists in an identically shaped strand, just as two unique pieces of DNA would."

The article goes on to explain Hillis's work with mRNA. Ian Armas Foster, *Proteomic Research Unfurls Cancer Conundrum*, Jan. 8, 2013, https://www.datanami.com/2013/01/08/proteomic_research_unfurls_cancer_conundrum/.

The work of Hillis, of course, relates to the mRNA technology of the vaccine. When one recognizes this relationship, one must question whether this too reflects an entwinement. Disney's original fellow works at the forefront of the development of mRNA technology. Is Disney's super-vaccine-vigilance based on its personal sympathies toward the vaccine and its benefits or is it based on deeper connections to the government? Hillis's company, of course, is at the forefront of this area of research and development. "The Applied Proteogenomics OrganizationaL Learning and Outcomes (APOLLO) network is a collaboration between NCI, the Department of Defense (DoD), and the Department of Veterans Affairs (VA) to incorporate proteogenomics into patient care as a way of looking beyond the genome, to the activity and expression of the proteins that the genome encodes." Apollo Network, https://proteomics.cancer.gov/programs/apollo-network. Hillis's work which partners with the government seems distant from his work with Disney, and Disney's vaccine mandate, on one level. On another level, they are operating on two very related frontiers, or in Defense Department parlance, fronts.

COMPLAINT AND JURY DEMAND - 43

a penchant for security and secrecy (Disney won't say how many scientists it employs)."[55]

86.      Perhaps we stop thinking of Disney as a Mickey Mouse operation and start recognizing it as a massive operation entwined and intertwined with the military and Defense Department, highly relevant to its treatment of the vaccine mandate and those who sought exemptions.[56]

_____

[55] Richard Verrier, *Disney Research Chief Joins U.S. Spy Agency*, L.A. TIMES, Jul. 17, 2002 12 AM PT. The point made in this article we can take in conjunction with the point made in *supra* note 54. Taking them together, it's also worth noting that Danny Hillis's co-founder of Applied Proteomics, David Agus, M.D. became a CBS contributor in May 2013. During the Covid-19 pandemic he has been a strong advocate of the vaccine. CBS notes: "Dr. Agus is an international pioneer in biomedical research and healthcare technologies, and he's considered one of the world's leading physicians. He's also the New York Times and international best-selling author of 'The End of Illness,' 'A Short Guide to a Long Life,' and 'The Lucky Years: *How to Thrive in the Brave New World of Health*.'" CBS News Team, David Agus, M.D. Feb. 14, 2017 12:18 PM, https://www.cbsnews.com/team/dr-david-agus/. Based on what we know about Eric Haseltine, who worked closely with David Hillis at Disney, we can safely say there is much more than meets the eye to David Hillis's role, as described in *supra* note 54, with Disney and the Defense Department. As we can see from what we know about Haseltine, Hillis and Agus, their work is closely tied to the government's Covid-19 vaccine initiative (the Defense Department's Operation Warp Speed) and they have a solid history with Disney.

[56] As another example, CSR Monitor reports about the top-secret National Counter Terrorism Center:

"The Central Intelligence Agency, the Defense Department, the Federal Bureau of Investigation, and 15 other federal agencies funnel information through the center. The data include government briefings, satellite photos, classified cables, phone conversations, even gossip and routine threats – tens of thousands of potential intelligence bits a day. Most of it is nonsense, called 'noise' by the spies. But somewhere, amid all the chatter, there's the occasional 'signal' – something of import or interest. And when they find it, the NCTC thrums to life."

Of Disney's role in the National Counter Terrorism Center, it reports the following:

"Later in the tour, Louise Lief, the deputy director of the International Reporting Project at Johns Hopkins University's School of Advanced International Studies, which organized our visit, asked the question we all really wanted to know: Did Disney really help design the center?

'We don't discuss our contractual relationships,' said Wesley, our latest tour guide. (For security's sake, he asked that his last name not be used. Turns out, even his neighbors don't know what he does.) Even so, a

COMPLAINT AND JURY DEMAND - 44

## AS AND FOR A FIRST CAUSE OF ACTION
### (Religious Discrimination - Title VII)

87.     Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

88.     Plaintiffs are protected under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e- 2 *et seq*.) from discrimination in the workplace based on their religion. The statute provides that it is an unlawful employment practice "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2.

89.     Defendants are Plaintiffs' "employer" under Title VII and falls within the jurisdiction of the statute. The statute provides that "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person. 42 U.S.C. §2000e.

---

quick Google search confirms that, sure enough, Walt Disney "Imagineers" were tapped to help configure the operations center, presumably because they know something about building workspaces that foster creativity and man-machine interaction, not because of their expertise with Snow White."

Alexandra Marks, *Spending a day at the National Counter Terrorism Center; Reporters tour the secret intelligence agency and find computers, intense security, and a touch of Walt Disney*, THE CHRISTIAN SCIENCE MONITOR, Jun. 13, 2007.

COMPLAINT AND JURY DEMAND - 45

90.     As further described herein, Plaintiffs were subjected to discrimination from Defendants based on their religious beliefs.

91.     Plaintiffs were qualified for their positions.

92.     Plaintiffs suffered adverse action by being terminated from their employment due to their religious beliefs.

93.     Defendants failed to reasonably accommodate Plaintiffs' religious beliefs, as required by law, and terminated Plaintiffs under circumstances that were discriminatory in nature.

94.     Due to Defendants' willful violations of Title VII, Plaintiffs were damaged and are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

95.     WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.


**AS AND FOR A SECOND CAUSE OF ACTION**
**(Hostile Work Environment based on Religion – Title VII)**

96.     Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

97.     Plaintiffs are protected by Title VII from harassment based on their religion in their workplace. 42 U.S.C. §2000e-2.

COMPLAINT AND JURY DEMAND - 46

98.     Defendants are Plaintiffs' employer pursuant to Title VII.

99.     Plaintiffs were subject to harassment based on their religion from Defendants, which subjected them to terms and conditions of their employment that were different from those of persons of different religions and which ultimately led to their termination. This harassment was pervasive, chronic and severe and constitutes a hostile workplace.

100.    The hostile environment includes significantly that on June 30, 2021, after Plaintiff Williams surfaced the deprecating comment by Walden, coaxing Plaintiff to leave for a new opportunity (see paragraph 12), Walden responded in email hostilely by snidely and threateningly soliciting not Faber's objection and support for Faber's sincerity but rather the name of her parish representative so Walden could "discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view." (emphasis added).

101.    Plaintiffs were qualified to perform their duties as described herein.

102.    Due to Defendants' willful violations of Title VII, Plaintiffs were damaged and are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

103.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A THIRD CAUSE OF ACTION

COMPLAINT AND JURY DEMAND - 47

**(Retaliation - Title VII)**

104.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

105.    On June 30, 2021, after Williams surfaced the diminishing comment by Walden, coaxing her to leave for a new opportunity (see paragraph 14), Walden retaliated by snidely soliciting not Faber's objection and support for Faber's sincerity but rather the name of her parish representative so Walden could "discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view."

106.    Further, retaliation can be inferred from the Defendants' failure to reverse their baseless policy during the 2021-2022 season, from their continued penalization of Faber and Williams even after they had actual knowledge that there was no valid reason to do so, from their failure to reinstate Plaintiffs for the 2021-2022 season (*after* the government's inoculation mandate was lifted), and from all affirmative adverse employment actions that occurred after the "vaccine" mandate became moot. This includes Faber's termination on September 9, 2021 and Williams's termination on October 19, 2021.

107.    42 U.S.C. 2000e-3(a) makes it unlawful for any person to retaliate against an employee who has opposed a discriminatory practice. Under 42 U.S.C. § 2000e-3: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

COMPLAINT AND JURY DEMAND - 48

this subchapter."

108.   Defendants impermissibly took adverse employment against Plaintiffs, including wrongfully terminating them, denying them of financial compensation, and in the case of Williams, pursuant to a contract, and intentionally harming their relationship in their industry, because they complained about the discrimination they suffered based on their religious beliefs, a protective activity.

109.   Defendants' actions constitute unlawful retaliation in violation of Title VII.

110.   Defendants lacked any justification for the adverse employment actions taken against Plaintiffs, and said actions were neither based on job-related rational nor consistent with business necessity.

111.   Defendants' discrimination against Plaintiffs was intentional and was performed with malice, willfulness, and reckless indifference to Plaintiffs' protected civil rights.

112.   Any justification offered by Defendants for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

113.   By the aforesaid acts and conduct of Defendants, and each of them, Plaintiffs have been directly and legally caused to suffer actual damages, as set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, reputational damages, past and future medical and counseling expenses to the extent any exist, damages for emotional trauma and distress, interest, and reasonable attorneys' fees and costs of the action pursuant to 42 U.S.C. § 2000e-5(k).

114.   As a result of Defendants' intentional violation of the Title VII rights of Plaintiffs

COMPLAINT AND JURY DEMAND - 49

they suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life, thereby

entitling them to compensatory damages.

115.    The events described here justify an award of punitive damages under Title VII.

116.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as

hereinafter set forth in their prayer for relief.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Discrimination based on Religion - C.G.S. §46a-60b)

117.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding

paragraphs as if fully set forth herein.

118.    Plaintiffs are protected by the CFEPA from discrimination based on their religion

in their workplace.

119.    The statute provides that "It shall be a discriminatory practice in violation of this

section: for an employer, by the employer or the employer's agent, except in the case of a bona

fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from

employment any individual or to discriminate against such individual in compensation or in

terms, conditions or privileges of employment because of the individual's race, color, religious

creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or

past history of mental disability, intellectual disability, learning disability, physical disability,

including, but not limited to, blindness or status as a veteran." C.G.S. §46a-60(b)(1).

120.    Further, CT Gen Stat § 46a-58 (a) provides: It shall be a discriminatory practice in

COMPLAINT AND JURY DEMAND - 50

violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, gender identity or expression, sexual orientation, blindness, mental disability, physical disability or status as a veteran."

121.    Defendants are Plaintiffs' "employer" and have more than one person in their employ.

122.    Plaintiffs were subject to adverse action based on their religion from Defendants, which terminated their employment.

123.    Plaintiffs were qualified for their position.

124.    Defendants failed to reasonably accommodate Plaintiffs' religious beliefs, as required by law and terminated Plaintiffs under circumstances which were discriminatory in nature.

125.    Due to Defendants' willful violations of the C.G.S., Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

126.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A FIFTH CAUSE OF ACTION

COMPLAINT AND JURY DEMAND - 51

**(Hostile Work Environment based on Religion - C.G.S. §46a-60b)**

127.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

128.    Plaintiffs are protected by the CFEPA from harassment based on their religion in their workplace.

129.    Defendants are Plaintiffs' "employer."

130.    Plaintiffs were subject to harassment based on their religion from Defendants, which subjected Plaintiffs to terms and conditions of their employment that were different from those of persons of different religions. This harassment was chronic, pervasive and severe and constituted a hostile workplace for Plaintiffs.

131.    The hostile environment includes significantly that on June 30, 2021, after Plaintiff Williams surfaced the disparaging comment by Walden, coaxing Plaintiff to leave for a new opportunity (see paragraph 14), Walden responded in email hostilely by snidely and threateningly soliciting not Faber's objection and support for Faber's sincerity but rather the name of her parish representative so Walden could "discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view." (emphasis added).

132.    Plaintiffs were qualified to perform their duties as described herein.

133.    Due to Defendants' willful violations of CFEPA, Plaintiffs were damaged and are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

COMPLAINT AND JURY DEMAND - 52

134.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Retaliation based on Religion - C.G.S. §46a-60)**

135.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

136.    At all times herein mentioned, C.G.S. §46a-60b was in full force and effect and was binding on Defendants, as Defendants regularly employed one (1) or more persons.

137.    C.G.S. §46a-60(b)(4) makes it unlawful for any person to retaliate against an employee who has opposed a discriminatory practice.

138.    On June 30, 2021, after Plaintiff Williams surfaced the belittling comment by Walden, coaxing her to leave for a new opportunity (see paragraph 14), Walden retaliated in email by snidely soliciting not Faber's objection and support for Faber's sincerity but rather the name of her parish representative so Walden could "discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view."

139.    Further, retaliation can be inferred from the Defendants' failure to reverse their baseless policy during the 2021-2022 season, from their continued penalization of Faber and Williams even after they had actual knowledge that there was no valid reason to do so, from their failure to reinstate Plaintiffs for the 2021-2022 season (*after* the inoculation mandate was lifted), and from all affirmative adverse employment actions that occurred after the "vaccine" mandate became moot. This includes Faber's termination on September 9, 2021 and Williams's

termination on October 19, 2021.

140.    Defendants impermissibly took adverse employment against Plaintiffs, including wrongfully terminating them, denying them of financial compensation, and in the case of Williams, pursuant to a contract, and intentionally harming their relationship in their industry, because they complained about the discrimination they suffered based on their religious beliefs, a protective activity.

141.    Defendants' actions constitute unlawful retaliation in violation of C.G.S. Section 46a-60(b)(4).

142.    As a result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, both economic and non-economic loss, including, but not limited to: loss of wages, benefits, pension, bonus entitlements, residual payments, deferred compensation, future pecuniary losses, emotional distress, and other compensatory damages.

143.    As outlined above, Defendants purposefully and intentionally retaliated against Plaintiffs based upon their opposition to Defendants' vaccine mandate and denial of their religious exemption requests by taking adverse employment action against them. Plaintiffs are entitled to recover damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary losses caused by Defendants' unlawful retaliation.

144.    Defendants' actions described above were done with malice or a reckless indifference to Plaintiffs' protected rights to be free from retaliation for opposing unlawful employment practices. Due to the willful and malicious nature of the retaliation against

COMPLAINT AND JURY DEMAND - 54

Plaintiffs, they are entitled to an award of punitive damages in an amount sufficient to deter Defendants from engaging in retaliatory conduct in the future.

145.    As a proximate result of the wrongful acts of Defendants, Plaintiffs have suffered and continue to suffer emotional distress, humiliation, mental anguish and embarrassment, as well as the manifestation of physical symptoms as a result of the stress. Plaintiffs are informed and believe and thereupon allege that they will continue to experience said physical and emotional suffering for a period in the future not presently ascertainable, all in an amount subject to proof at the time of trial.

146.    As a proximate result of the wrongful acts of Defendants, Plaintiffs have been forced to hire attorneys to prosecute their claims herein, and have incurred and are expected to continue to incur attorneys' fees and costs in connection therewith. Plaintiffs are entitled to recover attorneys' fees and costs under C.G.S. Section 46a-104.

147.    Plaintiffs are entitled to other such relief as this court deems appropriate.

148.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Disability Discrimination- ADA)

149.    Plaintiff Williams repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

150.    Plaintiff Williams is protected by the ADA from disability discrimination in her

COMPLAINT AND JURY DEMAND - 55

workplace. The ADA specifically provides "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101. It provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112.

151.   Defendants are a "covered entity" pursuant to 42 U.S.C. §12111 that are subject to ADA jurisdiction because they are an "employer" as defined by the ADA, namely "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."

152.   Plaintiff Williams is "disabled" within the meaning of 42 U.S.C. §12102, which defines disability as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

     a.   Plaintiff Williams was to undergo an in vitro fertilization.

     b.   Such would have exposed her unborn baby to risks associated with the untested Covid-19 vaccination.

     c.   Williams had had an adverse reaction to a vaccine when she was 12.

153.   Plaintiff was denied a medical exemption.

154.   Plaintiff was otherwise qualified to perform the essential functions of her job with or without a reasonable accommodation.

COMPLAINT AND JURY DEMAND - 56

155.    Plaintiff opposed the denial of her medical exemption.

156.    Plaintiff suffered adverse action by being terminated from her employment due to her disability.

157.    Defendants failed to reasonably accommodate Plaintiff's disability, as required by law.

158.    Due to Defendants' willful violations of the ADA, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

159.    WHEREFORE, Plaintiff respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.


## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Disability Discrimination - C.G.S. §46a-60(b))

160.    Plaintiff Williams repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

161.    The Defendants' actions are a violation of C.G.S. sec.46a-60(b)(1) and sec.46a-60(b)(4).

162.    As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, reputational damages, damages for emotional trauma and stress, anxiety and loss of the ability to

enjoy life's pleasures and activities.

163.    Plaintiff is seeking damages as a result of Defendants' unlawful conduct.

164.    WHEREFORE, Plaintiff respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.


### AS AND FOR A NINTH CAUSE OF ACTION
**(Violation of Religious Liberty Under the First, Fifth and Fourteenth Amendments Pursuant to 42 USC §1983 - U.S. Constitution)**
**(Free Exercise)**

165.    Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

166.    Defendants, as a state actor, have imposed an unconstitutional burden on Plaintiffs' exercise of religion through their imposition of the vaccine mandate. The burden imposed on Plaintiffs' exercise of religious is substantial, in that the Defendants' mandate *inter alia* affect Plaintiffs' ability to: maintain employment, seek future employment, abide by the principles, beliefs, morals, values, or practices of their religion, ostracizes plaintiffs in society, discriminates against plaintiff because of their religion, and causes other economic and non-pecuniary injuries including the loss of promotional opportunity, benefits and insurance, and causes Plaintiffs to endure mental anguish and emotional distress concerning their ability to abide by their faith and further mental anguish and emotional distress related to fear of physical or mental injury that has been and continues to be directly and proximately caused by the Defendants' mandate.

COMPLAINT AND JURY DEMAND - 58

167.    The mandate is not neutral and is not generally applicable in that it applies inordinately to Disney/ESPN media personnel (See further discussion in the Equal Protection counts below).

168.    Accordingly, the First, Fifth and Fourteenth Amendments require that Defendants compensate them for any and all damages including compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

169.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

### AS AND FOR A TENTH CAUSE OF ACTION

**(Violation of Article I, Section 3 of the Connecticut Constitution)**
**(Free Exercise of Religion)**

170.    Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

171.    Article I, Section III of the Connecticut Constitution states that "the Free Exercise of Religion shall *forever* be allowed in Connecticut." Article I, Section III of the Connecticut Constitution protects the "free exercise" of religion.

172.    The mandate is not neutral and is not generally applicable in that it applies inordinately to Disney/ESPN media personnel (See further discussion in the Equal Protection

counts below).

173.    A law, or government entwinement in a policy, burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny.

174.    A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's interest in a similar way."

175.    Accordingly, where a State, or State Actor, extends discretionary exemptions to a policy, it must grant exemptions for cases of religious hardship or present compelling reasons not to do so.

176.    Defendants' actions, as described herein, including hostility towards religious beliefs, as well as allowing secular exemptions from its policies, while denying religious exemptions, constitute a violation of Connecticut's Free Exercise Clause of Article I, Section III of the Connecticut Constitution.

177.    Defendants do not establish a compelling interest in denying Plaintiff's religious exemptions while granting medical exemptions and allowing other religious exemptions.

178.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
### (Violation of the Religious Freedom and Restoration Act)

179.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

COMPLAINT AND JURY DEMAND - 60

180.    Defendants are a state actor, entwined with the government and doing the work of the federal government.

181.    In 1993, Congress enacted the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb et seq., which provides a statutory right to challenge substantial burdens on religious exercise. See *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. § 2000bb(a)(2). "RFRA was designed to provide very broad protection for religious liberty" and it reaches "far beyond what […] is constitutionally required" by the First Amendment. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). RFRA requires that the federal government provide exceptions or accommodations to people whose religious practices are unduly burdened by federal law or policy. See *Gonzales*, 546 U.S. 418; *Hobby Lobby*, 573 U.S. 682.[57]

_____

[57] The Congressional Research Service issued a CSR Legal Sidebar, prepared for Members of and Committees of Congress, entitled COVID-19 Vaccination Requirements: Potential Constraints on Employer Mandates Under Federal Law, in which it discussed the application of RFRA:

Considerations Under the Religious Freedom Restoration Act and Other Laws

Under the federal laws discussed above, if an employer cannot reasonably accommodate a worker's disability or religious practice, the employer may exclude the employee from the workplace. But before terminating an unvaccinated worker, employers must consider other potential employee protections.

The Religious Freedom Restoration Act (RFRA) prohibits the federal government and other covered entities like the District of Columbia and Puerto Rico from "substantially burden[ing]" a person's exercise of religion except in limited circumstances. RFRA authorizes a person "whose

COMPLAINT AND JURY DEMAND - 61

1

2

182.    RFRA provides that the federal government may not "substantially burden a

3

_____

4

5

6

religious exercise has been burdened in violation" of the statute to sue the government. In such an
action, the government may need to show that the burden imposed furthers a "compelling
governmental interest" and is "the least restrictive means" of furthering that interest. RFRA's
standard is thus more rigorous than Title VII's religious accommodation standard, for which the
touchstone is reasonableness. (RFRA also provides more robust protections from application of
facially neutral laws and policies than the First Amendment's Free Exercise Clause, which the
Supreme Court has construed as not normally providing a basis for noncompliance with generally
applicable laws and policies. However, the scope of that Clause's protections is currently the
subject of a pending Supreme Court case.) Many states have adopted their own versions of RFRA.

RFRA could apply in the context of workplace COVID-19 vaccination in two ways. First, if the
federal government or a covered entity as a regulator passes a law or adopts a rule mandating
vaccination for certain public or private employees, employees with religious objections may have
a cause of action Congressional Research Service 6 against the government under RFRA. (RFRA
provides that new federal statutes must "explicitly exclude[]" RFRA's application if Congress
does not want RFRA to apply to that law.) Likewise, if the law or rule imposes vaccination
obligations on private employers, employers with religious objections may also have a RFRA
claim. Second, if the federal government or a covered entity as an employer adopts its own policy
requiring its employees to be vaccinated, employees with religious objections could bring a RFRA
claim against their government employer—although some courts might limit their remedy to Title
VII. Federal appellate courts have split on whether Title VII provides the "exclusive" remedy for
employees seeking religious accommodations from their government employers, or whether
plaintiffs can bring separate claims under RFRA and Title VII. The Supreme Court has not yet
opined on RFRA's relationship with Title VII, but in Bostock v. Clayton County, the Court
recently posited that "[b]ecause RFRA operates as a kind of super statute, displacing the normal
operation of other federal laws, it might supersede Title VII's commands in appropriate cases."

Assuming that an employee in an RFRA action were to demonstrate a "substantial burden" on the
employee's religious exercise, cases involving other compulsory vaccination programs suggest
strong governmental interests behind immunization efforts against infectious diseases. However,
applying RFRA in the context of a COVID-19 gathering restriction in the District of Columbia, a
federal district court cautioned that a government's "generalized interests" in "combating the
COVID-19 pandemic" may not rise to the level of "compelling" under RFRA unless the
government can show a compelling reason to apply its policy to "the particular claimant whose
sincere exercise of religion is being substantially burdened." Moreover, whether a particular law
or policy is the "least restrictive means" of furthering public health-related interests likely depends
on the particulars of the law or policy and any exemptions or accommodations.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

April J. Anderson and Victoria L. Killion, COVID-19 Vaccination Requirements: Potential Constraints on Employer
Mandates Under Federal Law, Feb. 10, 2021, https://crsreports.congress.gov/product/pdf/LSB/LSB10573.

26

27

COMPLAINT AND JURY DEMAND - 62

28

person's exercise of religion," even by "rule[s]of general applicability" except by using "the least restrictive means" to further a "compelling governmental interest." 42 U.S.C. § 2000bb-1. This statutory provision is intended to reinstate the "Sherbert Test," overturned in *Smith*, 494 U.S. 872 (1990), as a statutory right. *See* 42 U.S.C. § 2000bb(b) ("The purposes of this Act are [...] to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and [...] to provide a claim or defense to persons whose religious exercise is substantially burdened by government.").

183. RFRA applies to "all [f]ederal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after the enactment of [RFRA]," except for federal statutes "adopted after [the enactment of RFRA]" which "explicitly exclude[] such application by reference to RFRA." 42 USCS § 2000bb-3.

184. There are no laws enacted that apply here, that explicitly exclude their application by reference to RFRA.

185. RFRA relief is available to anyone "whose religious exercise has been burdened in violation of [RFRA]." 42 U.S.C. § 2000bb-1(c).

186. Religious freedom is one of the foundational principles of our nation. The familiar words of the First Amendment to the U.S. Constitution are: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

187. To help safeguard that freedom, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA). The RFRA provides a statutory right to challenge burdens that

the federal government places on religious liberty. RFRA requires that the federal government provide accommodations including changes to rules to people whose religious practices are unduly burdened by a federal law or policy.

188. Religious exercise includes belief, profession, and "the performance of (or abstention from) physical acts […] engaged in for religious reasons. *Hobby Lobby*, 573 U.S. at 710 (internal quotations omitted).

189. Plaintiffs' beliefs about the Covid-19 vaccination and their objections to it set forth in this complaint are religious in nature.

190. Plaintiffs' beliefs are sincerely held.

191. **Plaintiffs were terminated from their lifetime careers** because of their religious beliefs.

192. Forcing Plaintiffs to choose between continuation of their employment and a violation of their religious beliefs in order to retain their livelihoods imposes a substantial burden on Plaintiffs' ability to conduct themselves in accordance with their sincerely held religious beliefs.

193. Accordingly, RFRA requires that Defendants compensate them for any and all damages including compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

194. WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (Violation of An Act Concerning Religious Freedom, the Connecticut Religious Restoration Act, C.G.S. §52-571b)

195.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

196.    The Connecticut Religious Restoration Act requires that "The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section."

197.    Defendants are a state actor, entwined with the government and doing the work of the government.

198.    Plaintiffs' beliefs about the Covid-19 vaccination and their objections to it set forth in this complaint are religious in nature.

199.    Plaintiffs' beliefs are sincerely held.

200.    Plaintiffs were terminated from their lifetime careers because of their religious beliefs.

201.    Forcing Plaintiffs to choose between continuation of their employment and a violation of their religious beliefs in order to retain their livelihoods imposes a substantial burden on Plaintiffs' ability to conduct themselves in accordance with their sincerely held religious beliefs.

202.    Due to Defendants' willful violations of the RRA, Plaintiffs were damaged and

COMPLAINT AND JURY DEMAND - 65

are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

203.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
**(Violation of the Fifth and Fourteenth Amendment's Equal Protection Clause)**

204.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

205.    The vaccination rates for employees in the Disney/ESPN, professional sports media segment are not normal, they're extraordinarily high.[58]

206.    The vaccination rates in the Disney/ESPN media segment, professional sports, reflect the joint power of the government working with an uber-influencer (as detailed in the state action paragraphs 59 - 80).

207.    Had the government instituted a requirement that all professional athletes and personnel of leading media outlet are required to receive a vaccination, without rights to exemption, such an action would be subject to an equal protection challenge for its treatment of

_____

[58] *See supra* note 50 and 62.

COMPLAINT AND JURY DEMAND - 66

professional athletes and leading media differently than other similarly situated persons.

208.     Similarly, a state actor performing such a function is subject to an equal protection challenge on the same basis.

209.     Disney/ESPN entwined with the Defense Department, acts as an agent, arm of the Defense Department.

210.     Disney/ESPN, acting as an agent, arm, and effectively a department of the Defense Department, with tasks to perform, targeted a class of persons.

211.     Disney/ESPN, working on behalf of the government, targeted the class of persons, media workers who oppose the vaccine mandate. The subset of media workers and athletes who oppose the vaccine mandate, the government could not reach through Executive Order 14042, which applied to Federal Contractors, and through 14043, which applied to Federal Employees. Disney/ESPN. Thus, targeting them, a private entity who would not, ordinarily, be subject to the Equal Protection clause, would bypass the stringent strict scrutiny applied to discrimination on the basis of religion[59] or would even bypass the rational basis requirement applied to any and all media workers.

212.     The class of individuals that Plaintiffs belong to that have been discriminated

_____

[59] Note, the timing of the terminations were exactly temporally coincident with the height of the government's pressure and announcement of the three mandates, EO 14042, EO 14043 and the OSHA Emergency Temporary Standard.

COMPLAINT AND JURY DEMAND - 67

against are Disney/ESPN media personnel (a group with a huge influence over professional athletes and other non-Disney/non-ESPN media personnel) who oppose the vaccination, many on the basis of religion.

213. The Disney/ESPN policy, on behalf of the government, again, creates a class and discriminates against that class, that class being Disney/ESPN media personnel. (It also influences others not in that class, such as professional sports athletes, though such influence is not within the protected class asserted here).

214. The Constitution provides that the government, and state actors cannot take life, liberty or property without due process and equal protection of the law.

215. To understand how this class of similar persons is not being treated in a similar manner as those not in the class, we need only contrast the treatment of Disney/ESPN media personnel to treatment of individuals in other industries. But before doing so, it is helpful to distinguish related facts, both facts as to what the government did and did not do, as pertains to this case.

     a. The government did not mandate an across-the-board vaccination requirement of all employees of all businesses, public or private.

         i. An across-the-board mandate would raise substantive due process flags on the basis of (a) a right to privacy/right to bodily integrity and (b) a right to an occupation. But unlike that type of action (unlike an across-the-board mandate), instead the targeting of an extremely large but narrower occupational segment (Disney/media personnel) in

part, to reach religious objectors, as was done here, by a state actor, is subject to a classification challenge.

ii. The government created an OSHA Rule, an Emergency Temporary Standard (ETS) on businesses over 100 employees – that rule or mandate is *not* being challenged on equal protection grounds, here.

iii. What is being challenged is the subset of employees who, through Disney's government entwinement, were singled out: Disney/ESPN media employees who opposed vaccination and further those who did so on a religious basis. (Those employees who did not do so on a religious or medical basis were denied exemptions, and relatively easily).

iv. By contrast, we can see a myriad of places, including Yale University, Yale Hospital, and innumerous other health care environments, where religious exemptions were granted in large numbers.

v. Numerous industries reflect significantly lower vaccination uptake rates than Disney/ESPN media with relative ease and no court involvement.

1. By contrast, there are currently numerous individuals who opposed vaccination on a basis related to religion that were denied and have sued Disney and/or ESPN:

COMPLAINT AND JURY DEMAND - 69

      a.   Sage Steele

      b.   Rockmund Dunbar

      c.   Barbara Andreas

      d.   Stephen J. Cribb

      e.   Adam Pajer

      f.   Steven Gibbons

      g.   Cheron Hayes

      h.   Cathryn Koepke

      i.   Seth Schmidt

2.   Those are only some of the Disney/ESPN employees who opposed the policy, most on the basis of religion.[60]

---

[60] The same story is being told over and over again. For instance, in a lawsuit against Disney-owned ABC for General Hospital employees:

"4.      The media has been among the most aggressive in mandating the Covid-19 shots for its employees. To that end, during the summer of 2021, Defendant American Broadcasting Companies., Inc. ("ABC"), a wholly owned subsidiary of The Walt Disney Company, ordered that anybody working on a television show it produced would have to get the Covid-19 shot (the "Covid Vaccine Mandate").

…

32.     ABC said it would respect an individual's sincere religious objection to the Covid Vaccine Mandate. Therefore, during October 2021, Plaintiffs requested religious exemptions to the mandate.

33.     Rather than accept Plaintiffs' request for a religious exemption, ABC scheduled an interview between them and an ABC employee to discuss their requests. Although ABC described

COMPLAINT AND JURY DEMAND - 70

3.  The facts are that the Disney/ESPN motive and actions, as the facts support, were taken to work around the religious accommodation requirement of a religious exemption by denying this whole class of media personnel, with a huge influence on the public and on professional athletes, the exemption.

      a.  There was no business necessity for denying this class.

      b.  This group of individuals who opposed on religious grounds make up the largest percentage of those opposed to the mandate, but still make up a very small percentage of the Disney/ESPN workforce, small enough to not make it a business necessity to deny their exemption requests.

      c.  This entity, Disney/ESPN, the facts reflect, has a disproportionate impact and influence on society. The Disney/ESPN commentators essentially browbeat

_____

the interview as an "interactive process," the interview was conducted by a lawyer who works for Disney. It was a cross-examination designed to elicit information that ABC could use to deny Plaintiffs' requests for an exemption, as it denied almost all such requests during 2021."

COMPLAINT AND JURY DEMAND - 71

employees and professional athletes into taking the vaccine. Beyond browbeating employees and professional athletes, they effectively made sure those individuals were suspended and/or terminated for opposition.

d.  At the same time, in so doing, they served the government's public relations campaign interest.

e.  And Disney/ESPN was handsomely rewarded for doing so.[61]

216.    The process utilized by Defendants to deny a legitimate religious exemption, while under Title VII must satisfy the unduly burdensome test, must under an equal protection challenge satisfy the much more difficult business necessity test.

217.    Under strict scrutiny, it also must be very narrowly tailored or the least restrictive means for achieving the compelling objective.

218.    Even under the rational basis standard, the targeting of one industry or industry subsegment for denial of religious accommodation is not rational. As described by Judge Ralph Porzio, referring to "a different decision for similarly situated people based on identical facts,"[62]

_____

[61] See supra note 20.
[62] Garvey v City of New York, 2022 NY Slip Op 22335 (Sup Ct, Richmond County 2005, Porzio, J.).

COMPLAINT AND JURY DEMAND - 72

in ordering the reinstatement of New York City sanitation workers: "There is nothing in the record to support the rationality of keeping a vaccination mandate for public employees, while vacating the mandate for private sector employees or creating a carveout for certain professions, like athletes, artists, and performers."[63]

219.    By failing to consider reasonable accommodations, Defendants have deprived Plaintiffs of their constitutionally protected rights to equal protection and religious exercise.

220.    Defendants have engaged in overt acts to deprive Plaintiffs of their civil rights by failing to engage in the interactive process and terminating Plaintiffs' employment.

221.    Classifications that "impinge upon the exercise of a fundamental right" are "presumptively invidious" and subject to strict scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

222.    "A statutory classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right." *Nordlinger v Hahn*, 505 U.S. 1, 10 (1992).

223.    Defendants' actions in denying the religious exemptions deprive Plaintiffs of the equal protection of the laws guaranteed by the United States Constitution.

224.    At all relevant times, Defendants' actions were taken under the color of state law,

---

[63] *Id.* Note, regarding the carve out for athletes, this NYC reversal, allowing NBA unvaccinated players, most notably Kyrie Irving, to play was not until March 2022, after the vaccination rate for the NBA had already reached 97%, and mission accomplished. *See e.g.*, Scott Cacciola, *N.B.A. Says It Will 'Follow the Science' as Coronavirus Cases Rise*, N.Y. TIMES, Dec. 14, 2021, https://www.nytimes.com/2021/12/14/sports/basketball/nba-covid.html.

as state actors.

225.    Plaintiffs are entitled to other such relief as this court deems appropriate.

226.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### (Violation of the Connecticut Constitution Equal Protection Clause)

227.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

228.    Defendants' actions intentionally treat the class of Disney/ESPN media religious employees differently than other similarly situated persons.

229.    Classifications that "impinge upon the exercise of a fundamental right" are "presumptively invidious" and subject to strict scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

230.    "A statutory classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right." *Nordlinger v Hahn*, 505 U.S. 1, 10 (1992).

231.    Defendants' actions in denying the religious exemptions deprive Plaintiffs of the equal protection of the laws guaranteed by both the Connecticut Constitution.

232.    At all relevant times, Defendants' actions were taken under the color of state law, as state actors.

233.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as

hereinafter set forth in their prayer for relief.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.    Enter judgment on the First Cause of Action declaring that Defendants have violated Title VII of the Civil Rights Act of 1964; declaring that Defendants had actual and constructive knowledge that violations of Title VII were occurring; declaring that Defendants' violations of Title VII were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

B.    Enter judgment on the Second Cause of Action declaring that Defendants have violated Title VII of the Civil Rights Act of 1964; declaring that Defendants had actual and constructive knowledge that violations of Title VII were occurring; declaring that Defendants' violations of Title VII were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and

COMPLAINT AND JURY DEMAND - 75

awarding such other and further relief as the Court deems just and proper.

C.     Enter judgment on the Third Cause of Action declaring that Defendants have violated Title VII of the Civil Rights Act of 1964; declaring that Defendants had actual and constructive knowledge that violations of Title VII were occurring; declaring that Defendants' violations of Title VII were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

D.     Enter judgment on the Fourth Cause of Action declaring that Defendants have violated Connecticut Fair Employment Practices Act (CFEPA); declaring that Defendants had actual and constructive knowledge that violations of CFEPA were occurring; declaring that Defendants' violations of CFEPA were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

E.     Enter judgment on the Fifth Cause of Action declaring that Defendants have

violated Connecticut Fair Employment Practices Act (CFEPA); declaring that Defendants

had actual and constructive knowledge that violations of CFEPA were occurring; declaring

that Defendants' violations of CFEPA were willful; enjoining future violations of the law by

Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory

damages, including but not limited to damages for emotional pain and suffering; awarding

reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and

post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and

awarding such other and further relief as the Court deems just and proper.

   F. Enter judgment on the Sixth Cause of Action declaring that Defendants have

violated Connecticut Fair Employment Practices Act (CFEPA); declaring that Defendants

had actual and constructive knowledge that violations of CFEPA were occurring; declaring

that Defendants' violations of CFEPA were willful; enjoining future violations of the law by

Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory

damages, including but not limited to damages for emotional pain and suffering; awarding

reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and

post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and

awarding such other and further relief as the Court deems just and proper.

   G. Enter judgment on the Seventh Cause of Action declaring that Defendants have

violated the Americans with Disabilities Act (ADA) and the Americans with Disabilities Act

Amendments Act (ADAAA); declaring that Defendants had actual and constructive

knowledge that violations of ADA, ADAAA were occurring; declaring that Defendants'

COMPLAINT AND JURY DEMAND - 77

violations of ADA, ADAAA were willful; enjoining future violations of the law by Defendants; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

H.    Enter judgment on the Eighth Cause of Action declaring that Defendants have violated the CFEPA with respect to Plaintiff's disabilities; declaring that Defendants had actual and constructive knowledge that violations of CFEPA were occurring; declaring that Defendants' violations of CFEPA were willful; enjoining future violations of the law by Defendants; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

I.    Enter judgment on the Ninth Cause of Action declaring that the Defendants' mandate is unconstitutional because it violates the Plaintiffs' individual rights of free exercise under the U.S. Constitution; declaring that Defendants had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to

COMPLAINT AND JURY DEMAND - 78

damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

J.      Enter judgment on the Tenth Cause of Action declaring that the Defendants' mandate is unconstitutional because it violates the Plaintiffs' individual rights of free exercise under the Connecticut Constitution; declaring that Defendants had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

K.      Enter judgment on the Eleventh Cause of Action declaring that the Defendants' mandate is a violation of the Religious Freedom Restoration Act (RFRA) because it violates the Plaintiffs' individual right to free exercise of their religion; declaring that Defendants had actual and constructive knowledge that violations of RFRA were occurring; declaring that Defendants' violations of RFRA were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages;

COMPLAINT AND JURY DEMAND - 79

awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

L.    Enter judgment on the Twelfth Cause of Action declaring that the Defendants' mandate is a violation of Connecticut's Religious Restoration Act (RRA) because it violates the Plaintiffs' individual right to free exercise of their religion; declaring that Defendants had actual and constructive knowledge that violations of RRA were occurring; declaring that Defendants' violations of RRA were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

M.    Enter judgment on the Thirteenth Cause of Action declaring that the Defendants' mandate is unconstitutional because it violates the Plaintiffs' equal protection rights under the U.S. Constitution; declaring that Defendants had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest;

awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

N.      Enter judgment on the Fourteenth Cause of Action declaring that the Defendants' mandate is unconstitutional because it violates the Plaintiffs' individual rights to equal protection under the Connecticut Constitution; declaring that Defendants had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 8, 2023.


LAW OFFICES OF SHELDON KARASIK, P.C.
Attorneys for Plaintiff

By:_____/s/ *Sheldon Karasik*___

Sheldon Karasik (SK-4020)

COMPLAINT AND JURY DEMAND - 81

244 Fifth Avenue, Suite Q249
New York, New York 10001
Direct Dial: (917) 587-8153
Email: sheldon@karasiklawoffices.com


DUNN EMPLOYMENT LAW, LLC
Attorneys for Plaintiff

By:_____ /s/ *Christopher Dunn*_

Christopher Dunn (ct30900)
P.O. Box 4124
Madison, Connecticut 06443
Direct Dial: (203) 903-7650
Email: christopherdunnlaw@gmail.com

COMPLAINT AND JURY DEMAND - 82

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT AND JURY DEMAND - 83