Sheldon Karasik (*Pro hac vice application forthcoming*)
244 Fifth Avenue, Suite Q249
New York, New York 10001
(917) 587-8153
Email: sheldon@karasiklawoffices.com

Christopher Dunn
Dunn Employment Law, LLC
P.O. Box 4124
Madison, CT 06443
(203) 903-7650
cdunn@dunnemploymentlaw.com

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| BETH FABER, ALLISON WILLIAMS, AND MIKE RYAN<br><br>       Plaintiffs,<br><br>vs.<br><br>ESPN PRODUCTIONS, INC., ESPN, INC., and THE WALT DISNEY COMPANY in their official capacities; JULIE WALDEN**,** AMANDA GIFFORD, JAMES PITARO, BOB IGER, BOB CHAPEK, DERICA W. RICE, SUSAN E. ARNOLD, FRANCIS A. DESOUZA and DOES 1 through 10, inclusive, in their individual capacities.<br><br>       Defendants | Case No.: 3:23-cv-00041<br><br><u>AMENDED COMPLAINT AND JURY DEMAND</u> |

Plaintiffs BETH FABER, ALLISON WILLIAMS, AND MIKE RYAN, by and through their attorneys, LAW OFFICES OF SHELDON KARASIK, P.C., as and for their Complaint against Defendants, THE WALT DISNEY COMPANY, ESPN, INC., ESPN, PRODUCTIONS, INC., JULIE WALDEN, AMANDA GIFFORD, JAMES PITARO, BOB IGER, BOB CHAPEK, DERICA W. RICE, SUSAN E. ARNOLD, FRANCIS A. DESOUZA AND DOES 1

AMENDED COMPLAINT AND JURY DEMAND - 1

THROUGH 10, INCLUSIVE state as follows:

## **PARTIES**

1.      Plaintiff BETH FABER ("Faber") is an individual residing in Erie County, New York.

2.      Plaintiff ALLISON WILLIAMS ("Williams") is an individual residing in San Diego County, California.

3.      Plaintiff MIKE RYAN ("Ryan") is an individual residing in Milan, Indiana.

4.      Defendant ESPN Productions, Inc. ("ESPN") is an entity incorporated in the State of Delaware with its principal place of business located at 935 Middle St, Bristol, CT 06010.

5.      Defendant ESPN, Inc. ("ESPN, Inc.") is an entity incorporated in the State of Delaware with its principal place of business located at 935 Middle St, Bristol, CT 06010.

6.      Defendant The Walt Disney Company ("Disney") is an entity incorporated in the State of Delaware, is headquartered and has its principal place of business located at 500 S. Buena Vista Street, Burbank, California 91521, and is doing business in Connecticut.

7.      Defendant Julie Walden is now and has been at all material times an ESPN Senior Human Resource Specialist. Walden is a state actor.

8.      Defendant Amanda Gifford is now and has been at all material times an ESPN Vice President, Content Strategy and Audio. Gifford is a state actor.

9.      Defendant James Pitaro is now and has been at all material times the Chairman of

AMENDED COMPLAINT AND JURY DEMAND - 2

ESPN and Sports Content.[1] Pitaro is a state actor.

10. Defendant Bob Iger is now the CEO and has been at all material times the Disney Chairman of the Board. Iger is a state actor.

11. Defendant Bob Chapek was at all material times the Disney Chief Executive Officer ("CEO"). Chapek is a state actor.

12. Defendant Derica W. Rice is now and has been at all material times a Disney Director. Rice is a state actor.

13. Defendant Susan A. Arnold was at all material times a Disney Director. Arnold is a state actor.

14. Defendant Francis A. deSouza is now and has been at all material times a Disney Director. deSouza is a state actor.

---

[1] Pitaro, though his title denotes ESPN, is a Disney/ESPN employee, described as follows: "His focus is the entirety of Disney/ESPN's multimedia offerings – including live sports programming, sports news and original and non-scripted sports-related content, audio, digital and social endeavors – plus all sports-related content for Disney's cable channels, ESPN+, and ABC." James Pitaro, Chairman, ESPN and Sports Content, ESPN PRESS ROOM, https://espnpressroom.com/us/bios/james-pitaro/ (last visited Feb. 9, 2023). See also, James Pitaro, Chairman, ESPN, The Walt Disney Company, https://thewaltdisneycompany.com/leaders/james-pitaro/#:~:text=Jimmy%20Pitaro%20was%20named%20Chairman,channels%2C%20ESPN%2B%2C%20and%20ABC (last visited Feb 9, 2023). "Prior to that, Mr. Pitaro was named ESPN President and Co-Chair, Disney Media Networks, on March 5, 2018, after serving as Chairman of Disney Consumer Products and Interactive Media (DCPI). At that time, he brought his history of leading businesses focused on consumer products, digital initiatives and sports to ESPN at a pivotal point in the company's 38-year history: a time of unprecedented technological advancements and rapidly changing consumer habits." Id.

AMENDED COMPLAINT AND JURY DEMAND - 3

**<u>JURISDICTION AND VENUE</u>**

15.     Jurisdiction in this Court is based upon 28 U.S.C. §1331 as it involves a federal question pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII") and the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq*. ("ADA"). Further, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1391(c)(2) and (d).

16.     Venue is proper in this district as one or more of Defendants' acts and those events complained of occurred herein, pursuant to 28 U.S.C. § 1391.

**Beth Faber**

17.     Plaintiff Beth Faber was hired in December 1991 and worked for Defendants for just shy of 31 years, working as a Producer from 2014-2021. Plaintiff carried out her duties in an exemplary manner. At no time did Defendants have grounds to, nor did it, prior to Plaintiff's assertions of her rights to be exempt from a vaccination, discipline or take any adverse action against the Plaintiff.

18.     On May 27, 2021, Defendants' Amanda Gifford, Vice President, Content Strategy & Audio, informed Plaintiff via email that she was required to receive a Covid-19 vaccination by July 31, 2021, and she was also notified that preferential treatment would be given to the fully vaccinated for work location assignments beginning the end of June. No process or provision for religious exemption requests was mentioned in the correspondence.

19.     On the very same day, within hours, May 27, 2021, concerned, Plaintiff responded to Gifford stating her objections, which included as her basis, in her own words,

"VERY strong religious beliefs," and asked how she should proceed. Faber also shared other concerns, but she noted that her opposition was "most importantly" based on her religious objections.

20.    On May 28, 2021, Gifford responded to Faber, copying and directing her to Julie Walden, Employee Relations, or Human Resources.

21.    On June 1, 2021, Walden sent via email to Faber an accommodation request form in advance of a scheduled call the two had.

22.    On or about June 1, 2021, Plaintiff had a conversation with HR Representative Julie Walden, who rather than objectively stating the steps to take, when Plaintiff expressed her sincere beliefs about the role God plays in her life and the basis for her religious objection, threateningly told Plaintiff that "maybe God has led you to a new career, when God closes a door, he opens another."

23.    On June 15, 2021, Plaintiff surfaced her concern about Walden's comment. Subsequently, ESPN made no efforts whatsoever to address Walden's comment. Its silence belies its tacit approval for the comment and is consistent with its overall disfavor with accommodations for religious exemptions, disfavor exhibited throughout its dealing with Plaintiff.

24.    On June 15, 2021, Plaintiff applied for exemption from vaccination on grounds of religion. Plaintiff's sincerely held religious beliefs prohibit her from being vaccinated. In Plaintiff's application, Plaintiff expressed her perception of, and concern regarding, Walden's diminishing and threatening statement, and asserted her religious belief.

AMENDED COMPLAINT AND JURY DEMAND - 5

1

2

3       a.   Plaintiff informed Defendants in writing that she was a devout Catholic and

4            that her sincere and heartfelt religious belief prohibited her from being

5            vaccinated.

6       b.   Plaintiff cited numerous scriptural passages in support of her sincerity.

7       c.   She informed Defendants that she engaged in "hours and hours of prayer and

8            re-reading scripture" as part of her decision-making process.

9

10      d.   She informed Defendants of "the personal direction" she "received from God

11           through prayer" as informing her decision.

12      e.   She informed Defendants that she could not accept the vaccination due to its

13           reliance on fetal cell lines for its development and how such is "AGAINST

14           what God wants" her to put in her body.

15

16      f.   She informed Defendants that she did not consider it consistent with her

17           religious faith to rely upon an immune system other than the one provided by

18           her God, which she describes as "the perfect immune system he put in my

19           body before I was ever born."

20

21      g.   She further informed Defendants that "God and the immune system he has

22           entrusted to me has protected me through more than 1550 remote events,

23           millions of miles in airline travel, and countless numbers of nights in various

24           hotels throughout this country and the world. I will not turn my back on

25           God's protection, and violate my sincere personal religious beliefs."

26   25.    Despite these clear articulations of sincerely held religious beliefs in support of

27
28

her opposition and request for an exemption, ESPN *found* reason to continue to question her sincerity.

26.     On June 30, 2021, Walden sent Faber an email correspondence indicating ESPN's concerns about the religious nature of her request, seeking the pastoral reference and challenging Plaintiff's sincerity on the basis of her other personal concerns. Defendants identified and utilized specious criteria and methodology for determining her sincerity: a) they would identify Plaintiff's other concerns relative to her religious concerns and then weigh the two; and b) they would seek evidence or support from her parish as to their beliefs to validate her beliefs. This methodology was reflective more of an antipathy toward religious accommodation than a search for truth.

27.     On June 30, 2021, extremely noteworthy is that Walden's email correspondence solicited not Faber's objection or inquiry into Faber's sincerity, but rather the name of her parish representative "to discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view."

28.     On July 1, 2021, in response to Walden's diminishment of Plaintiff's faith, Plaintiff responded recognizing Defendants' antipathy: "I do not even know how to respond to this other than to say that my sincere personal religious beliefs are my OWN. My religious beliefs have grown, changed and evolved all of my life, as my relationship and connection with God continues to grow, change and strengthen. I do not expect to be cross examined or to have to bring in an "expert" on my own personal religious beliefs for anyone to judge me or my belief in God's will for me. My sincerely held religious beliefs preclude me from taking the COVID-19

AMENDED COMPLAINT AND JURY DEMAND - 7

vaccine. I believe the Bible. I believe in their guidance I receive thru prayer and scripture. Have a good day."

29. On July 12, 2021, Defendants' Walden, via email, denied Plaintiff's religious exemption request, stating, "You have not provided sufficient documentation to support your accommodation request, and your request is denied." Plaintiff, according to Defendants had failed the balancing test Defendants had devised for weighing expressions of other concerns (HIPPA, human rights, and safety of the new mRNA technology) against her religious concerns, and she had failed to provide and meet their external support criterion, validation from a priest as to the priest's and / or the church's beliefs.

30. The July 12, 2021 email from Walden set the date to be vaccinated or terminated by August 1, 2021.

> As we discussed today, I have reviewed the documentation you provided and I have also reviewed your subsequent responses to my further questions. You have not provided sufficient documentation to support your accommodation request, and your request is denied.
>
> It is an essential qualification of your role as a Remote Radio Producer to be fully vaccinated by August 1, when the vaccination requirement becomes effective for all Remote workers. If you choose not to be fully vaccinated by that date, your employment with the Company will end. You are welcome to apply for any open positions with the Company that do not require vaccination at that time, however. Please let us know your intentions by July 14, 2021.

31. The July 12, 2021 email included a request for Plaintiff to let Defendants "know your intentions by July 14, 2021."

32. On July 15, 2021, Plaintiff expressed her dismay at the Defendants' behavior

AMENDED COMPLAINT AND JURY DEMAND - 8

making an issue of her sincerity, and reiterated in answer to the threat of termination, "I stand by my convictions."

33.     On July 16, 2021, Walden, as if she were a salesperson trying to meet a quota – and not understanding Plaintiff's July 15 decision to not take the vaccination – attempted again to meet her goal:

> Please inform us by no later than Monday, July 19, as to whether you will comply with Remote Operation's mandatory COVID 19 vaccination requirement, or have chosen to remain unvaccinated. As we have discussed at length, being fully vaccinated by August 1 is an essential qualification of your role because of safety & health and logistical reasons. Many leagues have already imposed requirements that all crew members working events are vaccinated, and we anticipate others will implement such requirements in the near future with little or no advance notice to ESPN. If you fail to inform us of your intentions by Monday, July 19, The Company will not be able to schedule you to work assignments after August 1, and will separate you from employment at that time.

34.     In light of what happened next, we can see that last set of communications as being, from the standpoint of the Defendants, a game of chicken, with the issue of Plaintiff's sincerity as merely one milestone on the path toward an ultimate end, the chopping block, vax or be terminated, religious believers need not apply (for an exemption). One way or another the Defendants would meet their actual goal.

35.     ESPN did not go through with the termination on the scheduled date. It changed course.

36.     ESPN stated it was going to defer on ascertaining her sincerity.

37.     Defendants explained, in so many words, Why execute the firing on such a basis as opposing the sincerity of Plaintiff's exemption request when you can instead, as it stated:

AMENDED COMPLAINT AND JURY DEMAND - 9

"beg[in] examining whether it would even be possible to accommodate her. After all, ESPN need not accommodate her professed beliefs if 'doing so would cause' it 'to suffer an undue hardship.'"

38.     After threatening to fire Plaintiff, on the doorstep of her termination they then begin to attempt to examine whether accommodating her was even possible. At least that is what the Defendants state they did.

39.     In fact, Defendants did not do anything of the sort.

40.     Defendants failed to take the most basic measure they had readily available to them, which was to send out an *en masse* communique to their venues indicating that they had personnel whom they afford religious and / or medical exemptions and seeking the venues' cooperation in extending the same. The personnel would be taking other precautionary measures. Defendants cannot claim it was an undue burden to accommodate Plaintiff without their having taken the most basic step to ascertain the extent to which exemptions were or were not available to them.

41.     Moreover, had it taken such a step, it would find that no undue burden existed whatsoever, as reporting shows.

42.     At the time of Plaintiff's termination, for the upcoming fall 2021 season

practically *no* NFL team was excluding the unvaccinated.[2] With only two exceptions, *no* NFL team for the whole fall 2021 season excluded the unvaccinated.

43.　For the fall 2021 season no, or next to no, college football teams excluded the unvaccinated.

44.　Defendant, themselves, reported on the fact that the unvaccinated were not excluded. For example, ESPN reports, August 26, 2021, of the SEC, "Now, unvaccinated student-athletes, coaches and support staff will undergo weekly surveillance testing -- regardless of how much of the rest of the team is vaccinated -- and they are required to wear masks in the athletic facilities."[3] No mention of an exclusion, quite the contrary. Similarly, of the NCAA, ESPN reports, "Earlier this month, the NCAA recommended that unvaccinated college athletes should be tested weekly for COVID-19, wear masks in most situations and be quarantined if

_____

[2] *See e.g.*, Mike Gavin, *NBC Latest NFL rules on COVID, fan vaccinations and positive cases,* NBC SPORTS (Aug. 3, 2022) https://www.nbcsports.com/chicago/bears/latest-nfl-rules-covid-fan-vaccinations-and-positive-cases (inaccurately stating, "In 2021, only a handful of NFL teams required proof of vaccination for entry into their stadiums. That included, in some form, the Buffalo Bills, Seattle Seahawks, New Orleans Saints and Las Vegas Raiders."). The actual requirement was in fact vaccination or a negative test, except for two teams. The more accurate report was: "The Seahawks and Saints are accepting proof of a negative test within 72 hours of the game, but the Raiders and Bills are not," as reported by News10. Nick Veronica, 258 fans turned away at Bills-Dolphins game as full vaccine mandate goes into effect, NEWS 10, Nov 1, 2021 / 03:44 PM EDT, Updated: Nov 1, 2021 / 06:52 PM, https://www.news10.com/sports/buffalo-bills/258-fans-turned-away-at-bills-dolphins-game-as-full-vaccine-mandate-goes-into-effect/.
[3] Heather Dinich, *The 2021 college football COVID protocols -- Requirements, attendance, forfeits and more,* ESPN, Aug. 26, 2021, https://www.espn.com/college-football/story/_/id/32084177/the-2021-college-football-covid-protocols-requirements-attendance-forfeits-more.

AMENDED COMPLAINT AND JURY DEMAND - 11

exposed to the virus, while vaccinated individuals can avoid routine testing."[4] No exclusion for

the unvaccinated. In case the Defendants were not paying attention to its own reporting, CNN

widely reported the fact that exclusions were not the rule. For example, CNN reported "Some of

the country's biggest powerhouses – including Georgia, Alabama, Ohio State and Oklahoma, to

name a few – are hosting games to full capacity on Saturday. And fans who attend these games

won't have to prove their vaccination status, won't be required to social distance and won't have

to wear masks in their seats."[5] Some stadiums had different rules for the media, but in reality

only a small number of schools whose games Plaintiff covered required vaccination for the

media.

     45.    ESPN conjured up a burden that simply did not exist and one that did not jibe

with reality.

_____

[4] ESPN also reported:

> "A Big 12 spokesman told ESPN on Tuesday that none of the schools in the conference are currently requiring fans to show proof of vaccination before attending games, and all of them are planning for full-capacity crowds."

Also:

> "Earlier this month, the NCAA recommended that unvaccinated college athletes should be tested weekly for COVID-19, wear masks in most situations and be quarantined if exposed to the virus, while vaccinated individuals can avoid routine testing."

*Id.*

[5] Eric Levenson, *College football fans and traditions are back, even with Covid-19 still here*, CNN, September 11, 2021, https://www.cnn.com/2021/09/11/us/college-football-fans-covid/index.html.

46. ESPN's communications with Plaintiff were consistent with other public statements by Disney executives and with Disney communications directly to Plaintiff, all indicating effectively no tolerance for being unvaccinated. Disneycareers.com, periodically posted positions on its career board for ESPN positions, often noting, "This position is with ESPN Productions, Inc, which is part of a business we call Disney Media & Entertainment Distribution." None of the positions would accommodate Plaintiff's exemption.

47. On September 2, 2021, after no serious attempt at accommodation, it again demanded that Plaintiff be vaccinated (first dose) or be terminated by September 8, 2022.

48. On September 9, 2021, Defendants terminated Plaintiff Faber.

49. On February 4, 2022, Plaintiff Faber filed a charge of employment discrimination (Charge No. 525-2022-00229) against Defendants with the U.S. Equal Employment Opportunities Commission ("EEOC").

50. On October 14, 2022, the EEOC issued a "right to sue" letter to Plaintiff Faber. This action is filed pursuant thereto.

**Allison Williams**

51. Plaintiff joined Defendants as a Reporter / Host in August 2010 working at college and professional sporting events and carried out her duties in an exemplary manner. At no time did Defendants have grounds to, nor did they, prior to Plaintiff's assertions of her rights to be exempt from a vaccination, discipline or take any adverse action against the Plaintiff.

52. On August 1, 2017, the parties signed a three-year employment agreement.

53. On August 15, 2020 Plaintiff's contract was renewed for one year.

54. On April 1, 2021, Plaintiff, like other employees, received a communication from Disney regarding Disney's vaccination expectations. She regularly received Disney communications.

55. In or about June, 2021, Defendants' Chandon Hudgins informed Plaintiff via email that Plaintiff was required to receive a Covid-19 vaccination or receive a religious exemption by August 1, 2021.

56. On August 13, 2021, the parties extended for thirty days Williams's contract which was set to expire on August 14, 2021.

57. On August 13, 2021, Plaintiff Williams applied to Defendants for exemption from vaccination on grounds of disability. Plaintiff was undergoing in vitro fertilization and was concerned about the potential unknown effects the vaccination would have on the fetus.

    a. Plaintiff lives in California where medical licenses are threatened if doctors provide a medical exemption and she was therefore unable to obtain a doctor's letter in support of her legitimate concerns.

    b. In or about July 2022, Plaintiff and her husband welcomed their second child into the world.

58. On or about August 31, 2021, Plaintiff applied for an exemption from vaccination on grounds of religion, submitting her application to Walden. Plaintiff's sincerely held religious beliefs prohibit her from accepting vaccination.

    a. Plaintiff informed Defendants in writing that she was a Christian and that

AMENDED COMPLAINT AND JURY DEMAND - 14

her sincerely held and heartfelt religious beliefs prohibited her from being vaccinated.

b. She informed Defendants that she could not accept the vaccination to "honor the creation and conception of a child" referring in part to the vaccination being due to its reliance on fetal cell lines for its development.

c. She further informed Defendants that she did not consider it consistent with her religion to rely upon an immune system other than the one provided by her God, by referring to her belief in "protect[ing] the sanctity of my body."

59. On or about September 2, 2021, Thomas Carroll, Employee Relations, requested additional information.

60. On or about September 3, 2021, Plaintiff Williams spoke with Natasha Finch, Employee Relations Associate. Plaintiff explained to Finch that:

a. "We are created perfectly and any intervention in the absence of disease would go against that" as it "shows distrust in the process of creation";

b. her two-year old had not received any vaccinations; and

c. she had not received any vaccines since she was 12 after "she got a bad reaction to one."

61. Defendants made no effort to accommodate Plaintiff Williams.

a. Plaintiff Williams indicated that she would test regularly and mask;

b. Plaintiff Williams also had had Covid-19 and had natural immunity;

c. Plaintiff Williams also offered to host shows remotely or in-studio.

62. Defendants allege that no accommodation was possible because their venues demanded vaccination and would not extend medical or religious exemptions, however, Defendants made no efforts to either inquire as to how many would grant exemption or to assert that they had employees whom were entitled by law to exemption.

63. As with Plaintiff Faber, paragraphs 34-37, Defendants failed to properly acknowledge the reality.

a. At the time of Plaintiff's termination, for the upcoming fall 2021 season practically *no* NFL team was excluding the unvaccinated.[6] With only two exception, *no* NFL team for the whole fall 2021 season excluded the unvaccinated.[7]

b. For the fall 2021 season no college football team excluded the unvaccinated.

c. Defendants themselves reported on the fact that the unvaccinated were not excluded. For example, ESPN reports, August 26, 2021, of the SEC, "Now, unvaccinated student-athletes, coaches and support staff will undergo weekly surveillance testing -- regardless of how much of the rest of the team is

_____

[6] *Id.*
[7] *See supra* note 2.

AMENDED COMPLAINT AND JURY DEMAND - 16

vaccinated -- and they are required to wear masks in the athletic facilities."

No mention of an exclusion, quite the contrary. Similarly, of the NCAA,

ESPN reports, "Earlier this month, the NCAA recommended that

unvaccinated college athletes should be tested weekly for COVID-19, wear

masks in most situations and be quarantined if exposed to the virus, while

vaccinated individuals can avoid routine testing." No exclusion for the

unvaccinated. In case the Defendants were not paying attention to its own

reporting, CNN widely reported the fact that exclusions were not the rule.

For example, CNN reported "Some of the country's biggest powerhouses –

including Georgia, Alabama, Ohio State and Oklahoma, to name a few – are

hosting games to full capacity on Saturday. And fans who attend these games

won't have to prove their vaccination status, won't be required to social

distance and won't have to wear masks in their seats."

    d.  ESPN conjured up a burden that simply did not exist and one that did not

        jibe with reality.

64.    On September 14, 2021, the parties further extended Plaintiff Williams's contract.

65.    ESPN's communications with Plaintiff throughout the process were consistent

with other public statements by Disney executives and with Disney communications directly to

Plaintiff, all indicating effectively no tolerance for being unvaccinated. Disneycareers.com,

periodically posted positions on its career board for ESPN positions, often noting, "This position

is with ESPN Productions, Inc, which is part of a business we call Disney Media &

Entertainment Distribution." None of the positions would accommodate Plaintiff's exemption.

66.     On or about October 13, 2021, Plaintiff Williams was informed by Finch that her request was denied and she had one week to receive the Covid-19 vaccine or she would be terminated. She chose not to be vaccinated.

67.     On October 19, 2021, Defendants terminated Plaintiff Williams.

68.     On June 29, 2022, Plaintiff Williams filed a charge of employment discrimination (Charge No. 523-2022-02211) against Defendants with the U.S. Equal Employment Opportunities Commission ("EEOC").

69.     On January 5, 2023, the EEOC issued a "right to sue" letter to Plaintiff Williams. This action is filed pursuant thereto.

**Mike Ryan**

70.     In 2006, Plaintiff Mike Ryan was hired to work at an ESPN production as a freelancer.

71.     Ryan worked in that role until 2014, working football and basketball packages and other events as a freelancer.

72.     On August 28, 2014, Ryan was hired as an ESPN staff as a Remote Graphics Operator (full-time).

73.     He performed exceptionally.

74.     He received a paycheck from Disney, though he was in the belly of the ESPN television productions, doing Monday Night Football, College World Series, Big 12 Basketball,

College Football, Bowl games and other events.

75.     He had a signed agreement, a one-year contract in 2019, with an option by Disney/ESPN to renew which they did.

76.     However, on April 10, 2020, he received a letter putting him on furlough, as all sports competitions had been cancelled or suspended because of the Covid-19 pandemic, meaning his income ceased.

77.     In the interim, while his position with Disney/ESPN was shut down, Disney/ESPN started outsourcing the role, doing it remotely and in the studio.

78.     Disney/ESPN discovered they could do his position in the new environment at a reduced rate.

79.     On August 3, 2021, Ryan received an email form Julie Walden, informing him that if he was not vaccinated or granted a religious exemption by August 27, he would be terminated.

80.     Ryan was a lifelong Catholic.

81.     On August 3, 2021, Ryan requested a flexible work arrangement, as Disney/ESPN had already been operating this way.

82.     On August 11, 2021 Ryan's flexible work arrangement request was reviewed.

83.     On August 18, 2021, Disney/ESPN's Walden sent an email that they would not be considering a flexible working arrangement, asking for him to complete a Vaccination Accommodation Request Form.

84.     On August 19, 2021, Julie Walden informed Ryan again that he needed an

accommodation or vaccination to continue his employment with Disney/ESPN.

85.    On August 20, 2021, Ryan expressed his sincerely held religious beliefs which required him to oppose the vaccination, and he sent a religious exemption request to Jennifer Solomon, Remote Operations Manager.

86.    On October 11, 2021, Ryan's request for a religious exemption was denied in a letter sent by Natasha Finch.

87.    On October 18, 2021, Ryan's 15-year career with Disney/ESPN was terminated, his employment was ended.

88.    Disney wrongfully terminated Ryan, in violation of his rights.

89.    Disney could have accommodated Ryan.

**STATE ACTION**

90.    Defendants' actions were not merely as per a private corporation's policy, they were state action, governed by the state action doctrine. In its justification for the company mandate, Defendants referred to the Biden Administration's Executive Order expecting companies with greater than 100 employees to mandate the vaccination, however, it is on a far greater basis that state action is being asserted.

91.    Defendants were encouraged sufficiently by the government, and Defendants were jointly involved with the government, in sufficiently significant ways, apart from the business mandate, to warrant that the state action doctrine be applied. Defendants had additional reasons beyond the business mandate. There was such a web of relationships, including

significant business incentives, and joint activity between the government and Defendants, such that there was a close nexus between the state and the actions of the Defendants and such that there was pervasive public entwinement[8] in Defendants' management or control as pertains to the Disney/ESPN mandate.[9]

—————————————————

[8] Entwinement, of course, is an essential criterion in state action determinations. The Supreme Court in *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* was clear that the test was not whether each, or a combination, of several criteria were present, entwinement alone is enough:

> "Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards;"
>
> …
>
> Entwinement is also the answer to the Association's several arguments offered to persuade us that the facts would not support a finding of state action under various criteria applied in other cases. These arguments are beside the point, simply because the facts justify a conclusion of state action under the criterion of entwinement, a conclusion in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts.

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 302 (2000).

[9] The specifics of Disney's Defense Department relationship are paramount to the case, but it's important to note that there is a historical relationship between the Defense Department and filmmakers that significantly dates back to Franklin Delano Roosevelt. Associate Editor at Vanity Fair, writing for MRonline, explains:

> "In 1942, President Franklin D. Roosevelt created the Office of War Information (OWI) in an effort to better inform the public about the Second World War via newspapers, radio, and film. The Bureau of Motion Pictures, one of the many bureaus that operated under the OWI, worked directly with every major Hollywood studio to promote the war. Of the 1700 films distributed by Hollywood from 1942 to 1945, the OWI had their hand in about five hundred, all of which contained war-related material.
>
> After the war was over, the OWI dissolved and, in its stead, the Pentagon established an entertainment liaison office in 1948, which continues to operate directly out of Los Angeles."

Jon Skolnik, *Hollywood and the Pentagon are cheating on the American public*, MRonline (Jul. 03, 2020) https://mronline.org/2020/07/03/hollywood-and-the-pentagon-are-cheating-on-the-american-public/.

AMENDED COMPLAINT AND JURY DEMAND - 21

a.  Defendant ESPN is 80% owned by Disney.

b.  Disney has a symbiotic relationship with the Defense Department, which has a joint relationship with the CDC and the HHS[10], whose policies were advancing the uptake of the vaccine in the government sector differently than could be done in the private sector.[11] Such did not prevent the Defense

———————————————

[10] Lisa Simunaci, *Operation Warp Speed Refines Vaccine Delivery Plan,* U.S. DEPARTMENT OF DEFENSE, (Nov. 23, 2020), https://www.defense.gov/News/News-Stories/Article/Article/2423700/operation-warp-speed-refines-vaccine-delivery-plan/ (noting, "'Operation Warp Speed,' will hasten the delivery of that vaccine by conducting steps concurrently that normally would be conducted sequentially, senior administration officials said. Operation Warp Speed is a partnership among components of the Department of Health and Human Services, as well as the Defense Department.").

[11] The government had the power, through Executive Orders, to mandate for the military and government employers and contractors, power that was greater than that over the private sector. The Biden Administration's announcement on September 9, 2021, went beyond its role as employer to create a unity of interest between government and business, a unity that was at odds with a large percentage of workers and with laws, such as Title VII. The leading Human Resource organization, the Society for Human Resource Management (SHRM) captured the interplay between the government and business, and particularly the role of government as facilitator, and encourager, of business mandates, again, at odds with a large percentage of workers, as described below. Notably in the article, SHRM was careful to advise of the rights of individuals to receive medical and religious exemptions, something President Biden in his speech deliberately left out, except with very general language: "to the extent consistent with applicable law" and "with exceptions only as required by law." SHRM was more specific, referring to the ADA and Title VII specifically, in its overall reporting on views as to the interplay between government and business, and mandates:

> "Research from the Society for Human Resource Management (SHRM) found that 28 percent of employed Americans say they won't get the COVID-19 vaccine even if it costs them their job.
>
> The presidential announcement 'is a real game changer for many employers,' said Steve Bell, a partner at the international law firm Dorsey & Whitney in Denver. 'The fact that the largest employer in the U.S. is mandating vaccines will *give comfort to* private employers that have been hesitant to require vaccines. It may also *set the standard* for what a reasonable employer should be doing in the face of this continuing epidemic.'
>
> Chelsea Smith, a labor and employment attorney in the Oklahoma City office of Hall Estill, added that private-sector employers should seek legal advice and be sure to craft a mandatory vaccine policy that provides for exemptions for people with qualified disabilities, as defined under the Americans with

AMENDED COMPLAINT AND JURY DEMAND - 22

Department from working closely and jointly (which is one of the criteria of

the state action doctrine) with private entities, including monoliths, or

behemoths, like Disney.

    i.   It is no secret that the Government worked with Disney during World

          War I and World War II – it was a significant part of the war effort in

          both wars. There was joint involvement. Their partnership continues

          to this day in overt and covert ways (encouragement, whether overt

          or covert, is also one of the criteria for finding state action).[12]

    ii.   Nothing about the fact that covert involvement is involved makes

          them impervious to treatment as a state actor.

    iii.   Covert involvement is not the same as a conspiracy.

---

Disabilities Act, and for people with sincerely held religious beliefs, as defined under Title VII of The Civil Rights Act.

'This is the first vaccine mandate ever applicable to private employers,' said Kathryn Bakich, health compliance practice leader and senior vice president at employee benefits consulting firm Segal in Washington, D.C. 'Employers are moving toward mandatory vaccination policies at great speed. Those that are not mandating vaccines are considering whether they can implement premium differentials in their health plans to penalize employees who won't get the vaccine. Wellness regulations currently permit incentives and penalties for taking legitimate health-related steps, so a COVID-19 vaccination incentive should be permissible. I would expect that the Biden administration would move ***to help employers by explicitly issuing guidance to permit these incentives***.'"

Roy Maurer, *Biden Orders Vaccination Mandates for Larger Employers, Federal Workforce, Under upcoming rule, companies with more than 100 employees must require vaccinations or weekly testing, SHRM*, (September 9, 2021) https://www.shrm.org/resourcesandtools/hr-topics/talent-acquisition/pages/federal-vaccine-mandate.aspx.

[12] *Brentwood Academy*, *infra* note 37.

AMENDED COMPLAINT AND JURY DEMAND - 23

iv.  It is well-known that the Defense Department has exercised direct

editorial control over Disney's content. That control does not stop at

content but extends to direct, indirect and covert encouragement as it

pertains to policies and practices, such as vaccination requirements.

v.  The symbiotic relationship includes the fact that the Defense

Department occupies and maintains land, land it owns, at Walt

Disney World, Orlando Florida. It is the only Armed Forces

Recreation Center in the continental United States.

vi.  Consistent with this symbiotic relationship, and reflective of the deep

ties, is the fact that retired United States Army Major General, Joe

Potter, was recruited and oversaw the construction of Walt Disney

World.

1.  Joe Potter's military experience was stellar and significant, as

pertains to the joint relationship between the military and

Disney.

a.  The Walt Disney Archies explains the significant role

and involvement between Disney and the Defense

Department, describing Potter's unique qualifications,

suited for a clearly interconnected relationship.

"Walt Disney recruited the retired United States
Army major general," Joe Potter "to oversee the
early construction of Walt Disney World..." In this

task he "transform[ed] 300 acres of Florida land into the Magic Kingdom…."

Joe was not your "average Joe." As the archives explain, "Born in Oshkosh, Wisconsin, on July 17, 1905, Joe graduated from the United States Military Academy at West Point, the Massachusetts Institute of Technology and the National War College in Washington, D.C." The archives further explain his role and the unique fit for an essentially military private partnership:

> "During World War II, he directed logistical planning for the invasion of Northern France.... After the war he served in Washington, DC, as assistant chief of engineers for Civil Works and Special Projects.
>
> In 1956, President Dwight D. Eisenhower appointed Joe to serve as the governor of the Panama Canal Zone."
>
> ...
>
> Soon after his 'retirement,' he became executive vice president of the 1964-65 New York World's Fair, charged with construction of the federal and state attractions. These included 26 state pavilions and the $17-million United States pavilion.
>
> During this time he met Walt Disney, joining the Company in 1965 as its vice president of Florida Planning. In that role, Joe oversaw construction of the Park's entire infrastructure; this included

underground utilities and sewer, power, and water treatment plants that were considered revolutionary at the time. He also developed drainage canals for the entire property, which were known as 'Joe's ditches.'"

    b.   Joe Potter worked with another military notable on the project.

2.   Another not so average Joe. While Joe Potter prepared the land, Joe Fowler oversaw the construction "and went on to manage its operations after it opened."[13] According to Walt Disney Archives, Joe Fowler was another distinguished military man, a Navy Rear Admiral.

    a.   "Born on July 9, 1894, in Lewiston, Maine, Joe graduated second in his class at the U.S. Naval Academy in 1917. He graduated from Massachusetts Institute of Technology with a master's degree in naval architecture in 1921. A veteran of both world wars, Joe designed and supervised the building of gunboats in Shanghai, China, during the 1920s; he later designed and built aircraft carriers, including the U.S.S. Lexington and the U.S.S. Saratoga, which were the largest aircraft carriers of World War II. He was also in charge of all U.S. Navy work conducted in the West Coast shipyards during World War II."[14]

---

[13] Walt Disney Archives, WALT DISNEY, https://d23.com/walt-disney-legend/joe-fowler/ (last visited Jan. 6, 2023).
[14] Id.

AMENDED COMPLAINT AND JURY DEMAND - 26

b. Prior to his work with Disney, "in 1952 President Harry S. Truman appointed him civilian director of the Federal Supply Management Agency with a mandate to root out waste in the military."[15]

3. That Disney utilized military men in the construction and management of its parks is not in and of itself sufficient to justify state action, however, it is relevant evidence as part of an overall contextualization of the interworkings between the Defense Department and the private business Disney, **particularly since the military owns land in Disney World**. (See Paragraph 60 (b) (v)).

vii. Walt Disney, himself, was a government actor, and though his government role ultimately changed it did not change the essential relationship between the "World" and the Government.

1. Walt Disney was an FBI informant.[16] Walt Disney was made

[15] Wolfgang Saxon, *Joseph Fowler, 99, Builder of Warships And Disney's Parks*, N.Y. TIMES, Dec. 14, 1993, https://www.nytimes.com/1993/12/14/obituaries/joseph-fowler-99-builder-of-warships-and-disney-s-parks.html.
[16] Herbert Mitgang, *Disney Link To the F.B.I. And Hoover Is Disclosed*, N.Y. TIMES, May 6, 1993,

a 'full Special Agent in Charge Contact' in 1954."[17]

    2.   The relationship was far more than the actions of a private person. It was a business government partnership, even in this role: "What Hoover got in return. In return for Disney's information, J. Edgar Hoover, the Director of the bureau, allowed Disney to film in F.B.I. headquarters in Washington. For his part, Disney allowed Hoover access to some Disney scripts, and made slight changes in a few lesser-known movies and an episode of 'The Mickey Mouse Club' television show to mollify the director."[18]

    viii.   Disney's current involvement with the Defense Department includes the same kind of involvement revealed in the FOIA documents regarding Walt Disney. These documents show significant influence over content.[19] Much as Hoover was allowed content influence

_____

https://www.nytimes.com/1993/05/06/movies/disney-link-to-the-fbi-and-hoover-is-disclosed.html (noting: "From 1940 until his death in 1966, Walt Disney served as a secret informer for the Los Angeles office of the Federal Bureau of Investigation, according to documents that have come to light under the Freedom of Information Act.").
[17] *Id.*
[18] *Id.*
[19] Professor Roger Stahl writes in an LA Times Op Ed: "Until recently, the scholarly consensus had been that this phenomenon was isolated to perhaps a couple of hundred films. In the past five years, however, my small group of researchers has acquired 30,000 pages of internal Defense Department documents through Freedom of Information Act requests and newly available archives at Georgetown University, which show that the Pentagon and the Central

through Walt Disney, today the Defense Department is responsible for hundreds of millions of dollars in Disney revenue, because of the military's involvement in Marvel feature films. It has been reported that without the Defense Department's provision of military equipment the Marvel films would not have been made. Air University (Air University is the U.S. Air and Space Force's center for professional military education (PME)) reports: "Tom Secker, the author of National Security Cinema and an expert on US military-Hollywood relations, states that 'without the Pentagon's support, it is possible that the Marvel Universe wouldn't have become the world's biggest film franchise. The first two Iron Man films benefited from large-scale production assistance from the USAF."[20] This was no small role. Disney's purchase of Marvel has led the company to have

_____

Intelligence Agency have exercised direct editorial control over more than 2,500 films and television shows." Roger Stahl, *Op-Ed: Why does the Pentagon give a helping hand to films like 'Top Gun'?*, LA TIMES, May 30, 2022 3:15 AM PT, https://www.latimes.com/opinion/story/2022-05-30/top-gun-maverick-memorial-day-tom-cruise-pentagon-propaganda.

[20] Frank Martinez, *Reaching a New Audience: Strengthening the US Air Force through the Marvel Cinematic Universe*, AIR UNIVERSITY, Jul. 12, 2022, https://www.airuniversity.af.edu/Aether/Perspectives/Article-Display/Article/3090461/reaching-a-new-audience-strengthening-the-us-air-force-through-the-marvel-cinem/#:~:text=Tom%20Secker%2C%20the%20author%20of,the%20world's%20biggest%20film%20franchise.

AMENDED COMPLAINT AND JURY DEMAND - 29

"more than quadrupled its money."[21]

92.     There can be no doubt that the government benefits from its symbiotic

relationship.[22]

93.     The Defense Department's relationship to Disney is not a backdrop, and it is not a

collateral matter. The United States government has gone to great lengths to bring the vaccine to

the whole United States citizenry. A relationship as strong and intertwined as that between the

Defense Department and Disney, who owns 80% of ESPN, qualifies Defendants for treatment as

_____

[21] Jane Kleinman, *13 Years Ago, Disney Bought Marvel — and Changed Movies Forever, In 2009, Disney swooped in and bought the nascent Marvel Cinematic Universe for $4B.*, INVERSE, Sep. 1, 2022, https://www.inverse.com/entertainment/why-did-disney-buy-marvel. *See also*, Samuel Pennifold, *Disney and the US Department of Defense – weaponising streaming*, KING'S BUSINESS REVIEW, Jul. 14, 2021, https://kingsbusinessreview.co.uk/weaponising-streaming (noting: "The purchase of Marvel in 2009 has been a masterstroke, with global box office ticket revenue of the Marvel Cinematic Universe equating to more than $23 billion alone. Under Iger's leadership, Disney's market capitalization also increased from $48 billion to $257 billion."). (King's Business Review is a publication of King's Business Club, the largest student led business and finance society in London.)

[22] As an example, it is reported that recruitment shot up following the Defense Department's "partnership" with Paramount Pictures:

> "[F]or the Navy, Top Gun was more than just a movie. It was a recruitment bonanza.
>
> Military recruiting stations were set up outside movie theaters, catching wannabe flyboys hopped up on adrenaline and vibes. Others enlisted on their own. Interest in the armed forces, primarily the Navy and the Air Force, rose that year, though it's unclear just how much. Naval aviator applications were claimed to have increased by a staggering 500 percent."

Alissa Wilkinson, *The long, long, twisty affair between the US military and Hollywood, For the Pentagon, films like Top Gun: Maverick are more than just a movie,* VOX, May 27, 2022, 8:00am EDT, https://www.vox.com/23141487/top-gun-maverick-us-military-hollywood.

Paramount is one of Disney's competitors. The implied message is that Disney is competing for the Defense Department's favor.

a state actor.[23]

_____

[23] Disney's importance to the government's objective can be seen in the placement of Disney CEO Bob Chapek at Biden's important business meeting with top CEOs, September 15, 2021, one week after announcing the Administration's rules intending to require vaccination or testing for companies with more than 100 employees. Chapek is seated separated from Biden by only Kaiser CEO and council to the president. Access and optics are, of course, important indicators of the existence, extent and importance of joint relationships. *See e.g.*, Christina Wilkie, *Biden touts employer vaccine mandates at meeting with top execs from Microsoft, Walgreens and others*, CNBC, Sep. 15, 2021, 9:47 AM EDT Updated, Wed. SEP 15 20215:27 PM EDT, https://www.cnbc.com/2021/09/15/biden-to-push-vaccine-mandates-in-meeting-with-top-execs-from-microsoft-walgreens-others.html. Noteworthy, in this regard, Kaiser also has extensive ties to the Defense Department, and to Disney and the Defense Department. Henry J. Kaiser, who is the co-founder of Kaiser Permanente, was instrumental in World War II, and is regarded as the father of modern American shipbuilding. Kaiser and Disney worked together significantly with the Defense Department. Kaiser describes the relationship as:

> "The historic connections between Kaiser (Kaiser Industries and Kaiser Permanente) and Disney (Walt Disney Studios and Disneyland) are longer than the bobsled ride down the iconic Matterhorn.
>
> During World War II, when Henry J. Kaiser was building hundreds of ships for the war effort, Walt Disney Studios was producing posters for the War Manpower Commission encouraging home front workers to be productive."

Kaiser Permanente, *Kaiser and Disney — spreading fun and health since World War II*, about.kaiserpermanente.org, Jan. 3, 2017, https://about.kaiserpermanente.org/who-we-are/our-history/kaiser-and-disney-spreading-fun-and-health-since-world-war-ii (last visited Jan. 6, 2023).



**President Joe Biden meets with CEOs at the Eisenhower Executive Office building at the White House complex.**
(Photo by Oliver Contreras/Sipa USA)(Sipa via AP Images)

Photo credit: *Id.* The optics and the reality is this is a war effort, a government business joint action.

AMENDED COMPLAINT AND JURY DEMAND - 31

94.     The policies and procedures are being dictated and implemented based on this overarching relationship.[24] CEO Bob Chapek's presence at the Biden Administration's business summit reflects the active involvement of the highest level of management.[25]

95.     Additional management at Disney came directly from the Biden Administration, and from the Biden Administration's vaccine effort. For example, Kristina Schake, who headed the Covid-19 vaccine education campaign of the Biden Administration, was selected by Disney as its new executive vice president of global communications. Disney's own website refers to her as "working at the *nexus* of government, media, business, entertainment, and technology."[26] (emphasis added). The close nexus continues, of course, when she works on the private side of the house. Disney describes Schake's important role, noting she is "responsible for Disney's worldwide communications strategy and operations, and serves as lead spokesperson for the Company."[27] The close nexus also includes Disney's naming of former Pentagon Press Secretary

_____

[24] It is one thing to work together to build ships and put out encouraging posters during war time, it's another to work together using the same tactics to force inoculations to the point of denying a religious exemption.
[25] *Id*.
[26] The Walt Disney Company, https://thewaltdisneycompany.com/leaders/kristina-schake/.
[27] Schake's government involvement is not insignificant:

> "Prior to joining Disney in April 2022, Ms. Schake spent three decades working at the nexus of government, media, business, entertainment, and technology. Most recently, she was appointed by President Biden to lead the nationwide COVID-19 vaccine campaign, managing the federal government's $1 billion national public education initiative. Prior to that, Ms. Schake was Global Communications Director for Instagram, where she served as a primary advisor to the company's founder and CEO, and oversaw the communications and digital divisions in North America, Latin America, Europe and Asia.

AMENDED COMPLAINT AND JURY DEMAND - 32

Geoff Morrell, "to the newly created position of chief corporate affairs officer, overseeing corporate communications, government relations and global public policy."[28]

96.     The vaccine policy was set at a level of management where this Defense Department relationship was an integral part of all decision making. More broadly, the government was an integral part of decision making as pertains to the vaccine. The very same day that the Biden Administration "called on leaders in the private and public sector to implement vaccine requirements, saying it will push millions more Americans to get vaccinated," [29] Bob Chapek responded to Biden's call. Biden had stated, or ordered, "If you're a business leader, a nonprofit leader, a state or local leader, who has been waiting for full FDA approval to require vaccinations, I call on you now to do that. Require it,"[30] Chapek, on Jim Cramer's Mad Money that very day stepped up, and Cramer noted something already making the

Ms. Schake has served at the highest levels of government, as Communications Director for First Lady Michelle Obama and Deputy Communications Director for Secretary Hillary Clinton's 2016 presidential campaign. Previously, she spent several years as the senior communications strategist for California First Lady Maria Shriver, the California Women's Conference, and the California Endowment's Building Healthy Communities Initiative. Additionally, Ms. Schake co-founded the American Foundation for Equal Rights, which led the successful bipartisan public awareness campaign and legal challenge to restore marriage equality in California. She began her career as a speechwriter for Los Angeles Mayor Richard J. Riordan."
*Id.*
[28] Dawn Chmielewski, *Disney names former Pentagon press secretary as corporate affairs head*, REUTERS, Dec. 7, 20212:43 PM EST. https://www.reuters.com/business/media-telecom/disney-names-former-pentagon-press-secretary-corporate-affairs-head-2021-12-07/.
[29] Kate Sullivan, CNN, *Biden encourages Americans who have been waiting for full FDA approval to get their Covid vaccination: 'Get it today'*, Aug. 23, 2021, CNN, https://www.cnn.com/2021/08/23/politics/biden-fda-approval-covid-remarks/index.html.
[30] *Id.*

rounds.

> "Cramer: I understand that you have a very tough policy on vaccinations."[31]

Apparently, word was getting around in the media industry. Cramer mentioned another CEO's

requirement, and then repeated:

> "Frankly, I'm hearing you are being *very*, *very* adamant on vaccinations."[32]

Chapek replied by noting that, "We have about a quarter of a million cast members that we'd

love to see vaccinated."[33] He clearly is including all of Disney's employees, including ESPN

employees, as that would be the top number of employees Disney had. If Disney's Chapek

wanted to send a message to all employees, subsidiaries and divisions included, using the top

end number would be the way to do it. Notably, Disney regarded its Connecticut operations as

significant. It features, in its 2021 Annual Financial Report, Connecticut as one of only three

centers it set up nationwide, as part of its Covid-19 policy, noting that it: "Provided the ability

for our employees to get vaccinated by offering on-site distribution in California, Florida, and

Connecticut."[34]

97.     ESPN's spokesperson Mike Soltys stated publicly that the Disney vaccine policy

_____

[31] Sarah Whitten, *Disney World reaches deal with unions to require Covid-19 vaccinations for unionized employees*, CNBC, Aug. 23, 2021, https://www.cnbc.com/2021/08/23/disney-world-to-require-covid-19-vaccinations-for-unionized-employees-.html.
[32] *Id*.
[33] *Id*.
[34] The Walt Disney Company, *2021 Annual Financial Report*, 5 (2021) https://www.sec.gov/Archives/edgar/data/1744489/000174448921000220/dis-20211002.htm.

AMENDED COMPLAINT AND JURY DEMAND - 34

applies to ESPN employees.[35]

      98.    The idea of questioning the interaction between government, particularly, the

Defense Department, and the entertainment industry is not a novel or even outside the

mainstream exercise: the relationship is frequently reported and questioned.[36] There are clearly

cases that fall outside of the intertwined nature that exists between Disney and the Defense

Department. However, when the nature is intertwined, and there is a "close nexus" between the

state and the action in question then the state action doctrine is applicable.

-----------------

[35] *See* Justin Muszynski, *ESPN employees included in decision by Walt Disney Co. to mandate covid-19 vaccine*, The Bristol Press, Aug. 2, 2021, http://www.bristolpress.com/BP-Bristol+News/394140/espn-employees-included-in-decision-by-walt-disney-co-to-mandate-covid19-vaccine.

[36] As an example, The Guardian notes:

    "Marvel and Disney's long histories of collaborating with the US government, in particular the FBI and the Pentagon, to create propaganda – in exchange for military equipment, location access and consultation – is reason for concern."

Akin Olla, *Is WandaVision ... Pentagon propaganda?*, THE GUARDIAN, Mar. 9, 2021 06.15 EST, https://www.theguardian.com/commentisfree/2021/mar/09/wandavision-pentagon-propaganda-marvel-disney-fbi.

The bias is apparent. For instance, Harper's editor Lewis Lapham describes the Pentagon's preference for positive treatment:

    "'ABC News reporters were not able to go anywhere near the war in Afghanistan,' Lapham said with some exaggeration, but ABC's parent, the Walt Disney Co., hired Hollywood producer Jerry Bruckheimer to make a 13-part series on the war 'with the full cooperation of the Pentagon.'

    'The media always wants to reduce it to a fairy tale,' he said. 'You can't tell the difference between the war in Afghanistan and "The Fellowship of the Ring." Even the names are similar.'"

Dan Fost, *Harper's editor laments rise of corporate news purveyors*, SFGATE, Apr. 24, 2002, https://www.sfgate.com/business/article/Harper-s-editor-laments-rise-of-corporate-news-2847683.php.

AMENDED COMPLAINT AND JURY DEMAND - 35

99.     To be clear, bias is at issue with both the portrayal of the military by Disney for symbiotic gain and also with the vaccination uptake for symbiotic gain.

100.    In April 2022, the Department of Defense announced it would be holding the Defense Department Warrior Games at the ESPN Wide World of Sports Complex at Walt Disney World Resort. In August 2022, it was the first time the event was ever held there since the inception of the Games in 2010. The event was scheduled to be held at the ESPN Disney Complex in 2021, but the 2021 event was cancelled due to Covid-19 restrictions. The timing of the grant of the Games to the Disney venue is not insignificant in light of the relationship between the Defense Department, Disney, ESPN and the vaccine policies.

101.    There is no dispute that the Defense Department was looking to partner with private business in its effort to vaccinate. There is a point, as applies here, where partnership goes beyond independent entities working voluntarily toward a shared mission and becomes entwinement, such that they can be considered a state actor. Here, there are sufficient facts that show independence is lost, and that personal career success and the private business' success is dependent upon being in lockstep with the government.[37]

_____

[37] Cases referring to the criteria of: "significant encouragement, either overt or covert"; "willful participant in joint activity with the State or its agents"; "entwined with governmental policies," and others are cited in the seminal state action case:

> "Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of 'coercive power,' *Blum*, 457 U. S., at 1004, when the State provides 'significant encouragement, either

102.    The facts show that, additionally, the backdrop is the delegation of a public function to a private enterprise: Defendant was entrusted with responsibility by the government to perform a traditional government function. Disney has over 220,000 employees. While the number of people under its control is not the size of a small state, sitting at just under one half of the smallest state Wyoming, its reach is far broader. Its revenue is, of course, far greater than that of the government of Wyoming, which has just over $10 billion in revenue. Disney's revenue for 2022 was $82.72 billion[38] making it larger than 47 of the 50 United States, ranking it third behind only California and New York. (Everything's bigger in Texas – except Disney revenue, just beating it out, and the revenue of California and New York.) It's no wonder that the federal government turns to a behemoth like Disney, with long established ties to the Defense Department to delegate this public function.[39] And, is Disney what it is today because it turns to

_____

overt or covert,' *ibid*., or when a private actor operates as a 'willful participant in joint activity with the State or its agents,' *Lugar, supra*, at 941 (internal quotation marks omitted). We have treated a nominally private entity as a state actor when it is controlled by an 'agency of the State,' *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U. S. 230, 231 (1957) (*per curiam*), when it has been delegated a public function by the State, cf., e. g., *West v. Atkins, supra*, at 56; *Edmonson v. Leesville Concrete Co.*, 500 U. S. 614, 627-628 (1991), when it is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control,' *Evans v. Newton*, 382 U. S. 296, 299, 301 (1966)."

*Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 U.S. 288, 296 (2000).
[38] companiesmarketcap.com, *Revenue for Walt Disney (DIS)*, https://companiesmarketcap.com/walt-disney/revenue/#:~:text=According%20to%20Walt%20Disney's%20latest,sale%20of%20goods%20or%20services (last visited Jan. 6, 2023).
[39] The importance of the activity being a traditional public function is discussed in *Brentwood Academy. See Brentwood Academy, supra* note 37.

AMENDED COMPLAINT AND JURY DEMAND - 37

the government since its inception, jointly working together to create a real magic kingdom with the power of government - and a palace, to boot.[40]

103.    Whether little governments and kingdoms on earth - with policies and procedures of little kingdoms and big governments - or fantasy worlds in the movies featuring military heroes, Disney is entwined with the military and the Defense Department.

104.    The creator of Marvel Comics, and ultimately the Disney blockbuster movie series, began his career writing for the military, a common path to comic book and film success. Stan Lee, born Stanley Martin Lieber, joined the United States Army in early 1942 as a member of the Signal Corps, which is the department responsible for the Army's entire systems of communications. He began there repairing telegraph poles and other military communications equipment. After being transferred to the Training Film Division, he wrote for the military, mostly manuals, training films, and slogans, along with some occasional cartooning. He was given the title "playwright." a rare title in the U.S. Army. This led to his ultimate success in essentially launching the largest comic book series in United States history.

105.    Chairman of ESPN and Sports Content (in charge of Disney/ESPN's multimedia offerings) (former Disney/ESPN Co-Chair of Disney Media Networks)[41] James Pitaro's wife,

---

[40] This point is apart from the point that The Walt Disney Company, by virtue of its total control and ownership over Florida public entity and governmental agency, the Reedy Creek Improvement District (RCID), a special governing district, is also state agency.
[41] *See supra* note 1.

AMENDED COMPLAINT AND JURY DEMAND - 38

actress Jean Louisa Kelly, was awarded a significant acting role[42] in the 2022 blockbuster movie *Top Gun: Maverick*. Though the movie was a Paramount Pictures release, Disney's team was not without a reward and stake in the success of the movie. The movie was one of only six that grossed over $700 million in North America alone,[43] grossing $1.5 billion worldwide, as of December 1, 2022, making it the number one grossing movie domestically[44] and the number two worldwide for 2022.[45] The military involvement in the Top Gun sequel was significant to say the least, and dated back to 2018.

106.     Another Disney Defense Department entwinement, the Chairman and former CEO of Marvel Entertainment and one of the largest shareholders of Disney, Isaac Perlmutter, a

_____

[42] Iceman's wife.

[43] *See e.g.*, Rebecca Rubin, 'Top Gun: Maverick' Passes 'Black Panther' as Fifth-Highest Grossing Movie Ever in North America, VARIETY Sep. 5, 2022, https://variety.com/2022/film/box-office/top-gun-maverick-becomes-fifth-highest-grossing-movie-north-america-1235353287/. *See also e.g.*, Nicolas Vega, *'Avatar: The Way of Water' crosses $1B in ticket sales in just 14 days: Here are the 10 highest-grossing movies of 2022*, CNBC, Dec 28 20223:15 PM EST Updated Wed, Dec 28 20223:32 PM EST, https://www.cnbc.com/2022/12/28/top-gun-to-avatar-these-are-the-highest-grossing-movies-of-2022.html#:~:text=Tom%20Cruise's%20%E2%80%9CTop%20Gun%3A%20Maverick%E2%80%9D%20is%20the%20highest%2D,2022%20with%20nearly%20%241.5%20billion.&text=%E2%80%9CWe%20might%20have%20been%20in,editorial%20director%20at%20BoxOffice.com.

[44] *See e.g.*, Sarah Whitten, 'Top Gun: Maverick' and Disney were the box office leaders in an otherwise soft 2022, CNBC, Jan. 10, 2023, https://www.cnbc.com/2023/01/10/top-gun-maverick-disney-top-box-office-2022.html#:~:text=Paramount%20and%20Skydance's%20%22Top%20Gun,and%20%22Doctor%20Strange%22%20sequels.

[45] *See e.g.*, Siladitya Ray, *Weekend Box Office: 'Avatar' Sequel Now 7th-Highest Grossing Film Ever With $1.7 Billion In Worldwide Earnings*, FORBES, Jan. 8, 2023, https://www.forbes.com/sites/siladityaray/2023/01/08/weekend-box-office-avatar-sequel-now-7th-highest-grossing-film-ever-with-17-billion-in-worldwide-earnings/?sh=785330a068ce.

AMENDED COMPLAINT AND JURY DEMAND - 39

veteran of the Six-Day War in 1967,[46] went on to be investigated by Congress[47] in 2021 for being allegedly a shadow head of the Department of Veteran Affairs during the Trump Administration.[48] Perlmutter and two others were involved in "all manner of policy and personnel decisions."[49] Among the reported events: "Perlmutter convened a series of conference calls with executives at Johnson & Johnson, leading to the development of a public awareness campaign about veteran suicide."[50] Perlmutter later appeared with executives from Disney who "joined Johnson & Johnson as sponsors of the Veterans Day event at the stock exchange. [Former VA secretary David] Shulkin rang the closing bell standing near a preening and flexing Captain America, with Spider-Man waving from the trading pit, and Marvel swag distributed to some of the attendees. 'Generally the VA secretary or defense secretary don't shill for companies,' the leader of a veterans advocacy group said."[51]

107.     When the dividing lines between government and business become so blurred, when the distinctions become so muddled, the divisions erased, it is likely not because "it just

---

[46] Forbes Profile, *Isaac Perlmutter, Chairman, Marvel Entertainment*, https://www.forbes.com/profile/isaac-perlmutter/?sh=47583df56caf (last updated Jan. 6, 2023).

[47] Kevin Breuninger, Marvel Entertainment chairman, others accused of breaking law in Veterans Affairs scheme under Trump, CNBC Sep. 27, 2021, 11:41 AM EDT, Updated Sep. 28, 2019 9:06 AM, https://www.cnbc.com/2021/09/27/marvel-chairman-accused-of-breaking-law-in-va-scheme-under-trump.html

[48] Isaac Arnsdorf, *Inside Trump's VA, The Shadow Rulers of the VA, How Marvel Entertainment chairman Ike Perlmutter and two other Mar-a-Lago cronies are secretly shaping the Trump administration's veterans policies*, Aug. 7, 2018, 6:29 p.m. EDT, https://www.propublica.org/article/ike-perlmutter-bruce-moskowitz-marc-sherman-shadow-rulers-of-the-va.

[49] *Id*.

[50] *Id*.

[51] *Id*.

AMENDED COMPLAINT AND JURY DEMAND - 40

happens" but rather because it's by design: cross-sector social interactions is a thing. It is a real thing. The Disney Defense Department interaction meets the definition of a cross-sector partnership. Professors Clarke and Crane state the reality: "Cross-sector partnerships—by which we mean relatively intensive, long-term interactions between organizations from at least two sectors (business, government, and/or civil society) aimed at addressing a social or environmental problem—are now a fixture in management research and practice."[52] Not everyone of them results in the performance of a public function by a private entity, but when one does, as is the case here, it warrants treatment of the private business as a state actor.

108.     As the noted social scientist, communications expert, and consultant to the U.S. government Harold Lasswell explained in a 1927 publication entitled *Propaganda Technique in the World War*:

> During the war-period, it came to be recognized that the mobilization of men and means was not sufficient; there must be a mobilization of opinion. Power over opinion, as over life and property, passed into official hands. Indeed, there is no question but that government management of opinion is the unescapable corollary of large-scale modern war. The only question is the degree to which the government should try to conduct its propaganda secretly.[53]

109.     After all, a one page dictate to 220,000 people doesn't simply engender nearly

---

[52] Clarke, A. and Crane A., *Cross-Sector Partnerships for Systemic Change: Systematized Literature Review and Agenda for Further Research*, J Bus Ethics 150, 303–313 (2018). https://doi.org/10.1007/s10551-018-3922-2.
[53] Harold Lasswell, *Propaganda technique in the world war,* 14-15 (2013).

AMENDED COMPLAINT AND JURY DEMAND - 41

100%[54] obedience without an effort to shape opinion, a massive effort. The kind of effort that

<hr />

[54] The number of ESPN employees who took the vaccine is unknown, however the major professional sports associations have been very public in reporting their extraordinary uptakes. *See e.g.*,

> "Around 67% of eligible Americans are fully vaccinated, according to the Centers for Disease Control and Prevention. Meanwhile, leagues such as the NBA, NFL and MLS have rates greater than 90%, with the NHL and WNBA at over 99%."

Meredith Deliso, *How professional sports leagues got most players vaccinated -- without mandates, A small number of holdouts have made headlines for not getting the shot.* ABC News, Oct. 21, 2021, 5:48 AM, https://abcnews.go.com/Sports/professional-sports-leagues-players-vaccinated-mandates/story?id=80668945.



Of course, funding for professional sports comes from the leaders in the communications industry, leaders such as ESPN and ABC Sports owned by Disney. For example, ESPN reportedly pays to the NBA $2.6 billion per year. "This nearly triples what the NBA currently makes off of TV and digital rights." KPCC, *New NBA TV deal is a cash injection for league and players,* Jun. 8, 2014, https://www.kpcc.org/show/take-two/2014-10-07/new-nba-tv-deal-is-a-cash-injection-for-league-and-players. There is obviously a ripple effect with the influence of the government relationship on Disney and ESPN flowing to the sports leagues that depend upon them. The Disney/ESPN clout with and influence over the NBA was increased during the Covid-19 pandemic. Disney/ESPN teamed up with the NBA,

AMENDED COMPLAINT AND JURY DEMAND - 42

requires government and private business entwinement.

110.    The September 9, 2021 termination of Beth Faber, exactly on, and of both Allison Williams and Mike Ryan shortly after, the date of President Biden's announcement of a business mandate, are more than just symbolic, they are part of a very orchestrated and choreographed partnership between government and business – nowhere did the Biden Administration say that exemptions would not be granted, nor that they would be disfavored, though nowhere did the Biden Administration extend such assurances to people such as Beth Faber, Allison Williams and Mike Ryan that they would not be wrongfully ousted or that there would be severe penalties for such egregious behavior on the part of private businesses that discriminate.[55]

111.    If the government is going to dole out such fabulous rewards to unique agents, such as Disney, it must also dole out significant protections to individuals against medical and religious discrimination, or it leaves the private partners in the position of being exposed to treatment as a state actor.

112.    Defendants erred in their zeal to be the shining star of the government's arsenal to implement vaccine mandates by going too far. As merely one example of the pervasive insensitivity of the rights of individuals to seek religious and medical exemptions endorsed by

_____

of course, to bring the playoffs to "the Bubble" as it was called, where the NBA held the final regular season games and playoffs of the 2020-2021 season, utilizing the ESPN Wide World of Sports Complex at Walt Disney World for games and Disney hotels for the players to stay.
[55] See supra note 11.

Defendants, ESPN's top pundit, Steven A. Smith, paid $12 million per year, engaged in a public debate with LeBron James as to James's unwillingness to disclose whether he was vaccinated, in May 2021. Interviewed on CNN, by Don Lemon, Smith was careful not to say James should get vaccinated – Lemon did that work for him, as they double-teamed against James.[56] Smith kept his criticism to the fact that James would not say whether he was or wasn't and to minimizing any legitimate opposition that might exist in the world.[57] From every angle, whether the

---

[56] CNN, Stephen A. Smith criticizes LeBron James' vaccination comments, see, CNN, *Stephen A. Smith criticizes LeBron James' vaccination comments,* May 25, 2021*,* https://www.youtube.com/watch?v=aQNUPzfvSMo.

Smith also acknowledges that "optics matter" in his aggressive campaign to influence people to take the vaccine. Smith made the point, stating "optics matter," as he chided NBA superstar LeBron James, who is normally outspoken on issues, for James's not sharing his vaccination status when asked. Smith certainly wasn't saying in this segment James should come out and say he was not vaccinated, and to express some legitimate reason, such as a religious exemption – no mention whatsoever that there might be a legitimate reason for not taking the vaccine. Smith's tone and everything about the segment acted as if there could be no good reason for opposing the vaccine. Shaping the optics, shaping the way things look, was a massive part of delivering on the Defense Department's objectives.

[57] Smith later, January 18, 2022, shares his Covid-19 brush with death, a story that shares the horrors of Covid-19 but also serves to continue to advance the narrative "take the vaccine":

"I had 103 degree fever every night. Woke up with chills and pool of sweat. Headaches were massive, coughing profusely and it got to a point, that right before New Year's Eve, I was in the hospital New Year's Eve into New Year's Day, that's how I brought in the new year. And they told me, had I not been vaccinated, I wouldn't be here. That's how bad I was."

New York Post Sports, Stephen A. Smith details scary COVID-19 battle | New York Post, Jan. 18, 2022, https://www.youtube.com/watch?v=2ESLGQ2t0Xk.

Note, Smith does acknowledge publicly, October 13, 2021, "You do have a right not to take the vaccine… everybody has the right to take it or not take it …," in the context of a discussion where he concludes about Kyrie Irving, who didn't take the vaccine, "to me he's being selfish." ESPN, *Stephen A. questions Kyrie Irving's stance on the vaccine mandate | First Take*, Oct. 13, 2021, https://www.youtube.com/watch?v=eh7d1r63-2A.

Smith becomes the ESPN spokesperson taking on those who oppose the vaccination. Rarely did he discuss the issue of religious or medical objection. When he did, he apologized, as when he mistakenly said that Jehovah's Witnesses

executives, the management staff, the highest paid pundit, it was a full court press, backed by the strength of the U.S. Defense Department on its Operation Warp Speed mission – a mission that engulfed, not only entwined the private company Disney.[58]

---

were anti-vaccine while discussing Andrew Wiggins, who initially opposed the vaccination. *See, e.g.*, Lindsey Ellefson, *ESPN's Stephen A. Smith Apologizes to Jehovah's Witnesses For Falsely Suggesting They Are Anti-Vax; Smith suggested a basketball player was hesitant to get the jab because of his religion*, THE WRAP, Feb. 3, 2022, 10:06 AM, https://www.thewrap.com/espn-stephen-a-smith-jehovahs-witnesses-apology/. The silence was deafening as to his views on those who rightfully oppose on the grounds of religion.

[58] Not all of the blurring of the lines between what the government does and what the private entity does crosses into state action. For instance, it is natural that there will be some overlap in the use of resources. As an example, Danny Hillis, who invented one of the world's first supercomputers (by inventing parallel processing) and had the Defense Advanced Research Projects Agency (DARPA) as his first customer later went on to work for Disney. Disney created a brand-new position for him in 1996, Disney Fellow, and Vice President, Research and Development, at Disney's Imagineering. Disney, like the Defense Department, needs and uses supercomputers for the vast amount of data they manipulate. Moreover, they recognized Hillis as a key resource. "'Integration of science and technology as part of our creative process has always been a key element in creating the Disney magic,' said Michael D. Eisner, Disney's chairman and CEO" in announcing Hillis's joining Disney. HPCwire, *Danny Hillis Named First Member of Disney Fellows Program*, May 17, 1996, https://www.hpcwire.com/1996/05/17/danny-hillis-named-first-member-of-disney-fellows-program/.

Disney, as Hillis tells the story of how and why he went to Disney, was lucky to have him available as he was looking for some downtime with his young children. Hillis went on to work for Disney for five years, and then years later, after leading-edge technology work, was appointed by Secretary of Defense Ash Carter to the Defense Department's Innovation Board. U.S. Department of Defense, Secretary Carter Names Additional Members of Defense Innovation Advisory Board, Jul. 26, 2016, https://www.defense.gov/News/Releases/Release/Article/857710/secretary-carter-names-additional-members-of-defense-innovation-advisory-board/.

It's natural that business and government will overlap in their needs and use of resources. Hillis, who went to MIT as an undergraduate, and developed software for children, also later, as a graduate student at MIT Computer Science and Artificial Intelligence Laboratory, designed both "tendon-controlled robot arms" and a "touch-sensitive robot skin." *See e.g.*, W. Daniel Hillis, *A High-Resolution Imaging Touch Sensor*, Volume 1, Issue 2, Jul. 2, 2016. https://doi.org/10.1177/027836498200100202.

One curious overlap between the pandemic-related PCR test and Hillis's work is referred to in a 2010 TEDMED Talk he does in which he refers to the PCR technology, and its inventor, Kary Mullis, in regards to the PCR test's value for cancer research. TEDMED, *Danny Hillis at TEDMED 2010*, https://www.youtube.com/watch?v=J85O5F7dVuU. The PCR test became the most widely used test during the

AMENDED COMPLAINT AND JURY DEMAND - 45

113.     To fully appreciate the entwinement, it's helpful to recognize the connection between Disney Imagineering and the Defense Department. This LA Times article sums it up:

> "Disney Research Chief Joins U.S. Spy Agency
>
> Eric Haseltine is moving from one top secret organization to another.
>
> Walt Disney Co.'s chief of research and development is leaving to become head of research for the National Security Agency, which uses sophisticated technology to gather intelligence, break codes and protect sensitive government information systems.

Covid-19 pandemic for detecting Covid-19. Apparently, Hillis's work spans robotics, artificial intelligence, computer programing, software and hardware design, supercomputing and genetics.

Hillis co-founded "Applied Proteomics, a company designed to help map proteins within the human body and determine their interactions with cancerous cells and vice versa." Of Hillis's company and work, Datanami, a data science news outlet, explains:

> "It is tough for computers—even those equipped to handle big data—to get their servers around proteins. Sequencing DNA is relatively easy because it operates on a similar foundation to computers—there are four nucleic acids repeating themselves in a random pattern much like information codes itself through ones and zeros.
>
> On the other hand, proteins throw a wrench in this model due to a process known as protein folding. In its mRNA form, each protein exists in an identically shaped strand, just as two unique pieces of DNA would."

The article goes on to explain Hillis's work with mRNA. Ian Armas Foster, *Proteomic Research Unfurls Cancer Conundrum*, Jan. 8, 2013, https://www.datanami.com/2013/01/08/proteomic_research_unfurls_cancer_conundrum/.

The work of Hillis, of course, relates to the mRNA technology of the vaccine. When one recognizes this relationship, one must question whether this too reflects an entwinement. Disney's original fellow works at the forefront of the development of mRNA technology. Is Disney's super-vaccine-vigilance based on its personal sympathies toward the vaccine and its benefits or is it based on deeper connections to the government? Hillis's company, of course, is at the forefront of this area of research and development. "The Applied Proteogenomics OrganizationaL Learning and Outcomes (APOLLO) network is a collaboration between NCI, the Department of Defense (DoD), and the Department of Veterans Affairs (VA) to incorporate proteogenomics into patient care as a way of looking beyond the genome, to the activity and expression of the proteins that the genome encodes." Apollo Network, https://proteomics.cancer.gov/programs/apollo-network. Hillis's work which partners with the government seems distant from his work with Disney, and Disney's vaccine mandate, on one level. On another level, they are operating on two very related frontiers, or in Defense Department parlance, fronts.

AMENDED COMPLAINT AND JURY DEMAND - 46

Haseltine worked for a decade at Walt Disney Imagineering, the company's design and development group. As such, he would seem an unlikely choice for his new government mission. But the worlds of the NSA and Disney Imagineering aren't so dissimilar. Both include a diverse group of top-level scientists and share a penchant for security and secrecy (Disney won't say how many scientists it employs)."[59]

114.    Disney's entwinement with the military and the Defense Department is highly relevant to its treatment of the vaccine mandate and those who sought exemptions.[60]

---

[59] Richard Verrier, *Disney Research Chief Joins U.S. Spy Agency*, L.A. TIMES, Jul. 17, 2002 12 AM PT. The point made in this article we can take in conjunction with the point made in *supra* note 58. Taking them together, it's also worth noting that Danny Hillis's co-founder of Applied Proteomics, David Agus, M.D. became a CBS contributor in May 2013. During the Covid-19 pandemic he has been a strong advocate of the vaccine. CBS notes: "Dr. Agus is an international pioneer in biomedical research and healthcare technologies, and he's considered one of the world's leading physicians. He's also the New York Times and international best-selling author of 'The End of Illness,' 'A Short Guide to a Long Life,' and 'The Lucky Years: *How to Thrive in the Brave New World of Health*.'" CBS News Team, David Agus, M.D. Feb. 14, 2017 12:18 PM, https://www.cbsnews.com/team/dr-david-agus/. Based on what we know about Eric Haseltine, who worked closely with David Hillis at Disney, we can safely say there is much more than meets the eye to David Hillis's role, as described in *supra* note 58, with Disney and the Defense Department. As we can see from what we know about Haseltine, Hillis and Agus, their work is closely tied to the government's Covid-19 vaccine initiative (the Defense Department's Operation Warp Speed) and they have a solid history with Disney.

[60] As another example, CSR Monitor reports about the top-secret National Counter Terrorism Center:

"The Central Intelligence Agency, the Defense Department, the Federal Bureau of Investigation, and 15 other federal agencies funnel information through the center. The data include government briefings, satellite photos, classified cables, phone conversations, even gossip and routine threats – tens of thousands of potential intelligence bits a day. Most of it is nonsense, called 'noise' by the spies. But somewhere, amid all the chatter, there's the occasional 'signal' – something of import or interest. And when they find it, the NCTC thrums to life."

Of Disney's role in the National Counter Terrorism Center, it reports the following:

"Later in the tour, Louise Lief, the deputy director of the International Reporting Project at Johns Hopkins University's School of Advanced International Studies, which organized our visit, asked the question we all really wanted to know: Did Disney really help design the center?

115.     Disney's highest level of management, its board of directors, furthered the military and Defense Department objectives.

116.     Sitting atop all of the Disney entities is the Board of Directors and one Derica W. Rice. Derica W. Rice, an individual notably on the board since 2019,[61] has an extensive background in the pharmaceutical industry.[62] Rice currently "leads the pharmacy benefits management business of CVS Health."[63] CVS, of course, was, as the Kaiser Family Foundation's Drew Altman describes it, essentially the military's delivery mechanism for the Covid-19 vaccine.[64] As a board member, his wisdom and experience would have been integral to

_____

'We don't discuss our contractual relationships,' said Wesley, our latest tour guide. (For security's sake, he asked that his last name not be used. Turns out, even his neighbors don't know what he does.) Even so, a quick Google search confirms that, sure enough, Walt Disney "Imagineers" were tapped to help configure the operations center, presumably because they know something about building workspaces that foster creativity and man-machine interaction, not because of their expertise with Snow White."

Alexandra Marks, *Spending a day at the National Counter Terrorism Center; Reporters tour the secret intelligence agency and find computers, intense security, and a touch of Walt Disney*, THE CHRISTIAN SCIENCE MONITOR, Jun. 13, 2007.

[61] Derica W. Rice Nominated to The Walt Disney Company Board of Directors, Jan. 11, 2019, https://thewaltdisneycompany.com/derica-w-rice-nominated-to-the-walt-disney-company-board-of-directors/ (announcing: "The Walt Disney Company (NYSE: DIS) Board of Directors today announced that Derica W. Rice, Executive Vice President of CVS Health and President of CVS Caremark, has been nominated to stand for election as a director at the Company's annual meeting on March 7, 2019.").

[62] Mr. Rice "was formerly the President of CVS Caremark, the pharmacy benefits management business of CVS Health, and Executive Vice President of CVS Health." He was also "employed in various executive positions at Eli Lilly and Company since 1990, most recently serving as Executive Vice President of Global Services and Chief Financial Officer from 2006 to 2017." https://thewaltdisneycompany.com/leaders/derica-w-rice/

[63] *Id.*

[64] Drew Altman, Kaiser Family Foundation, *Pharmacies, not the military, will handle COVID-19 vaccinations*, Aug 31, 2020 https://www.axios.com/2020/08/31/coronavirus-vaccine-distribution-military-pharmacies. Altman explains:

any of Disney's vaccination strategies.[65]

_____

"Although President Trump has said the military is 'all mobilized' to help distribute a coronavirus vaccine, in the end that process will almost certainly rely heavily on the pharmacies, doctors and community hospitals we're all familiar with.

The big picture: Deciding how to distribute a vaccine is, for now, a government-driven task, and Trump has invoked the logistical expertise of the military as a way to do the job. For the public, though, this won't feel like a military exercise, with heavy trucks rolling into town and people lining up outside medical tents. It'll feel like going to CVS."

See also, the Defense Department's announcement: *Trump Administration Partners With CVS and Walgreens to Provide COVID-19 Vaccine to Protect Vulnerable Americans in Long-Term Care Facilities Nationwide*, Oct. 16, 2020. https://www.defense.gov/News/Releases/Release/Article/2384541/trump-administration-partners-with-cvs-and-walgreens-to-provide-covid-19-vaccin/#:~:text=To%20meet%20the%20Trump%20Administration's,facilities%20(LTCF)%20nationwide%20with%20no.

It's worth noting, on a ten-minute call on hold waiting for a person to answer the phone at CVS to see if a prescription is ready, you will hear a recording approximately 10 times stating, "CVS Pharmacy not only has flu vaccines for your family but 14 other vaccinations that can help protect against Covid-19, pneumonia, shingles, and more. You can even get multiple vaccines at the same time. Schedule ahead at CVS.com/vaccines." It's worth noting to point out the extent of machinations that a company like CVS went through to gain adherence and compliance. The symbiotic relationship between partners in programming is clear.

Of course, Disney is tapping this executive from CVS for its board of directors (before the pandemic).

[65] The role of the board of directors, while not involved in the day-to-day management, is involved in a "supervisory role, overseeing corporate activities and assessing performance," Alert Investor, Get on Board: Understanding the Role of Corporate Directors; Even the CEO have to answer to somebody, THE MOTLEY FOOL Mar 25, 2019, https://www.fool.com/investing/2016/12/08/get-on-board-understanding-the-role-of-corporate-d.aspx#:~:text=The%20board%20plays%20a%20supervisory,and%20for%20setting%20their%20compensation.

Diligent, the software company that makes corporate governance software notes that a board, among other functions, is "fully engaged with all major issues that affect the corporation":

"The purpose of a board of directors is much more than iconic figureheads. Boards typically look for specific qualities in choosing board members to fill vacant seats. Board members expect their fellow board directors to be willing to ask tough and probing questions to vet all sides of an issue. Board directors need to be well-informed and fully engaged with all major issues that affect the corporation. Identifying risks has become an integral part of board work because risks are becoming increasingly numerous and complex."

AMENDED COMPLAINT AND JURY DEMAND - 49

117.     Since being on the Disney Board of Directors, recently Mr. Rice was appointed to the board of directors of the global biopharmeceutical company Bristol-Myers Squibb and to the board of directors of the financial firm which made its name in the defense industry, the Carlyle Group. Note, Carlyle "has deep roots in the defense sector, dating to the days when former president George H.W. Bush, former British prime minister John Major and former U.S. defense secretary Frank Carlucci held senior advisory or executive positions."[66] Of course, the Carlyle

---

Ross Pounds, *The Roles and Responsibilities of a Board of Directors*, May 4, 2022, https://www.diligent.com/insights/board-of-directors/the-roles-and-responsibilities-of-a-board-of-directors/. Vaccination mandates would fall into that category of major issues affecting the corporation. *See also infra* paragraph 125 and accompanying note.

[66] Terence O'Hara, *Carlyle shows it's still tops with defense deal,* NBC, Feb. 13, 2006, 9:42 AM EST, https://www.nbcnews.com/id/wbna11324989. The deal referred to in the article refers to the privatization of "the main research laboratory for Britain's defense establishment. The point is the Carlyle Group essentially took control of the top research lab. This is no small bit player, the Carlyle Group. Consider the purchase (one of many by Carlyle):

> "Until 2001, Qinetiq was part of the Ministry of Defense, in essence the main research laboratory for Britain's defense establishment. The Qs in its name are a cheeky reference to the fictional character who created high-tech and often lethal spy gadgets for James Bond. Agency scientists were behind inventions as varied as the liquid crystal display and the vertical takeoff-and-landing gear on modern jet fighters. One of its chief specialties was radar technology.

> The Ministry of Defense initially planned to spin off Qinetiq into a separate publicly traded company, reasoning that the commercial marketplace would help fund and accelerate innovations previously paid for by the British government."

That purchase is one of many examples of the type of entwinement that is being advocated and implemented, by design, with the thought being, again, that "the commercial marketplace would help fund and accelerate innovations previously paid for by the British government." *Id*. They – the government – is getting the private sector to facilitate its work.

*See also*, M. Asif Ismail, *Investing in war*, Nov. 18, 2004, https://publicintegrity.org/national-security/investing-in-war/ (describing the entwinement between private investment and the Defense Department).

AMENDED COMPLAINT AND JURY DEMAND - 50

_____

Note also, Kori Schake, the sister of Disney's Kristina Schake (*see supra* paragraph 95 regarding "close nexus"), Director of Foreign and Defense Policy at the American Enterprise Institute, makes a similar point about how the government has managed to influence the world in her book, *Covid-19 and World Order; building a more globalized order*:

> "Our vision for a better world should be an international order of greater connectedness and greater accountability. The method and means for attaining such an order should be to use the tools of free societies to protect and advance free societies. What has made the American-dominated order cost-effective enough to be sustained by a reluctant hegemon (referring to Britain's hegemony) is that the rules were beneficial enough to cajole voluntary compliance."

Kori Schake, Building a More Globalized Order, COVID-19 and World Order, Gavin, Francis J., Hal Brands & Francis J. Gavin, https://muse.jhu.edu/chapter/2696573/pdf, 331 (2020).

Schake characterizes the U.S.'s approach as cajoling, which means persuading by sustained coaxing and flattery. However, it's apt to describe it as sufficient entwinement with much more muscle. Her spin on the bigger picture is pertinent:

> "Rather than construct an international order that maximized its dominance, the United States limited its direct power normatively, legally, and institutionally. It gave other states leadership roles and the ability to influence terms and institutions, which spread the burden of common problems more widely and made US dominance less objectionable than has been the case for previous hegemons. Leading with a light hand has served the United States well."

*Id*. https://www.nato.int/cps/en/natohq/opinions_180067.htm

There are, of course, places where the United States leads with a "light hand," there are also cases where the United States leads with a swift kick of the military boot, or certainly the threat of.

Schake's references in these regards, are, of course relevant, considering she is the "close" sister of Kristina Schake and both have served in high levels in government. (Regarding Kristina Schake's government work, see paragraph 95 and accompanying note, regarding Kori Schake's government work, "[s]he has had a distinguished career in government, working at the US State Department, the US Department of Defense, and the National Security Council at the White House. She has also taught at Stanford, West Point, Johns Hopkins University's School of Advanced International Studies, National Defense University, and the University of Maryland.") See e.g., https://policy.defense.gov/Portals/11/Documents/DPB_Docs/Schake%20DPB%20Bio_update.pdf.

Moreover, she and her experience, work and advocacy are relevant because, though the sisters are described as being politically polar opposites, the adoption of this entwined strategy is common to both of them. One is outwardly touting the strategy of entwining the military with private enterprise (Kori), the other is outwardly exhibiting the strategy of entwining the military with private enterprise (Kristina) (*See* paragraph 95).

Meghan Daum, *These Two Sisters Couldn't Be Closer—Or More Politically Opposed*, Dec. 15, 2015, Vogue,

AMENDED COMPLAINT AND JURY DEMAND - 51

Group is also involved in other investments, including involvement with the Covid-19 vaccine. In fact, the Executive Chairman of Pfizer, Ian Read, left Pfizer December 31, 2019[67] and took a role with the Carlyle Group in January of 2020.[68] Regarding Mr. Rice—the Disney Board of Director member, a former top executive with CVS and the former CFO of Eli Lilly, worthy of being appointed to both the Bristol-Myers Squibb Board of Directors and the Carlyle Group's Board of Directors—he certainly had something to say about the Disney corporate-wide mandate. Further, Disney appointed this individual with such an intimate involvement with pharmaceuticals in *2019*, also reflecting an awareness and entwinement with the Defense Department, with respect to the risks associated with pandemics and the need for mandates.[69] Just in time for a vaccine rollout.

118. To fully appreciate the significance of Rice being on the board of Disney, Bristol-

_____

https://www.vogue.com/article/sisters-kori-kristina-schake-politics-liberal-democrat-republican.

[67] *Ian Read to Retire as Executive Chairman of Pfizer's Board of Directors; Chief Executive Officer Dr. Albert Bourla Named Chairman*, Sep 27, 2019 - 04:00am, https://www.pfizer.com/news/press-release/press-release-detail/ian_read_to_retire_as_executive_chairman_of_pfizer_s_board_of_directors_chief_executive_officer_dr_alber t_bourla_named_chairman#:~:text=Read%20has%20chosen%20to%20retire,Read%20joined%20Pfizer%20in%201 978.

[68] The significance of the Carlyle Group, with representation on the Disney Board, can be gleaned from the fact that the CEO of Pfizer joined the Carlyle Group in January 2020 – January 9, 2020 to be precise. *See e.g.*, Angus Liu, *Busy Ian Read takes another post-Pfizer gig, this time as a Carlyle Group dealmaker*, Jan 9, 2020 10:18am, https://www.fiercepharma.com/pharma/busy-ian-read-takes-another-post-pfizer-title-joins-carlyle-group-as-operating-executive.

[69] Note, Disney's other pharmaceutical-related Director, Robert Matschullat, who served on the Disney Board from 2002-2018, was on the board of McKesson Corporation from 2002-2007. While "McKesson is … the nation's largest drug distributor, responsible for a third of all pharmaceuticals used each day in North America," Matschullat's role with McKesson, unlike Rice's role with CVS, was not as an executive. *McKesson*, Fortune, https://fortune.com/company/mckesson/.

Myers Squibb and the Carlyle Group, one need only consider a recent purchase by the Carlyle Group, as reported by Reuters in an announcement entitled: "Carlyle to buy U.S. defense contractor ManTech for $3.9 billion." The article explains, of the purchase of ManTech:

> "Fairfax, Virginia-based ManTech performs defense and non-defense contracting services for the intelligence community, the Pentagon and other government agencies.
>
> 'Carlyle will benefit from ManTech's large exposure to intelligence customers and to the cybersecurity sector,' Wells Fargo analyst Matthew Akers said."[70]

119. As a member of the board of directors, clearly Mr. Rice's experience of value includes that which relates to the vaccine, the mandates and the defense industry.

120. Of course, to the extent that there is an overlap, such as in the use of AI in all three industries, it only reinforces the synergistic nature of the relationship between these three, the business of Disney/ESPN, the objectives of the Defense Department and the objectives of the pharmaceutical industry.[71]

    a. Board member Mary T Barra, added to the board in 2017, also served as a Board member of General Dynamics, the fifth largest defense contractor, from 2011 to 2017.[72]

_____

[70] Carlyle to buy U.S. defense contractor ManTech for $3.9 billion, REUTERS, May 16, 202211:51 AM EDT, https://www.reuters.com/markets/us/carlyle-buy-us-defense-contractor-mantech-about-39-bln-2022-05-16/

[71] See e.g., Bristol-Myers Squibb Annual Report, *The power of science, the power of AI*, Mar. 10, 2022, https://annual-report.bms.com/assets/bms-ar/documents/2021-annual-report.pdf (describing the role of AI at Bristol-Myers Squibb).

[72] Mary T. Barra, Director Since 2017, https://thewaltdisneycompany.com/leaders/mary-t-barra/.

AMENDED COMPLAINT AND JURY DEMAND - 53

121.     In line with that know-how (in the areas of the vaccine, the mandates and the defense industry) Rice's work with Bristol-Myers Squibb also dovetails with sports and ESPN, as ESPN proudly telecasts the annual Sports Humanitarian Awards sponsored by Bristol-Myers Squibb. It's an important cobranding, particularly as it pertains to the vaccination mandate and the appearance of the value of pharmaceuticals. Moreover, the co-branding offers an award to athletes and teams directly from both the pharmaceutical industry and ESPN.[73]

_____

[73] ESPN Announces the Finalists for the 2020 Sports Humanitarian Awards (noting, as described by Kevin Martinez, vice president of ESPN Corporate Citizenship:

> "'For six years, ESPN has been honored to telecast the Sports Humanitarian Awards, which highlights the impact that sports has to create social change, and we're excited to carry that narrative through the ESPYS and our other platforms.'

The cobranding is described as follows:

> "The sixth annual *Sports Humanitarian Awards, sponsored by Bristol-Myers Squibb*, is a celebration of the impact made by athletes, teams and sports industry professionals who are using sports to make a difference in their communities and throughout the world.")

V Foundation, https://www.v.org/story/espn-announces-finalists-for-the-2020-sports-humanitarian-awards/ (last visited 020623).
Note, while Bristol-Myers Squibb's role with the Covid-19 pandemic was less than that of Pfizer, Moderna and Johnson & Johnson, it expects to play a larger role in the post pandemic environment, as for example, its drug partnership with Pfizer, with the drug Eliquis (apixaban) reduces the risk of strokes, strokes, of course, increasing in incidence after Covid-19. *See e.g.*, Arlene Weintraub, *Bristol Myers Squibb's blood thinner Eliquis soars on COVID-19 demand, but Opdivo could suffer: execs*, May 7, 2020 10:36am, https://www.fiercepharma.com/pharma/covid-drives-huge-demand-for-bristol-myers-blood-thinner-eliquis-but-could-dampen-mid-year (noting "COVID-19 stocking of BMS and Pfizer's blood thinner Eliquis drove sales of that product up 37% to $2.6 billion.").

Bristol-Myers Squibb and Pfizer note after the 2013 FDA approval of Eliquis that: "ELIQUIS is the result of leading scientific innovation and the shared vision of our alliance to introduce a new oral anticoagulant for patients with nonvalvular atrial fibrillation in the U.S." U.S. FDA Approves ELIQUIS® (apixaban) to Reduce the Risk of Stroke and Systemic Embolism in Patients with Nonvalvular Atrial Fibrillation, Jan 02, 2013,

AMENDED COMPLAINT AND JURY DEMAND - 54

122. Rice is not the first Carlyle Group member of Disney's Board of Directors. He was preceded by Susan E Arnold, who was brought on as a director in 2007, and elected chair on December 31, 2021.[74]

123. The extensive entwinement of Disney/ESPN with the government, and particularly with the Defense Department and HHS, subjecting Disney/ESPN to state actor thresholds and burdens, is further evidenced by the fact that Operation Warp Speed touts itself as a partnership and coordination between government and business:

**About Operation Warp Speed**

OWS is a partnership among components of the Department of Health and Human Services and the Department of Defense, engaging with private firms and other federal agencies, and coordinating among existing HHS-wide efforts to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics.[75]

That relationship alone might qualify a private partner and coordinator for treatment as a state actor, however, there are far more connections and entwinements which have been shown. Still

_____

https://news.bms.com/news/details/2013/US-FDA-Approves-ELIQUIS-apixaban-to-Reduce-the-Risk-of-Stroke-and-Systemic-Embolism-in-Patients-with-Nonvalvular-Atrial-Fibrillation/default.aspx.

[74] *See e.g.*, *Susan Arnold Named Chairman Of The Board Of The Walt Disney Company, Effective December 31,* Dec 1, 2021, https://thewaltdisneycompany.com/susan-arnold-named-chairman-of-the-board-of-the-walt-disney-company-effective-december-31/#:~:text=December%201%2C%202021-,Susan%20Arnold%20Named%20Chairman%20Of%20The%20Board%20Of,Disney%20Company%2C%20Effective%20December%2031&text=BURBANK%2C%20Calif.%2C%20December%201%2C%20effective%20December%2031%2C%202021.

[75] *See e.g.*, Trump Administration Collaborates With McKesson for COVID-19 Vaccine Distribution, Aug. 14, 2020 https://www.defense.gov/News/Releases/Release/Article/2313808/trump-administration-collaborates-with-mckesson-for-covid-19-vaccine-distributi/.

AMENDED COMPLAINT AND JURY DEMAND - 55

more will be shown.

124.     Another Defense Department Disney entwinement is the fact that the Defense Department funds Covid-19 research by Illumina, whose CEO, Francis deSouza, was added to the Disney Board in 2018. With all the products in the world—artificial intelligence, robotics, software, high tech, other health care products—and only 12 slots for Directors, and only one or two new individuals to be added, with some years having no new board members, Disney adds the CEO of Illumina, the company which makes next generation sequencing (NGS), the first company to be approved by the FDA for COVID-19 diagnostic testing utilizing next generation sequence technology.[76] The NIH also awarded Illumina several million dollars, including for a "massive lab," as it's described in the grant award for Covid-19 testing.[77] The fact is that this is the fifth individual notably a part of Disney's Board of Directors, Rice, Arnold, Matschullat, Barra, and now Francis deSouza, all involved with the pharmaceutical and or the defense industry.[78] They're on the board because of their relevant expertise. They are highly symbiotic in

_____

[76] *See e.g.*, *Illumina Receives First FDA Emergency Use Authorization for a Sequencing-Based COVID-19 Diagnostic Test,* Jun. 9, 2021, https://www.illumina.com/company/news-center/press-releases/2020/8cd141fb-68d0-4144-8922-45693ac3f453.html. *See also, Coronavirus (COVID-19) Update: FDA Authorizes First Next Generation Sequence Test for Diagnosing COVID-19*, FDA Statement, Jun. 10, 2021, https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-next-generation-sequence-test-diagnosing-covid-19#:~:text=The%20U.S.%20Food%20and%20Drug,utilizing%20next%20generation%20sequence%20technology.
[77] *See e.g.*, Illumina, Inc., Tracking Federal Purchases to Fight Coronavirus, https://projects.propublica.org/coronavirus-contracts/vendors/illumina-inc.
[78] Also, Disney Board of Directors, Director Michael Froman on the Transatlantic Task Force deals with "Coping with Covid-19 and Future Pandemics." The task force in this regard refers to the following challenges:

Pandemic

_____

• Create a Transatlantic Stockpile of Medical Supplies and Medicines: Regularly report on transatlantic production capacity, output, domestic demand, and create a joint stockpile of medical supplies, equipment, and medicines to respond to inevitable future emergencies.

• Ensure Equitable Access to Pandemic Treatment: Build on efforts led by the World Health Organization and others to ensure equitable access to pandemic vaccines and therapies, including the creation of a Global Fund to Fight Pandemics, to finance research, production, and large-scale, rapid distribution of treatments for COVID-19 and future pandemics, especially in the developing world.

Notably, as with many Disney efforts and related efforts, there is no mention of the societal objective of "ensuring that those with sincere religious objections receive proper and just treatment, and in the event of displacement, protection and care." It's as if the law with respect to religious rights is not part of the equation, except to stamp it out.

Additionally, Kori Schake and Michael Froman, Disney Board Member, share a common thread which relates to war, and the current war, being talked about in terms of World War III, they both sit on the Transatlantic Task Force, also known as the Transatlantic Security Task Force. *See The German Marshall Fund and Bundeskanzler-Helmut-Schmidt-Stiftung Launch "Transatlantic Task Force" Setting Path Forward for U.S.-Europe Relations*, Dec. 12, 2019 https://www.gmfus.org/news/together-or-alone-choices-and-strategies-transatlantic-relations-2021-and-beyond.

The Transatlantic Task Force is the body created as a tribute to the Marshall Plain, by Germany and Harvard University, the effort to rebuild Europe after World War II. The tribute, with significant funding continues to foster their joint efforts. (It's the private continuation of the prior government/public project/function). Here we are with a Europe being affected currently considerably by a war in Eastern Europe, and a Disney Board Member is one of only 12 on that task force. He's on that Disney Board, while Kristina Schake is a Disney top executive, SVP and Chief Communications Officer, and while her sister, Kori Schake, is also on that Transatlantic Task Forse. Kori Schake wrote a policy paper, in 1998, entitled *Europe After NATO Expansion; the unfinished security agenda*. NATO expansion, isn't that what's being spoken about with respect to this current war? Froman's been on the Disney Board since 2018. He's wayley and relevant for this 2021 Transatlantic Task Force also? Yes. Prescient? Government entwinement, more likely.

Not only more likely, clearly evident: Disney has had its hands in biotechnology for some time. Back to Epcot. To appreciate it, this simple description helps:

In 1982, Disney debuted Listen to the Land, a slow-moving boat ride through agricultural vignettes that culminated in a visit to sprawling greenhouses that provided a peek at Disney's biotechnology labs. Inside, scientists in white lab coats pipetted and plated dozens of samples. The September 1989 issue of Agricultural Research magazine put it plainly: "ten million people a year now get a close-up look at tissue culture and biotechnology in action."

AMENDED COMPLAINT AND JURY DEMAND - 57

their fit together, to the point where state action exists.

125.    It is the Disney Board that is responsible for selecting new board members and establishing the criteria for such selections. It is the Disney Board who has established and evaluated the criteria of having a defense background and a pharmaceutical/vaccination related background as backgrounds relevant to the success of Disney.[79]

126.    The mission of Disney goes beyond entertainment to informing. The Disney mission statement, in one version of it, is "to entertain, **inform** and inspire people around the globe through the power of unparalleled storytelling, reflecting the iconic brands, creative minds and innovative technologies that make ours the world's premier entertainment company."[80] Disney, similarly also states its mission as "to be one of the world's leading producers and

_____

The lab, launched as a partnership between Walt Disney World, Kraft, and the USDA's Agricultural Research Service (ARS), now operates as a branch of the Functional Genomics and Breeding Research Unit under the ARS. Since its conception, the lab has focused on improving the durability, yield, and disease resistance of crops, especially fruit trees. Researchers do so through tissue culture and cloning, two popular techniques in molecular biology that allow scientists to test different genetic modifications.

Rose Schnabel, *Conversations in Science at Indiana University, The happiest biotechnology lab on Earth*, Dec. 18, 2021, https://blogs.iu.edu/sciu/2021/12/18/happiest-biotechnology-lab/. So, when we say Disney knows what's coming, or rather knows what's going on, and that one can look at the highest levels of Disney regarding it, we mean it.

[79] The Disney Notice of 2021 Annual Meeting and Proxy Statement indicates that the Governance and Nominating Committee "assists the Board in developing criteria for open Board positions, reviews background information on potential candidates and makes recommendations to the Board regarding such candidates." https://thewaltdisneycompany.com/app/uploads/2021/01/2021-Proxy-Statement.pdf. The same function is noted in the Proxy Statements for prior years.
[80] https://thewaltdisneycompany.com/about/ (emphasis added).

AMENDED COMPLAINT AND JURY DEMAND - 58

providers of entertainment and **information**."[81] In each version, it emphasizes the role it seeks to play in informing.

127.    Disney's mission and efforts to inform include informing the public about taking the vaccination, and they include doing so through their informative sports channel, ESPN.

128.    To be sure Disney controls ESPN. On October 12, 2020, Disney restructured to bring the "ESPN and Sports Content" into a single, global Media and Entertainment Division."[82]

129.    In fact, Bob Iger takes credit for having influence over ESPN, as the justification for his compensation bonus, in the 2021 Disney Proxy report, lauds his having, in 2020, "Successfully launched Disney+ and drove unprecedented subscriber growth in the first year, while also increasing subscribers at ESPN+ and Hulu."[83]

130.    The 2021 Proxy Statement also notes that Disney under his leadership as Chairman of the Board in 2020, "Innovated to continue to deliver world-class content and experiences for our consumers. Adopted flexible and creative content distribution approaches, delivering content to consumers how and when they want it; brought sports to fans by hosting the MLS and NBA seasons at the ESPN Wide World of Sports complex in Orlando, Florida, with

---

[81] https://www.indeed.com/cmp/The-Walt-Disney-Company/about (emphasis added).
[82] The Walt Disney Company Announces Strategic Reorganization Of Its Media And Entertainment Businesses, Oct. 12, 2020, https://thewaltdisneycompany.com/the-walt-disney-company-announces-strategic-reorganization-of-its-media-and-entertainment-businesses/.
[83] *See supra* note 79, at 39.

AMENDED COMPLAINT AND JURY DEMAND - 59

extensive safety measures inside the 'bubble.'"[84]

131.    Similarly, Disney CEO Bob Chapek has taken credit for his influence over ESPN and its success and content delivery.[85]

132.    Disney brought ESPN further into its fold operationally to a large extent when it created its Direct to Consumer (DTC) strategy. Disney, in its 2021 Proxy report, touts its having "Reimagined our business. Reorganized our media and entertainment business to further accelerate and strengthen our DTC strategy and fuel the creative and financial growth of the Company."[86] The days of products being physical and tangible and reaching a market like Connecticut, where ESPN is headquartered, only by retail outlets, and shipments and delivery physically to one's door are long gone. As Disney notes of its DTC delivery of content through the internet, Disney does business in Connecticut and all over the world.

133.    Disney delivers its content and values through its new Disney+, Hulu and ESPN all in one bundle.

_____

[84] *Id.* at 22.
[85] *Id.* at 39.
[86] *Id.* at 22.

AMENDED COMPLAINT AND JURY DEMAND - 60



134.    These are Disney products sold as a Disney Bundle to anywhere in the world, including Connecticut.

135.    Disney is quite public about the values it promotes through its packages. Though it touts in its Proxy commitments to race, ethnicity, gender, diversity and inclusion, and an LGBTQ award, it makes no mention of religious rights.

136.    Despite having employees in Connecticut and selling to homes and consumers in Connecticut, through a variety of marketing arrangements and advertising in Connecticut, Disney and ESPN doesn't afford the religious rights to its employees guaranteed by federal law and Connecticut law. Those laws are intended to protect the rights of employees of companies and employers doing business, whether in a physical store or through online sales, in Connecticut such as Disney and ESPN.

137.    Disney makes no bones about the fact that it envelopes ESPN, and acts to control and manage it, in its announcement prior to the 2020 reorganization and DTC bundle integration:

"The Walt Disney Company Aligns Media Distribution Under Direct-To-Consumer & International Segment, Integrates Disney & ESPN Media Networks Affiliate Sales & Marketing Into DTCI Organization."[87] That Disney press release, July 18, 2019, explains: "The Walt Disney Company announced today that it will combine all of the Company's media sales and channel distribution into one organization under Justin Connolly, who has been named president, Media Distribution."[88] The release further explains the integration: "'By combining all of our media, affiliate, content and syndication sales, and distribution efforts into the Direct-to-Consumer & International segment, we continue to transform the ways in which we distribute the great stories and characters created by The Walt Disney Company's studios and media networks,' said Mayer."[89]

138.    The release explains the entities included and Connolly's responsibilities, as President Disney Platform Distribution at The Walt Disney Company: "In this role, Connolly will continue to oversee all aspects of North American distribution, affiliate marketing and affiliate-related business operations for all the services provided by Disney and ESPN media networks including, among other services: ESPN, ESPN2, ESPNEWS, ESPN Deportes, ESPNU,

───────────────────────

[87] *The Walt Disney Company Aligns Media Distribution Under Direct-To-Consumer & International Segment, Integrates Disney & ESPN Media Networks Affiliate Sales & Marketing Into DTCI Organization*, NEWS DTCI, https://dmedmedia.disney.com/news/dtci-integrates-disney-espn-media-network-affiliate-sales (last visited Feb 06, 2023).
[88] *Id.*
[89] *Id.*

AMENDED COMPLAINT AND JURY DEMAND - 62

SEC Network, ACC Network, Disney Channel, Disney Junior, Disney XD, Freeform, FX, FXX, FXM, National Geographic and Nat Geo Wild, and related WATCH, HDTV, video-on-demand, interactive television and retransmission consent agreements for The Walt Disney Company's eight-owned ABC stations. He will also continue to have oversight of the ABC Affiliate Relations and Marketing team.[90]

139. Bob Iger, himself, takes credit for decisions over ESPN matters, and terminations, such as when he publicly took credit for the decision not to discipline Jemele Hill, a host on the Disney-owned ESPN cable network, [who] called President Trump a "white supremacist" in a tweet after Mr. Trump's equivocal comments on the white nationalist march in Charlottesville, Va."[91] Iger, "[s]peaking on the stage of the Annenberg Center for the Performing Arts, [] defended the decision to refrain from disciplining Ms. Hill by saying, "I felt we needed to take into account what other people at ESPN were feeling at this time, and that resulted in not taking action."[92] He took personal responsibility, noting that "*I* felt…" and that it resulted in the ultimate decision.

140. Hill had apologized to John Skipper, the, then, ESPN President and Co-Chairman

_____

[90] *Id*.
[91] Jim Rutenberg, *For Disney's Iger, an Unlikely Political Turn*, N.Y. TIMES, Oct. 8, 2017, https://www.nytimes.com/2017/10/08/business/media/for-disney-chief-robert-iger-an-unlikely-political-turn.html.
[92] *Id*.

AMENDED COMPLAINT AND JURY DEMAND - 63

of Disney Media Network.[93] Skipper's role as both an ESPN executive and a Disney executive is reflective of the management involvement of Disney in ESPN's operations.

141.　　John Skipper was succeeded by James Pitaro, who again, also is an executive with both ESPN and Disney, serving formerly as Co-Chair of Disney Media Networks and ESPN's Chairman, and under the reorganization as Chairman of ESPN and Sports Content (in charge of Disney/ESPN's multimedia offerings).[94]

142.　　James Pitaro also reports to the Disney CEO, Chapek, from 2019-2022, and Disney CEO Iger since November 2022.

143.　　John Skipper negotiated the current nine year 2.6 billion dollar per year ESPN - NBA agreement, set to expire in 2024, yet it was not an ESPN executive that negotiated the NBA Bubble arrangement with Disney/ ESPN's World Wide of Sports Complex in Disney World, it was the Disney executive Bob Iger.[95] At least in part, because Iger has longstanding ties to the NBA.[96]

144.　　Iger's connections, and other Disney connections, to the NBA are not immaterial, considering the NBA's Covid-19 vaccination uptake rate and considering the military's

_____

[93] See column by Jemele Hill in the ESPN owned Andscape, formerly the Undefeated. Jemele Hill, *Jemele Hill on doing the right thing; A lesson from her grandmother: Be better. No matter what*, Sep 27, 2017, https://andscape.com/features/jemele-hill-on-doing-the-right-thing/.
[94] *See supra* note 1.
[95] Ramona Shelburne, *How Adam Silver, the NBA's stars and owners negotiated these playoffs*, ESPN, Jun. 4, 2020, https://www.espn.com/nba/story/_/id/29267245/how-adam-silver-nba-stars-owners-negotiated-playoffs
[96] *Id*.

AMENDED COMPLAINT AND JURY DEMAND - 64

involvement in the NBA which paragraphs 145 to 179 will detail.

145.     The United States military was singular, as an entity, in its overwhelming denial of religious exemptions, with its having granted only 15 of its service members religious exemption requests out of "approximately 16000" requests.[97]

146.     It was considerably surpassed in uptake rates only by the likes of the NBA.[98] (Uptake rates refer to the rate of Covid-19 vaccination).

147.     The United States military has been quite public about its symbiotic relationship with the NBA, the military's need for it and the benefits for both the NBA and the military.[99] For example, on or about April 17, 2014, General Martin Dempsey, the Chairman of the Joint Chiefs of Staff, as summed up by a Defense Department article titled, "Dempsey Praises Military Partnership With Pro Basketball," stated "I'm excited about partnering with the NBA and USA Basketball in finding innovative ways to serve the communities in which we live and work.… This partnership will be a slam dunk -- two groups who are the best in the world at what they do

_____

[97] Oren Liebermann and Ellie Kaufman, *US military has approved religious exemptions to vaccine mandate for 15 service members out of 16,000 requests*, CNN, Feb. 17, 2022, https://www.cnn.com/2022/02/17/politics/us-military-religious-exemptions-covid-vaccine/index.html.

[98] *See infra* paragraphs 109, 168, and 169 and accompanying notes.

[99] Jim Garamone, *Dempsey Praises Military Partnership With Pro Basketball*, AMERICAN FORCES PRESS SERVICE, May 5, 2014, https://www.jcs.mil/Media/News/News-Display/Article/571678/dempsey-praises-military-partnership-with-pro-basketball/#:~:text=%22I'm%20excited%20about%20partnering,the%20communities%20that%20support%20them.%22.

giving back to the communities that support them."[100] This was while Dempsey was in his government role.

148.     Dempsey described the partnership between USA Basketball, the NBA, and the Department of Defense as "a comprehensive partnership for a robust commitment to service."[101]

149.     While much of the military-NBA partnership revolves around community service and "assisting veterans in the transition back to civilian life," as described by NBA Commissioner Adam Silver, regarding the announcement of the partnership,[102] the partnership does in fact aid the military in a much broader campaign, a campaign that also involved Bob Iger and Disney/ESPN, to be developed further below.

150.     General Dempsey explained that partnerships, such as the one with the NBA, are designed to promote the military's (and the government's) values. "Dempsey said he's concerned about the public's lack of understanding of the military's role not only in war, but during 'the everyday business of protecting our national interests and promoting our values.'"[103]

151.     The military's everyday business of promoting values, while laudatory in its own

_____

[100] *Id.*
[101] *Id.*
[102] *Supporting Armed Forces Members And Their Families, Commitment To Service Will Focus On Four Pillars: Transition, Community, Leadership And Health*, May 5, 2014, https://www.usab.com/news-events/news/2014/05/usa-basketball-nba-and-department-of-defense-partner-on-a-commitment-to-supporting-armed-forces.aspx.
[103] Jim Garamone, *General Dempsey January 14, 2014 speaking to students at the National Defense University*, AMERICAN FORCES PRESS SERVICE, https://www.jcs.mil/Media/News/News-Display/Article/571640/dempsey-leaders-can-make-a-difference-in-challenging-world/.

AMENDED COMPLAINT AND JURY DEMAND - 66

right, begins to constitute entwinement when it works hand in hand with Disney/ESPN, as delineated herein.

    a. As only one prefatory example of the influence, and what promoting values includes, it includes imparting and landing messages to coaches at the Pentagon after they met with President Obama. In the words of University of Connecticut's world championship college basketball coach, Geno Auriemma, "When you start taking everything you're supposed to do as seriously as those kids your age take their job in the military, then you'll understand what passion is and what commitment to detail is, and when your teammate expects you to do something, you do it."[104] If that last phrase has a familiar ring to it, it may be that it's reminiscent of the famous line in the "Did you order the code red" segment of the movie "A Few Good Men," in which Colonel Jessup on the witness stand, in answer to Lieutenant Kaffee's question "When Kendrick spoke to the platoon and ordered them not to touch Santiago, any chance they ignored him?" famously professes: "Have you ever spent time in an infantry unit, son? … Ever served in a forward

---

[104] Ari Mason and Kevin Nathan, May 7, 2014, Updated on May 8, 2014, *UConn Coaches Speak to Military at Pentagon* https://www.nbcconnecticut.com/news/sports/huskies-uconn-ollie-auriemma-pentagon-oval-office-hoops-for-troops/52496/.

area? … Ever put your life in another man's hands, ask him to put his life in yours? … We follow orders, son. We follow orders or people die. It's that simple. Are we clear?"[105]

    b.   The meeting at the Pentagon was part of the Hoops for Troops program, which was described as being "part of an 'expanding relationship' between the basketball organizations and U.S. Department of Defense, focusing on 'commitment to service.'"[106]

152.    The partnership between the government and the NBA, with the above as one example, supported by and engaged in with Disney/ESPN[107] reflects coercive power, significant encouragement, joint action, agency control, and symbiosis.[108]

153.    The professed intention of Dempsey, for such partnerships, is to achieve the government's and military's aims, as such partnerships fit into a "whole-of-government" approach, as opposed to a solely military "tool" approach.[109] The latter depends heavily on the physical power of the military but has the associated risks and harms, the former enables the

---

[105] Aaron Sorkin, *A Few Good Men*, Jul. 15, 1991, https://imsdb.com/scripts/A-Few-Good-Men.html.
[106] *See supra* note 104.
[107] *See e.g., supra* paragraph 112 and accompanying note.
[108] Note, the two seminal cases on state action have involved sports and athletic associations. *Brentwood Academy* and *National Collegiate Athletic, Assn. v. Tarkanian*, 488 U. S. 179 (1988). *See also supra* paragraph 101 and accompanying note.
[109] Jim Garamone, *Dempsey Talks Caution, Whole-of-Government Approach*, DoD News, Sept. 22, 2015, https://www.defense.gov/News/News-Stories/Article/Article/618120/dempsey-talks-caution-whole-of-government-approach/.

achievement of the government and military aims without such harms.

154.    Such whole-of-government approach, evidently, and logically, includes partnerships with business. The military and the whole-of-government approach qualifies not only as partnership but also as pervasive entwinement, particularly with respect to vaccination mandates.

155.    The United States military has inherently "coercive power" in any mission it pursues with rigor.

156.    General Martin Dempsey, on or about October 2, 2015, one week after "stepping down as the military's top officer" became an advisor to the NBA. The NY Times reported Dempsey "was expected to counsel Mr. Silver on matters of leadership and service, as well as to advise N.B.A. owners and executives on how franchises can connect with communities. He will also head a new leadership council for the league's global youth basketball initiative, the Jr. N.B.A."[110]

157.    General Martin Dempsey as the former Chairman of the Joint Chiefs of Staff was the "nation's highest ranking military officer" and "the principal military advisor to the President, Secretary of Defense, and National Security Council."[111] Stepping into the role as

_____

[110] Zach Schonbrun, *Former Head of Joint Chiefs Will Advise N.B.A. and Adam Silver*, N.Y. Times, Oct. 2, 2015, https://www.nytimes.com/2015/10/02/sports/basketball/former-head-of-joint-chiefs-will-advise-nba-and-adam-silver.html.
[111] *See e.g.*, https://www.jcs.mil/portals/36/Documents/150429cjcsshort.pdf.

AMENDED COMPLAINT AND JURY DEMAND - 69

advisor to the NBA he brought with him not only the aims of a private individual but also those he carried with him as the top-ranking military official for the United States of America. They did not get checked at the door. His role would grow beyond advisor.

158.    On or about November 14, 2016, Retired General Dempsey became the Chairman of USA Basketball.[112]

159.    On or about March, 2017, General Dempsey became a member of the NBA's Officiating Advisory Council along with former Secretary of Education Arne Duncan.[113]

160.    USA Basketball, and General Dempsey, interfaced considerably with the NBA, which is of course interdependent with Disney/ESPN by virtue of their massive financial arrangement and their military entwinement.

161.    The interface of the former Chairman of the Joint Chiefs of Staff with the NBA coupled with the involvement of Disney/ESPN in promoting the vaccination included intimate involvement. Such intimate involvement included, beyond carrying the inherently coercive power of the most powerful military in the world, with the objectives and means of a man at the top of that military, engaging in "significant encouragement," "joint action," "agency control," and "symbiosis," both indirect and direct with respect to the Covid-19 vaccination mandate.

---

[112] He was reelected to the position in 2017 and 2020, serving until 2024. See *Retired General Martin E. Dempsey Re-elected Chairperson of USA Basketball*, Oct 25, 2021, https://www.usab.com/news-events/news/2021/10/bod-announced.aspx.
[113] Dan Feldman, *NBA to use virtual reality to train referees*, NBC Sports, Mar 2, 2017, https://nba.nbcsports.com/2017/03/02/nba-to-use-virtual-reality-to-train-referees/.

162.     This role, while characterized as a "whole-of-government" approach is better described as a "whole-of-society" approach, wherein government actors exiting government continue to promote, using the power of their government roles, the aims of government.

163.     In or about February 2019, the whole-of-government/whole-of-society approach would include former President Obama working with the NBA's Mark Tatum (Chief Operating Officer and Deputy Commissioner of the NBA, who currently sits on the board of USA Basketball,[114] as well) to open a basketball league in Africa. The opening up of a basketball league, with the aid of a former president, would involve significant financial incentives and benefits for the NBA. It also was a recognized way to influence synergistic government objectives, as described by former President Obama: "Glad to see this expansion into Africa because for a rising continent, this can be about a lot more than what happens on the court."[115] It's unfathomable that Obama's post presidency role is distinct from being aligned with governmental objectives. More than what happens on the court includes, quite obviously, the types of objectives Obama had as a President of the United States and as an ongoing extremely powerful man with regard to those objectives.[116]

_____

[114] *See 2021-2024 USA Basketball Board of Directors*, https://www.usab.com/about/about-usa-basketball/board.aspx.
[115] Des Bieler, *Barack Obama reportedly set for role with NBA-backed African basketball league*, Washington Post, Feb. 18, 2019, https://www.washingtonpost.com/sports/2019/02/18/barack-obama-reportedly-set-role-with-nba-backed-african-basketball-league/.
[116] General Dempsey makes clear his position on whether he continues to act as a representative of the government: "Generals and admirals are generals and admirals for life." Martin Dempsey, *Keep Your Politics Private, My Fellow*

_Generals and Admirals; We must not compromise our military's special role in democracy, nor hinder those who come after us_. Aug. 1, 2016, https://www.defenseone.com/ideas/2016/08/keep-your-politics-private-my-fellow-generals-and-admirals/130404/.

He explains that even a retired General plays a role in military relations with civil servants such as Congresspeople:

> "Moreover, if senior military leaders—active and retired—begin to self-identify as members or supporters of one party or another, then the inherent tension built into our system of government between the executive branch and the legislative branch will bleed over into suspicion of military leaders by Congress and a further erosion of civil-military relations."

_Id_.

He's essentially saying there is no such thing as a private military opinion, or a private military person's objective, only a governmental military opinion or objective, as even retired military leaders' views are perceived as representing the military and what it stands for.

Dempsey's weight as a military influence, after retiring, was also captured by Joseph Solosky, Managing Director for Nascar, in a one-on-one interview with General Dempsey:

> "It is clear that General Dempsey is aware of the weight his military career carries into his post-retirement life. When asked what he envisioned as his biggest challenge in transitioning from the military to a civilian career, he was clear about one thing, 'I want to use the professional reputation that I've accumulated for good service, and it's always in the back of my mind. The pressure of finding the right touch points and places to contribute is heavy, and weighs on me.'"

Joseph Solosky, _From Advising President Obama to Commissioner Silver; A One-On-One with Former Chairman of the Joint Chiefs of Staff General Martin Dempsey_, Nov. 11, 2015, https://medium.com/@jolosky5/from-advising-president-obama-to-commissioner-silver-bbdac9c55587.

This continues into retirement the synergistic goal Dempsey described in April 2014 before the NBA Board of Governors meeting in NYC.

> "'My prediction for us is that as these wars in Iraq and Afghanistan begin to fade and begin to pass into the rear-view mirror of American life, we're going to have to increase our efforts to connect with America,' he said.
>
> The U.S. military cooperating with the NBA brings a different synergy to both organizations, and helps both to partner and better connect with American people, Dempsey said."

AMENDED COMPLAINT AND JURY DEMAND - 72

164.     Further, as to the suggested benefits of the role of the former president,

> "the Associated Press reported Saturday that Obama is 'among those who are expected to have direct involvement with the league's plan to keep growing the game in Africa through the league and other initiatives.' In a tweet, Obama said that he's 'always loved basketball because it's about building a team that's equal to more than the sum of its parts.'"[117]

The government clearly was "building a team" with the NBA. State action can be overt or covert,[118] and this involvement, taken in conjunction with the Disney/ESPN full court press to vaccinate is evidence of covert state action.[119] In this context, the definition of covert as per the 50 USC § 3093(e) definition is essentially tantamount to whole-of-government/whole-of-society activities by a former president and the highest ranking General in the United States military, acting along with executives at one of the country's largest and most influential companies.[120]

165.     Two years later, on May 25, 2021, the NBA announced the formation of NBA

_____

*Supra note 99.*
[117] *Id.*
[118] *See infra* note 37.
[119] Covert action is defined in 50 USC § 3093(e):

> **"(e) 'Covert action' defined**
> As used in this subchapter, the term "covert action" means an activity or activities of the United States Government to influence political, economic, or military conditions abroad, where it is intended that the role of the United States Government will not be apparent…"

https://www.law.cornell.edu/uscode/text/50/3093#e.
[120] *Fortune ranked Disney the 5th most admired of the world's most admired companies, see e.g.*, Feb. 2, 2022, https://thewaltdisneycompany.com/disney-ranks-high-on-fortunes-2022-list-of-worlds-most-admired-companies/.

Africa, worth one billion dollars, at the time of announcement[121]—a valuation made possible in part because of the funding by/deal with Disney.[122]

166.    Such financial entwinement between former (or continuing) top government officials, Disney/ESPN and the NBA shows there exists "significant encouragement," "joint action," "agency control," and "symbiosis," the likes of which qualify Disney/ESPN as a state actor. The entwinement pertains to the Covid-19 vaccination, among other things, and establishes a "close nexus"[123] between the government's actions and objectives and that of the private party with which it became entwined.

167.    Certainly, financial benefits, and massive ones, flowing from the government (or because of the government's involvement) to the private party, the NBA, regardless of whether those financial benefits are earmarked for the private party achieving a particular vaccination uptake rate, reflect an entwinement and a close nexus between the government and the private party if the private party's actions (mandating a vaccine) could be reasonably considered as in service of (as opposed to coincident to) the government's objectives.

168.    The NBA's uptake rate would make the military proud, in that it is consistent with

——————————————

[121] Jabari Young, *NBA forms Africa business entity valued at nearly $1 billion, luring players and investors*, CNBC, May 24, 2021, https://www.cnbc.com/2021/05/24/nba-lures-players-and-investors-to-form-africa-business-entity.html.
[122] *See e.g.*, *supra* paragraph 143. Such funding made possible by support from the Defense Department. *See supra* paragraph 98 and accompanying note and paragraph 91 1.b.viii.
[123] *See supra* note 108.

the extremely hard line that both the military and the government have drawn in carrying out what is traditionally a public function.

169. On or about September 30, 2021, the NBA's uptake rate among players was 95 percent.[124]

170. On or about November 12, 2021, the NBA's uptake rate among players was 97 percent.[125]

171. No other industry has such a high rate.[126]

172. At this point it is worth further highlighting the NBA's close relationship with ESPN and Disney, and with the military and government, a relationship which bears heavily on the NBA's vaccination uptake and treatment of the Plaintiffs.[127]

173. Commissioner Adam Silver considers himself connected to the Disney ESPN entity. Silver, for example, has noted of the NBA's relationship to Disney, "I'm a big Bob Iger fan. Of course, Disney is one of our huge partners."[128] The point of "huge partners" will be

_____

[124] *See e.g.*, *NBA reaches 95% vaccination rate among players*, Kurt Helin, NBC Sports, Sep 30, 2021, https://nba.nbcsports.com/2021/09/30/report-nba-reaches-95-vaccination-rate-among-players/.

[125] Tim Reynolds, *In memo, NBA tells players and coaches to act on booster shots Health*, PBS News Hour, Nov. 12, 2021, https://www.pbs.org/newshour/health/in-memo-nba-tells-players-and-coaches-to-act-on-booster-shots.

[126] *See infra* note 54.

[127] A relationship which has recently been asserted in counsels' recent lawsuit against ESPN and Disney (excerpts included herein). *See Faber et al v. ESPN Productions, Inc. et al.*

[128] Ariel Shapiro, *NBA Commissioner Silver 'rooting' for Disney in the battle against Comcast for Fox*, CNBC, Jul 12, 2018, https://www.cnbc.com/2018/07/12/nba-commissioner-silver-rooting-for-disney-in-the-battle-against-com.html.

developed further.

174. The Disney ESPN entity is tied very closely, and entwined, as we have explained, with the government; the question is whether the Disney/ESPN relationship with the NBA is an extension of such entwinement, such that it actually reflects that entwinement, the answer is it does.

175. The NBA's Covid-19 vaccination rates are not the result of a special management capability among NBA management executive talent but rather the result of an entwinement between the government and private enterprise, principally Disney/ESPN and the NBA, among other sports leagues.

176. Two more points before detailing the Disney ESPN Defense Department relationship further, regarding the NBA Defense Department relationship: First, Dempsey speaking to the USA Basketball team, with Adam Silver present, and noting to the team that Dempsey is the highest-ranking officer in the military and what an honor it is to have him present,[129] stated:

_____

[129] Dempsey speaking to USA Basketball.

AMENDED COMPLAINT AND JURY DEMAND - 76

> "I like to think that this partnership, and that's what it is, a partnership, brings together members of the best military in the world with members of the best basketball teams in the world. I mean, I think it's actually quite a remarkable partnership and one that makes sense to America because, thankfully, the military enjoys a great esteem among the American people, as do these athletes, so if we can bond together and commit to give back, I think that we'll be doing a lot of good, not just for ourselves, collaboratively, but also for the country, and that's our goal."[130]

It's this issue of esteem by the American public and the branding of the military that becomes relevant, as it pertains to the Disney and ESPN, and the NBA, alongside the Covid-19 vaccination requirements. Dempsey, in his 2014 pregame speech to the USA Basketball FIBA World Cup players, remarks to the basketball players that they are essentially doing it for the

---



Photo credit: General Dempsey Addresses Men's National Team; General Martin Dempsey, Chairman of the Joint Chiefs of Staff, addressed the Men's National Team before their game Wednesday night against the Dominican Republic, and told them how important the World Cup is considered all over the world. Aug. 22, 2014, https://www.usab.com/basketball/media/videos/2014/08/general-dempsey-addresses-mens-national-team.aspx.
[130] Jason Schott, NBA's Silver, *General Dempsey discuss Hoops for Troops*, NY SPORTS TODAY (Aug. 21, 2014), https://www.nysportsday.com/2014/08/21/nbas-silver-general-dempsey-discuss-hoops-for-troops/.

AMENDED COMPLAINT AND JURY DEMAND - 77

military.[131] (Dempsey stated this in front of the USA Basketball coach, Mike Krzyzewski, well known for his highly successful career with the Duke Blue Devils, and lesser known for his graduating from The Unites States Military Academy at West Point, the only coach, among both NCAA and NBA coaches to hold that distinction.)

177.    Second, Dempsey's role reflects a significant entwinement, as Dempsey himself observes in touting his own role in this regard. He explains in his talk and teaching on Civil-Military Relations, a course he teaches at Duke University:

> "In the course of my duties as chairman of the Joint Chiefs of Staff, I saw the hidden hand of culture at work frequently. There was a point where I began to describe myself as the dash that separates the words civil and military in references to civil-military relations."[132]

He is referring, in this talk, to his role in connecting the civil realm and the military realm. To call and consider oneself the dash connecting the military to anything would ordinarily seem unlikely and impossible, even outlandish, however, when the individual making such a claim is the highest ranking military officer in the nation, the Chairman of the Joint Chiefs of Staff, we can recognize it for what it is, an acknowledgment of the very real role he plays, a role which is

_____

[131] *See supra* note 129.
[132] General Martin Dempsey, *Civil-Military Relations: "What Does It Mean?"* STRATEGIC STUDIES QUARTERLY – POLICY FORUM (Summer 2021), https://www.airuniversity.af.edu/Portals/10/SSQ/documents/Volume-15_Issue-2/Dempsey.pdf.

AMENDED COMPLAINT AND JURY DEMAND - 78

evident in his work with the NBA. There is no spatial separation. It's by design. The two

entities are separated only by a dash, a dash joining them together to form one concept.[133]

178.    It cannot be overstated that the NBA is, of course, deeply entwined with ESPN

and Disney, by virtue of the multibillion-dollar agreement they have, a nine-year agreement for

2.6 billion dollars per year.[134] The NBA receives from ESPN and Disney those billions of

---

[133] That role as a dash included a hand in bringing additional military personnel aboard. Though nothing can compare to the role of President or the role of the Chairman of the Joint Chiefs of Staff, rather uniquely powerful positions that dwarf all others in their ability to influence, and though her stint with the NBA was only from 2017 to 2019, it is worth noting that the quite distinguished and by all other accounts, powerful, Air Force Lt. Gen. Michelle D. Johnson, the first woman to head the United States Air Force Academy, and one of the Air Force Academy's top women's basketball players in school history, left the military and was named head of NBA Referee Operations in October 2017 shortly after General Dempsey was elected Chairman of USA Basketball. As to her distinguished career, and highly powerful influence, prior to heading the Academy,

> "Johnson spent two years as NATO's Deputy Chief of Staff for Operations and Intelligence (2011-13) and served stints at the Pentagon as the Air Force's Deputy Director for Information and Cyberspace Policy (2007-09) and Director of Public Affairs (2005-07). A command pilot with more than 3,600 flight hours, she was the Air Force aide to Presidents George H.W. Bush and Bill Clinton from 1992-94."

*Retired Air Force Lieutenant General Michelle D. Johnson named NBA Senior Vice President and Head of Referee Operations*, Oct. 12, 2017, https://www.nba.com/news/nba-michelle-johnson-senior-vice-president-referee-operations.

She also received several awards:

> "Upon retirement in August, Johnson received the Distinguished Service Medal. Her awards and decorations also include the Defense Superior Service Medal with three oak leaf clusters, the Legion of Merit with two oak leaf clusters and the Meritorious Service Medal with oak leaf cluster. In addition, she earned the Aerial Achievement Medal, the Air Force Commendation Medal, the Air Force Achievement Medal and the Global War on Terrorism Service Medal."

*Id.*

There is nothing inherently wrong with high level military personnel migrating from the military to the NBA, and working with the NBA, but when their roles and involvement involve working with private entities to further government objectives, values and approaches, state action exists.

[134] *See infra* note 54.

AMENDED COMPLAINT AND JURY DEMAND - 79

revenue, without which the NBA would not be what it is. And Disney is similarly dependent

financially on the military.[135]

179. Disney/ESPN did the Defense Department's bidding: The basketball uptake rates

are but one example of the existence and power of state action, the military working with

Disney/ESPN.[136]

180. Other evidence of the power of Disney/ESPN over sports includes the vaccination

rates among the NFL and the NHL, influenced by the Disney/ESPN Defense Department

treatment.

181. It should be noted, just how important ESPN is to Disney is evidenced by the

_____

[135] *See supra* paragraph 91 1.b.viii.

[136] Of course, what good would a Defense Department entwinement be without a member of the NSA being on the Disney Board of Directors, a top Disney IT executive winding up with a top White House post, and a top FBI official heading a top Disney position. Director Michael B.G. Froman, mentioned earlier above as being on the Disney Board and the Transatlantic Task Force, *see supra* note 78, also "served as United States Trade Representative in the Executive Office of the President from 2013 to 2017, and as Assistant to the President and Deputy National Security Advisor for International Economic Policy from 2009 to 2013, https://thewaltdisneycompany.com/leaders/michael-froman/.

Tony Scott served as CIO for Disney from 2005-2008, before becoming CIO at Microsoft then becoming the third CIO of the United States, serving from 2015-2017. *See e.g.*, https://alumni.business.uconn.edu/tony-scott/. Scott also served as Vice President of Operations at Bristol-Meyers Squibb Co. (1996-1999). *See e.g.*, Elizabeth Montalbano and Eric Lai, *Disney IT exec answers Microsoft's CIO casting call; Vendor taps Tony Scott, CIO at the entertainment company, to run its tech operations,* Jan 17, 2008 12:00 AM PST, IDG News Service, https://www.computerworld.com/article/2538754/disney-it-exec-answers-microsoft-s-cio-casting-call.html.

David Bowdich, Disney's Chief Security Officer served as the FBI's Deputy Director, "the second highest position" in the FBI. *See e.g.*, https://thewaltdisneycompany.com/leaders/david-l-bowdich/.

This is a company intimately entwined over a long period of time with the government.

AMENDED COMPLAINT AND JURY DEMAND - 80

streaming wars. With Netflix having dominated the streaming space, Disney went on a furious binge to shore up this entertainment front; they had already had success in the sports arena with ESPN. Yet, by adding Hulu, Disney, by April 2021, with ESPN a major part of its strategy, was able to take the lead spot in streaming.



The graph shows that with Disney+ and ESPN, it was significantly behind Netflix, but with the addition in 2019 of Hulu, Disney now outpaces Netflix 40% to 28%.[137]

    182.    Disney, in an effort to further shore up this streaming space, has added to its sports streaming capability with the purchase of BAMTech, begun as an MLB Advanced

_____

[137] Brendan Brady, The announced WarnerMedia merger would create the third largest player in the U.S. SVOD market, ANTENNA, MEDIUM, May 18, 2021, https://medium.com/antennaanalytics/the-announced-warnermedia-merger-would-create-the-third-largest-player-in-the-u-s-svod-market-cd406cdd9cb2.

Media.[138] The purchase of BAMTech gives the Disney/ESPN and Defense Department additional influence over MLB, NHL, MLSLive, among other sports.

183. ESPN's power in the streaming space, and influence over sports, has been growing as evidenced by streaming subscriber share.[139] ESPN went from 36% market share to 60% market share of subscriptions.



---

[138] *See e.g.*, Maury Brown, *Disney Purchases MLB's Remaining 15% In Disney Streaming For $900 Million*, Forbes, https://www.forbes.com/sites/maurybrown/2022/11/30/disney-purchases-mlbs-remaining-15-in-disney-streaming-for-900-million/?sh=4591f3fc4a4e.

[139] Brendan Brady, *Antenna launches Sports SVOD coverage*, https://www.antenna.live/post/antenna-launches-sports-svod-coverage.

AMENDED COMPLAINT AND JURY DEMAND - 82

184.    ESPN has influence also over the NFL, as it does with the NBA, also because it has a massive deal with the NFL, paying 2.7 billion dollars to the NFL for rights to its Monday Night Football package and rights to air two Super Bowls on ABC, among other rights.[140]

185.    The NFL actually touts its vaccination superiority: "Nearly 95% of NFL players are vaccinated; nearly 100% of NFL personnel are vaccinated. *With such a highly vaccinated population, the NFL environment is not comparable to anywhere else in society*. We will continue to work with the NFLPA with the goal of having 100% of players vaccinated."[141] (emphasis added). The power of ESPN combined with the military, is of course, what gives it that superiority, when it comes to vaccination uptake rates and minimal granting of religious exemption requests.

---

[140] Vinnie Iyer, *NFL's new TV rights deals, explained: What $100 billion package means for fans in 2023 and beyond*, Mar. 19, 2021, https://www.sportingnews.com/us/nfl/news/nfl-tv-rights-deals-explained/z4rlycwog3jz1f6pqdqoegbxf. (noting "Disney made sure "Monday Night Football" stayed on ESPN by investing more than the other networks, around $2.7 billion per season, per CNBC.") *See also,* Alex Sherman and Jabari Young, *NFL finalizes new 11-year media rights deal, Amazon gets exclusive Thursday Night rights*, CNBC, Mar 18, 2021 4:05 PM EDT, (noting "ViacomCBS, Fox and Comcast (which owns NBCUniversal) are all paying more than $2 billion per year for their 11-year-long packages, while Disney (which owns ESPN and ABC) will pay around $2.7 billion annually, according to people familiar with the matter. Using these numbers, the NFL's new agreement projects to be more than $100 billion -- the richest U.S. sports league media deal.").
[141] NFL COVID-19 Testing Results and Vaccination Rates: Dec. 26, 2021- Jan. 8, 2022, Published: Jan 13, 2022 at 05:26 PM, https://www.nfl.com/playerhealthandsafety/resources/press-releases/nfl-covid-19-testing-results-and-vaccination-rates-dec-26-2021-jan-8-2022#:~:text=Nearly%2095%25%20of%20NFL%20players,to%20anywhere%20else%20in%20society.

AMENDED COMPLAINT AND JURY DEMAND - 83

186.    Tagging on and teaming in this regard, the CDC has this to say about its star

player, the NFL:

> "Like society as a whole, the NFL faced varying degrees of vaccine hesitancy among
> some players and personnel. But, thanks to a program of education, protocol
> enforcement and consistent messaging from leadership, as of November 30, 94.5% of
> NFL players are vaccinated, as are nearly 100% of NFL personnel. These figures
> greatly outpace society as a whole – especially when controlled for demographic
> considerations."[142]

The CDC notes that these figures "greatly outpace society as a whole."

187.    The NFL went from headlines like "NFL Encountering Substantial Vaccine

Hesitancy Among Players"[143] and "NFL struggling to convince enough players to get

vaccinated"[144] in June of 2021 to nearly 100% vaccinated.

188.    The NFL teamed up with the White House. When the NFL's Commissioner

Roger Goodell sent a memo to all 32 teams "that detail[ed] drastic penalties for teams with

unvaccinated personnel, including the forfeiture of games," Jen Psaki, President Biden's press

_____

[142] *See CDC Shares NFL Vaccination Success Story as a Model for Society*, NFL, Nov 30, 2021 at 05:45 PM,
https://www.nfl.com/playerhealthandsafety/health-and-wellness/covid-19/cdc-shares-nfl-vaccination-success-story-as-a-model-for-society. *See also For NFL Players, Leadership and Teamwork Builds COVID-19 Vaccine Confidence,* CDC, Nov. 12, 2021, https://www.cdc.gov/vaccines/covid-19/health-departments/features/NFL.html (the NFL reporting on the CDC's story of the NFL).
[143] Tommy Beer, *NFL Encountering Substantial Vaccine Hesitancy Among Players*, Forbes, Jun 10, 2021,11:27am EDT, https://www.forbes.com/sites/tommybeer/2021/06/10/nfl-encountering-substantial-vaccine-hesitancy-among-players/?sh=45230d065e9d
[144] Ben Volin, *NFL struggling to convince enough players to get vaccinated*, BOSTON GLOBE, Jun. 5, 2021, 11:36 a.m., https://www.bostonglobe.com/2021/06/05/sports/nfl-struggling-convince-enough-players-get-vaccinated/.

AMENDED COMPLAINT AND JURY DEMAND - 84

secretary, was quick to reinforce the memo: "We certainly believe the biggest takeaway is that getting vaccinated is our ticket back to normal."[145]

189.    Goodell, of course, has been rewarded by the military. In 2014, he received the third highest award from the U.S. Army for substantial contributions in, as Chief of Staff of the Army Gen. Raymond T. Odierno explained while giving the award, "raising awareness of traumatic brain injuries, which affect not only players in the NFL but our Soldiers. In addition, the NFL, in partnership with the USO, diligently supports our troops overseas to improve the morale of our deployed forces."[146]

190.    Goodell's father was a notable part of the government, having served as a United States Senator after he was a Congressman and appointed Robert F. Kennedy's seat by Governor Nelson Rockefeller upon Kennedy's untimely death. Goodell famously moved from his Republican party in opposing the Vietnam War.[147] Unlike his father, who opposed President Richard Nixon, Goodell finds himself in sync with the President, President Biden. This is part of the whole-of-government/whole-of-society approach by the military and government to partner

_____

[145] Emmanuel Morgan, N.F.L. Sets Stiff Penalties for the Unvaccinated, Jolting Teams, Commissioner Roger Goodell said outbreaks traced to an unvaccinated player or staff member could warrant a game forfeiture for their teams. The announcement prompted a backlash from some players., N.Y. TIMES, Jul. 23, 2021 Updated Sep. 8, 2021, https://www.nytimes.com/2021/07/23/sports/football/nfl-vaccination-policy.html
[146] Chief of Staff of the Army Gen. Raymond T. Odierno, *April 28, 2014 -- CSA's remarks at Twilight Tattoo*, Apr. 29, 2014, https://www.army.mil/article/124906/April_28__2014____CSA_s_remarks_at_Twilight_Tattoo.
[147] Philip Bump, Roger Goodell's father was a senator — and he lost his seat because he opposed the President, President Nixon and the Vietnam War, Sep. 11, 2014 at 1:33 p.m. EDT, https://www.washingtonpost.com/news/the-fix/wp/2014/09/11/roger-goodells-father-was-a-senator-and-he-lost-his-seat-because-he-opposed-the-vietnam-war/.

to influence.

191.     While the Chairman of the Joint Chiefs of Staff, General Dempsey, who

previously was the 37th Chief of Staff of the Army prior to that position, was speaking to the

basketball players, the 38th Chief of Staff of the Army, General Raymond T. Odierno was

awarding the football commissioner, Goodell, a high honor.

192.     ESPN also kept pressure on the football players. For example, ESPN analyst and

commentator, Michael Wilbon shouts "get your vaccine, get vaccinated!"[148] He then compares

the service of the military personnel, to their country, to what's being asked of football players,

while discussing the NFL's policy around the vaccine:

> "This is not new, this is plus 60 years old in the United States of America. Don't tell me
> now that this is infringing on your freedom. When sometimes we … we, we, we thank all
> the time, and we should, justly so, the military, for giving up some of their own personal
> freedoms, people who serve this country, so that we, for the greater good, can have
> societal freedom. Well, where is this now, and I'm, I'm, I'm with that line of thinking a
> hundred percent."[149]

The military. He's calling on football players to consider what's being asked of the military.

Michael Wilbon and Tony Kornheiser co-host ESPN's *Pardon the Interruption*, a show that has

been on ESPN for twenty years, "and each make a hefty $6 million per year."[150] Wilbon, who

_____

[148] Tony Kornheiser and Michael Wilbon on NFL's new vaccine policy, Jul. 24, 2021, ESPN,
https://www.youtube.com/watch?v=kFeL0qXxbhc.
[149] *Id*.
[150] Jack Dougherty, *Who Is the Highest-Paid ESPN Personality and How Much Do They Make?* Apr. 26, 2020,
https://www.sportscasting.com/who-is-the-highest-paid-espn-personality-and-how-much-do-they-make/.

has covered every Super Bowl since 1987, in 2011 watched the Super Bowl from the White House (and also visited the White House, with his co-host Kornheiser, in 2013).[151]

193.     The Covid-19 vaccination rates for the NHL were also an anomaly, relative to other industries, with only 1 player unvaccinated. This rate of vaccination is similar to the 15 in 16000 rate, reflected in the military, however, this 1, amongst all of professional hockey including "all of [the] officials," includes zero players who opposed on a religious basis.[152]

194.     The military has been providing financial support to all major sports, including the NHL for many years, as was revealed in the Paid-for-Patriotism scandal.[153] While those payments were stopped, the relationships and belief in aligning sports with the military objectives have continued.

195.     Disney, on March 8, 2021, "which owns ESPN and ABC, announced [] that it had signed a seven-year rights agreement with the N.H.L. that will begin with the 2021-22

_____

[151] Marcus Vanderberg, *Michael Wilbon Watched Super Bowl XLV From The White House*, Feb 7, 2011, https://www.adweek.com/tvnewser/michael-wilbon-watched-super-bowl-xlv-from-the-white-house/88086/ (noting: "If you weren't lucky enough to get a ticket to Super Bowl XLV, the next best place to watch the game is at the White House. Michael Wilbon had that opportunity Sunday night after getting an invite from one of the president lieutenants.").

[152] Helene St. James, *Detroit Red Wings' Tyler Bertuzzi: 'Sucks missing games,' but he still won't get COVID-19 vaccine,* USA TODAY, Dec. 13, 2021, https://www.usatoday.com/story/sports/nhl/2021/12/13/tyler-bertuzzi-covid-vaccine-detroit-red-wings/6498371001/.

[153] *See e.g.*, Allan Muir, *Six NHL teams named in Senate's 'paid patriotism' report*, SPORTS ILLUSTRATED, Nov. 4, 2015, https://www.si.com/nhl/2015/11/04/nhl-defense-department-spending-scandal.

season."[154] The seven-year deal is estimated to be for $400 million per year,[155] giving ESPN

significant influence over the NHL.[156] The deal was inked just in time for the new vaccine and

the expectations.

—————————————————

[154] Regarding the deal, *see e.g.*, Kevin Draper, N.H.L. Returns to ESPN in a 7-Year Deal With an Emphasis on Streaming; The agreement assures hockey a higher profile on SportsCenter and gives ESPN the perfect sport for its streaming ambitions, N.Y. Times, Mar. 10, 2021, https://www.nytimes.com/2021/03/10/sports/hockey/hockey-nhl-espn-disney.html. The deal extended a prior deal for approximately 200 million dollars per year. *Id*.

[155] *Id*.

[156] *Id*. To appreciate the role ESPN plays generally and rather uniquely in shaping the sports world, *see e.g.*, Alex Suskind, ESPN: Changing the Way Americans Think About Sports, Feb 17, 2010, https://www.popmatters.com/118897-espn-turns-30-2496151198.html. *See also*, Phil Rosenthal, *How ESPN — now 40 years old — changed the sports world, from your growing cable bill and round-the-clock programming to the glut of bowl games*, Chicago Tribune, Sep 08, 2019 at 8:30 am., https://www.chicagotribune.com/sports/breaking/ct-cb-espn-40th-anniversary-changed-sports-20190906-ogxokpxedjgwdekdlmgudb6myq-story.html.

*See also, NHL, ESPN, Disney reach groundbreaking seven-year rights deal. Includes games across cable outlet's networks, streaming platforms, Stanley Cup Final on ABC*, NHL.com, Mar. 10, 2021 https://www.nhl.com/news/nhl-espn-disney-reach-groundbreaking-seven-year-rights-deal/c-322346092 (noting the impact of the deal:

> "The Walt Disney Company, ESPN and the National Hockey League have reached a historic and innovative seven-year television, streaming and media rights deal, taking the new partnership from the beginning of the 2021-22 season through the 2027-28 season.
>
> The visionary, first-of-its-kind agreement brings the NHL back to Disney and ESPN platforms and illustrates the unique position of The Walt Disney Company to bring the best hockey in the world to millions across its unparalleled collection of media platforms.
>
> It is highlighted by: exclusive coverage of the Stanley Cup Final on ABC in four of the seven years of the agreement, with the ability to simulcast/megacast on ESPN+ and additional ESPN networks; the return of live NHL action to ESPN networks with 25 exclusive national regular-season games on ABC or ESPN; 75 national regular-season games per season produced by ESPN that will stream exclusively on both ESPN+ and Hulu; half of the Stanley Cup Playoffs on ABC and ESPN each season; and coverage annually of NHL's Face-off (opening night games), the NHL All-Star Game and Skills Challenge, plus other NHL special events each season.").

*Id*.

AMENDED COMPLAINT AND JURY DEMAND - 88

196.    N.Y. Rangers coach Tom Renney makes this point which highlights the role that the military plays in the NHL: "'We're not enjoying our existence if it weren't for the military, on both sides of the border (referring to the United States-Canadian border), Renney said. Regardless of the demographic or where you're from, we're not going to be able to do what we love to do without the military giving us the opportunity to do it safely.'"[157] Renney's comment underlies a deep reality that players are quite aware of: beyond the military's readily apparent role in protecting all citizens, it is the military's research and development of technology that aids hockey players health and safety, which players are very aware of when he makes that point.

_____

[157] Katie Strang, *How NHL teams incorporate military philosophies to bolster performance*, THE ATHLETIC, Nov 13, 2018, https://theathletic.com/667125/2018/11/23/how-nhl-teams-incorporate-military-philosophies-to-bolster-performance/.

How NHL teams incorporate military philosophies to bolster performance



By Katie Strang   Nov 23, 2018

*Id.*

AMENDED COMPLAINT AND JURY DEMAND - 89

197.     This role of the military in research and development for assisting with player helmet safety was reported by ESPN.[158]

198.     Additional research and military involvement, as another example, among many, includes grants by the military into helmet safety research totaling more than one million dollars, from the U.S. Army Research Laboratory (ARL) in Aberdeen, Md. and from the U.S. Army Combat Capabilities Development Command (CCDC) Soldier Center in Natick, Mass. The grants are funding "researchers at the forefront of this effort, [] two engineering teams from UMass Lowell led by Prof. James Sherwood and Asst. Prof. Murat Inalpolat, both of the Department of Mechanical Engineering," Professor Inalpolat notes, "Our approach can also be used to improve helmets used in sports such as football, baseball, hockey, lacrosse, car racing and cycling, as well as other applications, including body armors for law enforcement.'"[159] This is only one of several areas of the military's benefits to the health and safety of players.

———————————————

[158] ESPN, for example, reported on joint military sports involvement in addressing concussions:

"One such initiative is the Concussion Assessment Research and Education (CARE) Consortium, a $30 million alliance between the NCAA and the Department of Defense that will test an estimated 35,000 male and female college athletes and service academy cadets over a three-year period. Among the participating programs are football powers like Oklahoma, Michigan, Nebraska, Florida, Georgia, Wisconsin and UCLA."

David Ching, LSU experiments with new technology to diagnose head injuries, ESPN, Sep 4, 2015, https://www.espn.com/blog/sec/post/_/id/105843/lsu-experiments-with-new-technology-to-diagnose-head-injuries.

[159] Edwin L. Aguirre, Researchers Use Advanced Modeling Tools to Improve Soldiers' Combat Helmets, Studies are Supported by Grants from U.S. Army Research Centers, Oct. 07. 2019, https://www.uml.edu/engineering/research/engineering-solutions/combat-helmet-research.aspx.

AMENDED COMPLAINT AND JURY DEMAND - 90

199. There are other technologies being jointly utilized for safety, reinforcing the players connection to the military. "Technology [that] was initially designed to be used on the battlefield, so as to ensure military units a quick, accurate way of determining when it was appropriate to remove a soldier from a combat scenario" for hockey players "can help assess and diagnose concussions based on a test that measures eye-tracking impairment,"[160] explains Chief Customer Officer Scott Anderson of Sync Think. "The technology, which is backed by 15 years worth of clinical research and was in large part funded by Department of Defense grants (roughly $36 million over an 8-10 year period, according to Anderson), is designed to assess a player's visual acuity; more specifically, how quickly a player's eyes can follow a target in motion. If there is an impairment, that can be detected in approximately one minute." The benefits for hockey players is significant:

> "'There is a biological signature when someone is impaired. We see a difference, very distinct signatures — one is related to fatigue and one is commonly seen in concussions, and we can separate the two out from each other," Anderson said. These mounts can be used right on the sidelines or on the bench, and send a near-immediate readout to an accompanying tablet for a clinician or trainer to read."[161]

Players understand the role that the military plays in their play safety and coaches reinforce it,[162] and Disney funds it—the Disney/ESPN deal with the NHL provides the funds for the

---

[160] *See supra* note 157.
[161] *Id.*
[162] *See e.g., supra* note 196.

AMENDED COMPLAINT AND JURY DEMAND - 91

league to purchase such technologies (and as noted previously, Disney receives massive funding from the Defense Department).[163] All this combines to create the high uptake rates to match the military's expectations (with the expectation being 15 in 16000 – essentially no exemptions).

200.     With Major League Baseball, the uptake rate was under 90%, at around 88% including management, still significantly higher than the national average but not quite the rates of the NBA, NFL, or NHL. ESPN, and effectively Disney and the Defense Department still hold sway over MLB, but they lacked the high-profile, high involvement of military, Defense Department, government interaction that is evident with Disney/ESPN, the NBA, NFL and NHL.

        a.    With MLB, FOX and Turner each have considerable deals relative to the Disney/ESPN stake.[164]

---

[163] *See supra* paragraph 98 and accompanying note and paragraph 91 1.b.viii.
[164] *See e.g.*, Maury Brown, *MLB's $4 Billion ESPN Media Rights Extension Brings The League's Total Broadcast Value To $12 Billion Over 7 Years*, May 14, 2021, Forbes, https://www.forbes.com/sites/maurybrown/2021/05/14/espns-7-year-392-billion-renewal-with-mlb-starts-in-2022/?sh=4e10f10f3b1c. The following is a breakdown of each broadcaster's contract:

201.    It's no secret that the military and the Defense Department have been using sports as a tool, as described by Michael Schottey, in The Bleacher Report (owned by Disney competitor TBS) article entitled "The Flag and the Shield: The Long Alliance Between the NFL and US Military," something most of us intuitively realize when we watch football:

"Where does the NFL end and the U.S. military begin? These days, it can be hard to tell.

From the military-stylized fanfare that goes into an NFL broadcast to the warfare terminology that permeates the very essence of the game, the NFL has become a primary touchpoint for many Americans when it comes to our armed forces.

This connection did not happen by accident but has evolved into something much bigger and much greater than was likely ever intended.

The league and its partners have doubled down on that connection and have become incredible partners for the military and support its mission both home and abroad. This, in turn, helps the NFL and its partners as well. Patriotism is good for business, and nothing is more patriotic than supporting our troops—especially when they are overseas at

——————————————

**MLB NATIONAL TV CONTRACT AMOUNTS (2022-28)**

Comparison of the current broadcast deal compared to the new agreements that start in 2022.

| Broadcast Partner | Current (Annually) | New (Annually) | (Annual +/- from current) | Total Contract |
|---|---|---|---|---|
| ESPN | $700 million | $550 million | -$150 million | $3.85 billion |
| FOX | $500 million | $728.6 million | $228.6 million | $5.1 billion |
| TBS | $300 million | $470 million | $170 million | $3.29 billion |
| TOTAL | $1.5 billion | $1.76 billion | $248.6 million | $12.24 billion |

Table: Maury Brown · Source: Multiple sources · Get the data · Created with Datawrapper

*Id.*

AMENDED COMPLAINT AND JURY DEMAND - 93

wartime."[165]

202.    It's not only football where such patriotism is evident, the military works with nearly all major sports to influence and shape public opinion using Disney/ESPN as a willing participant to do its bidding, to the point where Disney/ESPN will do its bidding by denying

---

[165] Michael Schottey, *The Flag and the Shield: The Long Alliance Between the NFL and US Military*, May 26, 2014, https://bleacherreport.com/articles/2029052-the-flag-and-the-shield-the-long-alliance-between-the-nfl-and-the-us-military.



Grant Halverson/Getty Images

*Id*. Photo credit: Grant Halverson/Getty Images. See also, *The N.F.L. Wears Patriotism On Its Sleeve. On Its Head. And Its Feet; Displays of the flag have become essential to the league, but a push for patriotism has not come without controversy*, N.Y. Times, Jan 6, 2020, https://www.nytimes.com/2020/01/03/sports/football/nfl-patriotism.html (noting:

> "Military personnel in uniform, fighter jet flyovers, field-size flags, and red, white and blue festooned N.F.L. jerseys have become part of the game's landscape. Despite criticism from certain corners about politicizing the game, the league has continued to embrace symbols of patriotism. Certain teams even accepted money from the Department of Defense for patriotic displays during games, with the league eventually returning more than $700,000 following an audit.").

*Id*. Despite the changes made regarding the payments from the Department of Defense, the legacy lives on as has been described herein.

AMENDED COMPLAINT AND JURY DEMAND - 94

rightful religious exemptions, as was the case here with Williams, Faber and Ryan.

203.    Apart from the evidence specific to other claims being made with respect to Williams, Faber and Ryan, the evidence of the joint involvement of Disney/ESPN with the military and the Defense Department and the government establishes that Disney/ESPN and the government were entwined together[166] in the vaccination mandate, such that state action is warranted.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Religious Discrimination - Title VII)
### Plaintiffs Faber and Williams

204.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

205.    Plaintiffs are protected under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e- 2 *et seq*.) from discrimination in the workplace based on their religion. The statute provides that it is an unlawful employment practice "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2.

---

[166] In addition to the other criteria being present for state action.

AMENDED COMPLAINT AND JURY DEMAND - 95

206. Defendants are Plaintiffs' "employer" under Title VII and falls within the jurisdiction of the statute. The statute provides that "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person. 42 U.S.C. §2000e.

207. As further described herein, Plaintiffs were subjected to discrimination from Defendants based on their religious beliefs.

208. Plaintiffs were qualified for their positions.

209. Plaintiffs suffered adverse action by being terminated from their employment due to their religious beliefs.

210. Defendants failed to reasonably accommodate Plaintiffs' religious beliefs, as required by law, and terminated Plaintiffs under circumstances that were discriminatory in nature.

211. Due to Defendants' willful violations of Title VII, Plaintiffs were damaged and are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

212. WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A SECOND CAUSE OF ACTION

**(Hostile Work Environment based on Religion – Title VII)**
**Plaintiffs Faber and Williams**

213.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

214.    Plaintiffs are protected by Title VII from harassment based on their religion in their workplace. 42 U.S.C. §2000e-2.

215.    Defendants are Plaintiffs' employer pursuant to Title VII.

216.    Plaintiffs were subject to harassment based on their religion from Defendants, which subjected them to terms and conditions of their employment that were different from those of persons of different religions and which ultimately led to their termination. This harassment was pervasive, chronic and severe and constitutes a hostile workplace.

217.    The hostile environment includes significantly that on June 30, 2021, after Plaintiff Williams surfaced the deprecating comment by Walden, coaxing Plaintiff to leave for a new opportunity (see paragraph 12), Walden responded in email hostilely by snidely and threateningly soliciting not Faber's objection and support for Faber's sincerity but rather the name of her parish representative so Walden could "discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view." (emphasis added).

218.    Plaintiffs were qualified to perform their duties as described herein.

219.    Due to Defendants' willful violations of Title VII, Plaintiffs were damaged and are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and

costs of the action, pre- and post-judgment interest.

220.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Retaliation - Title VII)
**Plaintiffs Faber and Williams**

221.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

222.    On June 30, 2021, after Williams surfaced the diminishing comment by Walden, coaxing her to leave for a new opportunity (see paragraph 14), Walden retaliated by snidely soliciting not Faber's objection and support for Faber's sincerity but rather the name of her parish representative so Walden could "discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view."

223.    Further, retaliation can be inferred from the Defendants' failure to reverse their baseless policy during the 2021-2022 season, from their continued penalization of Faber and Williams even after they had actual knowledge that there was no valid reason to do so, from their failure to reinstate Plaintiffs for the 2021-2022 season (*after* the government's inoculation mandate was lifted), and from all affirmative adverse employment actions that occurred after the "vaccine" mandate became moot. This includes Faber's termination on September 9, 2021 and Williams's termination on October 19, 2021.

224. 42 U.S.C. 2000e-3(a) makes it unlawful for any person to retaliate against an employee who has opposed a discriminatory practice. Under 42 U.S.C. § 2000e-3: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

225. Defendants impermissibly took adverse employment against Plaintiffs, including wrongfully terminating them, denying them of financial compensation, and in the case of Williams, pursuant to a contract, and intentionally harming their relationship in their industry, because they complained about the discrimination they suffered based on their religious beliefs, a protective activity.

226. Defendants' actions constitute unlawful retaliation in violation of Title VII.

227. Defendants lacked any justification for the adverse employment actions taken against Plaintiffs, and said actions were neither based on job-related rational nor consistent with business necessity.

228. Defendants' discrimination against Plaintiffs was intentional and was performed with malice, willfulness, and reckless indifference to Plaintiffs' protected civil rights.

229. Any justification offered by Defendants for their adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

230. By the aforesaid acts and conduct of Defendants, and each of them, Plaintiffs

have been directly and legally caused to suffer actual damages, as set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits, reputational damages, past and future medical and counseling expenses to the extent any exist, damages for emotional trauma and distress, interest, and reasonable attorneys' fees and costs of the action pursuant to 42 U.S.C. § 2000e-5(k).

231.    As a result of Defendants' intentional violation of the Title VII rights of Plaintiffs they suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life, thereby entitling them to compensatory damages.

232.    The events described here justify an award of punitive damages under Title VII.

233.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A FOURTH CAUSE OF ACTION
**(Discrimination based on Religion - C.G.S. §46a-60b)**
**Plaintiffs Faber and Williams**

234.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

235.    Plaintiffs are protected by the CFEPA from discrimination based on their religion in their workplace.

236.    The statute provides that "It shall be a discriminatory practice in violation of this section: for an employer, by the employer or the employer's agent, except in the case of a bona

fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability, physical disability, including, but not limited to, blindness or status as a veteran." C.G.S. §46a-60(b)(1).

237. Further, CT Gen Stat § 46a-58 (a) provides: It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, gender identity or expression, sexual orientation, blindness, mental disability, physical disability or status as a veteran."

238. Defendants are Plaintiffs' "employer" and have more than one person in their employ.

239. Plaintiffs were subject to adverse action based on their religion from Defendants, which terminated their employment.

240. Plaintiffs were qualified for their position.

241. Defendants failed to reasonably accommodate Plaintiffs' religious beliefs, as required by law and terminated Plaintiffs under circumstances which were discriminatory in nature.

242. Due to Defendants' willful violations of the C.G.S., Plaintiff was damaged and is

entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

243. WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Hostile Work Environment based on Religion - C.G.S. §46a-60b)
### Plaintiffs Faber and Williams

244. Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

245. Plaintiffs are protected by the CFEPA from harassment based on their religion in their workplace.

246. Defendants are Plaintiffs' "employer."

247. Plaintiffs were subject to harassment based on their religion from Defendants, which subjected Plaintiffs to terms and conditions of their employment that were different from those of persons of different religions. This harassment was chronic, pervasive and severe and constituted a hostile workplace for Plaintiffs.

248. The hostile environment includes significantly that on June 30, 2021, after Plaintiff Williams surfaced the disparaging comment by Walden, coaxing Plaintiff to leave for a new opportunity (see paragraph 14), Walden responded in email hostilely by snidely and threateningly soliciting not Faber's objection and support for Faber's sincerity but rather the

name of her parish representative so Walden could "discuss ***their*** opposition to vaccination, and what accommodation would be acceptable from a religious point of view." (emphasis added).

249.    Plaintiffs were qualified to perform their duties as described herein.

250.    Due to Defendants' willful violations of CFEPA, Plaintiffs were damaged and are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

251.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.


### AS AND FOR A SIXTH CAUSE OF ACTION
**(Retaliation based on Religion - C.G.S. §46a-60)**
**Plaintiffs Faber and Williams**

252.    Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

253.    At all times herein mentioned, C.G.S. §46a-60b was in full force and effect and was binding on Defendants, as Defendants regularly employed one (1) or more persons.

254.    C.G.S. §46a-60(b)(4) makes it unlawful for any person to retaliate against an employee who has opposed a discriminatory practice.

255.    On June 30, 2021, after Plaintiff Williams surfaced the belittling comment by Walden, coaxing her to leave for a new opportunity (see paragraph 14), Walden retaliated in email by snidely soliciting not Faber's objection and support for Faber's sincerity but rather the

AMENDED COMPLAINT AND JURY DEMAND - 103

name of her parish representative so Walden could "discuss *their* opposition to vaccination, and what accommodation would be acceptable from a religious point of view."

256. Further, retaliation can be inferred from the Defendants' failure to reverse their baseless policy during the 2021-2022 season, from their continued penalization of Faber and Williams even after they had actual knowledge that there was no valid reason to do so, from their failure to reinstate Plaintiffs for the 2021-2022 season (*after* the inoculation mandate was lifted), and from all affirmative adverse employment actions that occurred after the "vaccine" mandate became moot. This includes Faber's termination on September 9, 2021 and Williams's termination on October 19, 2021.

257. Defendants impermissibly took adverse employment against Plaintiffs, including wrongfully terminating them, denying them of financial compensation, and in the case of Williams, pursuant to a contract, and intentionally harming their relationship in their industry, because they complained about the discrimination they suffered based on their religious beliefs, a protective activity.

258. Defendants' actions constitute unlawful retaliation in violation of C.G.S. Section 46a-60(b)(4).

259. As a result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, both economic and non-economic loss, including, but not limited to: loss of wages, benefits, pension, bonus entitlements, residual payments, deferred compensation, future pecuniary losses, emotional distress, and other compensatory damages.

260. As outlined above, Defendants purposefully and intentionally retaliated against

Plaintiffs based upon their opposition to Defendants' vaccine mandate and denial of their

religious exemption requests by taking adverse employment action against them. Plaintiffs are

entitled to recover damages for future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary losses

caused by Defendants' unlawful retaliation.

261.    Defendants' actions described above were done with malice or a reckless

indifference to Plaintiffs' protected rights to be free from retaliation for opposing unlawful

employment practices. Due to the willful and malicious nature of the retaliation against

Plaintiffs, they are entitled to an award of punitive damages in an amount sufficient to deter

Defendants from engaging in retaliatory conduct in the future.

262.    As a proximate result of the wrongful acts of Defendants, Plaintiffs have suffered

and continue to suffer emotional distress, humiliation, mental anguish and embarrassment, as

well as the manifestation of physical symptoms as a result of the stress. Plaintiffs are informed

and believe and thereupon allege that they will continue to experience said physical and

emotional suffering for a period in the future not presently ascertainable, all in an amount subject

to proof at the time of trial.

263.    As a proximate result of the wrongful acts of Defendants, Plaintiffs have been

forced to hire attorneys to prosecute their claims herein, and have incurred and are expected to

continue to incur attorneys' fees and costs in connection therewith. Plaintiffs are entitled to

recover attorneys' fees and costs under C.G.S. Section 46a-104.

264.    Plaintiffs are entitled to other such relief as this court deems appropriate.

265. WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Disability Discrimination- ADA)
### Plaintiff Williams

266. Plaintiff Williams repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

267. Plaintiff Williams is protected by the ADA from disability discrimination in her workplace. The ADA specifically provides "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101. It provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112.

268. Defendants are a "covered entity" pursuant to 42 U.S.C. §12111 that are subject to ADA jurisdiction because they are an "employer" as defined by the ADA, namely "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."

269. Plaintiff Williams is "disabled" within the meaning of 42 U.S.C. §12102, which defines disability as (A) a physical or mental impairment that substantially limits one or more

major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

      a. Plaintiff Williams was to undergo an in vitro fertilization.

      b. Such would have exposed her unborn baby to risks associated with the untested Covid-19 vaccination.

      c. Williams had had an adverse reaction to a vaccine when she was 12.

270. Plaintiff was denied a medical exemption.

271. Plaintiff was otherwise qualified to perform the essential functions of her job with or without a reasonable accommodation.

272. Plaintiff opposed the denial of her medical exemption.

273. Plaintiff suffered adverse action by being terminated from her employment due to her disability.

274. Defendants failed to reasonably accommodate Plaintiff's disability, as required by law.

275. Due to Defendants' willful violations of the ADA, Plaintiff was damaged and is entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

276. WHEREFORE, Plaintiff respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Disability Discrimination - C.G.S. §46a-60(b))
### Plaintiff Williams

277.    Plaintiff Williams repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

278.    The Defendants' actions are a violation of C.G.S. sec.46a-60(b)(1) and sec.46a-60(b)(4).

279.    As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, reputational damages, damages for emotional trauma and stress, anxiety and loss of the ability to enjoy life's pleasures and activities.

280.    Plaintiff is seeking damages as a result of Defendants' unlawful conduct.

281.    WHEREFORE, Plaintiff respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Violation of Religious Liberty Under the First, Fifth and Fourteenth Amendments
### Pursuant to 42 USC §1983 - U.S. Constitution)
### (Free Exercise)
### All plaintiffs

282.    Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

AMENDED COMPLAINT AND JURY DEMAND - 108

283.    Defendants, as a state actor, have imposed an unconstitutional burden on Plaintiffs' exercise of religion through their imposition of the vaccine mandate. The burden imposed on Plaintiffs' exercise of religious is substantial, in that the Defendants' mandate *inter alia* affect Plaintiffs' ability to: maintain employment, seek future employment, abide by the principles, beliefs, morals, values, or practices of their religion, ostracizes plaintiffs in society, discriminates against plaintiff because of their religion, and causes other economic and non-pecuniary injuries including the loss of promotional opportunity, benefits and insurance, and causes Plaintiffs to endure mental anguish and emotional distress concerning their ability to abide by their faith and further mental anguish and emotional distress related to fear of physical or mental injury that has been and continues to be directly and proximately caused by the Defendants' mandate.

284.    The mandate is not neutral and is not generally applicable in that it applies inordinately to Disney/ESPN media personnel (See further discussion in the Equal Protection counts below).

285.    Accordingly, the First, Fifth and Fourteenth Amendments require that Defendants compensate them for any and all damages including compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

286.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A TENTH CAUSE OF ACTION

**(Violation of Article I, Section 3 of the Connecticut Constitution)**
**(Free Exercise of Religion)**
**All Plaintiffs**

287.    Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

288.    Article I, Section III of the Connecticut Constitution states that "the Free Exercise of Religion shall *forever* be allowed in Connecticut." Article I, Section III of the Connecticut Constitution protects the "free exercise" of religion.

289.    The mandate is not neutral and is not generally applicable in that it applies inordinately to Disney/ESPN media personnel (See further discussion in the Equal Protection counts below).

290.    A law, or government entwinement in a policy, burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny.

291.    A law "lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's interest in a similar way."

292.    Accordingly, where a State, or State Actor, extends discretionary exemptions to a policy, it must grant exemptions for cases of religious hardship or present compelling reasons not to do so.

293.    Defendants' actions, as described herein, including hostility towards religious beliefs, as well as allowing secular exemptions from its policies, while denying religious

exemptions, constitute a violation of Connecticut's Free Exercise Clause of Article I, Section III of the Connecticut Constitution.

294.     Defendants do not establish a compelling interest in denying Plaintiff's religious exemptions while granting medical exemptions and allowing other religious exemptions.

295.     WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
### (Violation of the Religious Freedom and Restoration Act)
### All Plaintiffs

296.     Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

297.     Defendants are a state actor, entwined with the government and doing the work of the federal government.

298.     In 1993, Congress enacted the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb et seq., which provides a statutory right to challenge substantial burdens on religious exercise. See *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. § 2000bb(a)(2). "RFRA was designed to provide very broad protection for religious liberty" and it reaches "far beyond what […] is constitutionally required" by the First Amendment. *Burwell v. Hobby Lobby Stores,*

*Inc.*, 573 U.S. 682, 706 (2014). RFRA requires that the federal government provide exceptions or

accommodations to people whose religious practices are unduly burdened by federal law or

policy. See *Gonzales*, 546 U.S. 418; *Hobby Lobby*, 573 U.S. 682.[167]

_____

[167] The Congressional Research Service issued a CSR Legal Sidebar, prepared for Members of and Committees of Congress, entitled COVID-19 Vaccination Requirements: Potential Constraints on Employer Mandates Under Federal Law, in which it discussed the application of RFRA:

> Considerations Under the Religious Freedom Restoration Act and Other Laws

> Under the federal laws discussed above, if an employer cannot reasonably accommodate a worker's disability or religious practice, the employer may exclude the employee from the workplace. But before terminating an unvaccinated worker, employers must consider other potential employee protections.

> The Religious Freedom Restoration Act (RFRA) prohibits the federal government and other covered entities like the District of Columbia and Puerto Rico from "substantially burden[ing]" a person's exercise of religion except in limited circumstances. RFRA authorizes a person "whose religious exercise has been burdened in violation" of the statute to sue the government. In such an action, the government may need to show that the burden imposed furthers a "compelling governmental interest" and is "the least restrictive means" of furthering that interest. RFRA's standard is thus more rigorous than Title VII's religious accommodation standard, for which the touchstone is reasonableness. (RFRA also provides more robust protections from application of facially neutral laws and policies than the First Amendment's Free Exercise Clause, which the Supreme Court has construed as not normally providing a basis for noncompliance with generally applicable laws and policies. However, the scope of that Clause's protections is currently the subject of a pending Supreme Court case.) Many states have adopted their own versions of RFRA.

> RFRA could apply in the context of workplace COVID-19 vaccination in two ways. First, if the federal government or a covered entity as a regulator passes a law or adopts a rule mandating vaccination for certain public or private employees, employees with religious objections may have a cause of action Congressional Research Service 6 against the government under RFRA. (RFRA provides that new federal statutes must "explicitly exclude[]" RFRA's application if Congress does not want RFRA to apply to that law.) Likewise, if the law or rule imposes vaccination obligations on private employers, employers with religious objections may also have a RFRA claim. Second, if the federal government or a covered entity as an employer adopts its own policy requiring its employees to be vaccinated, employees with religious objections could bring a RFRA claim against their government employer—although some courts might limit their remedy to Title VII. Federal appellate courts have split on whether Title VII provides the "exclusive" remedy for employees seeking religious accommodations from their government employers, or whether

AMENDED COMPLAINT AND JURY DEMAND - 112

299.     RFRA provides that the federal government may not "substantially burden a person's exercise of religion," even by "rule[s]of general applicability" except by using "the least restrictive means" to further a "compelling governmental interest." 42 U.S.C. § 2000bb-1. This statutory provision is intended to reinstate the "Sherbert Test," overturned in *Smith*, 494 U.S. 872 (1990), as a statutory right. *See* 42 U.S.C. § 2000bb(b) ("The purposes of this Act are […] to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and […] to provide a claim or defense to persons whose religious exercise is substantially burdened by government.").

300.     RFRA applies to "all [f]ederal law, and the implementation of that law, whether

---

plaintiffs can bring separate claims under RFRA and Title VII. The Supreme Court has not yet opined on RFRA's relationship with Title VII, but in Bostock v. Clayton County, the Court recently posited that "[b]ecause RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases."

Assuming that an employee in an RFRA action were to demonstrate a "substantial burden" on the employee's religious exercise, cases involving other compulsory vaccination programs suggest strong governmental interests behind immunization efforts against infectious diseases. However, applying RFRA in the context of a COVID-19 gathering restriction in the District of Columbia, a federal district court cautioned that a government's "generalized interests" in "combating the COVID-19 pandemic" may not rise to the level of "compelling" under RFRA unless the government can show a compelling reason to apply its policy to "the particular claimant whose sincere exercise of religion is being substantially burdened." Moreover, whether a particular law or policy is the "least restrictive means" of furthering public health-related interests likely depends on the particulars of the law or policy and any exemptions or accommodations.

April J. Anderson and Victoria L. Killion, COVID-19 Vaccination Requirements: Potential Constraints on Employer Mandates Under Federal Law, Feb. 10, 2021, https://crsreports.congress.gov/product/pdf/LSB/LSB10573.

AMENDED COMPLAINT AND JURY DEMAND - 113

statutory or otherwise, and whether adopted before or after the enactment of [RFRA]," except for

federal statutes "adopted after [the enactment of RFRA]" which "explicitly exclude[] such

application by reference to RFRA." 42 USCS § 2000bb-3.

301.    There are no laws enacted that apply here, that explicitly exclude their application

by reference to RFRA.

302.    RFRA relief is available to anyone "whose religious exercise has been burdened

in violation of [RFRA]." 42 U.S.C. § 2000bb-1(c).

303.    Religious freedom is one of the foundational principles of our nation. The familiar

words of the First Amendment to the U.S. Constitution are: "Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise thereof."

304.    To help safeguard that freedom, Congress enacted the Religious Freedom

Restoration Act of 1993 (RFRA). The RFRA provides a statutory right to challenge burdens that

the federal government places on religious liberty. RFRA requires that the federal government

provide accommodations including changes to rules to people whose religious practices are

unduly burdened by a federal law or policy.

305.    Religious exercise includes belief, profession, and "the performance of (or

abstention from) physical acts […] engaged in for religious reasons. *Hobby Lobby*, 573 U.S. at

710 (internal quotations omitted).

306.    Plaintiffs' beliefs about the Covid-19 vaccination and their objections to it set

forth in this complaint are religious in nature.

307.    Plaintiffs' beliefs are sincerely held.

308.     Plaintiffs were terminated from their lifetime careers because of their religious beliefs.

309.     Forcing Plaintiffs to choose between continuation of their employment and a violation of their religious beliefs in order to retain their livelihoods imposes a substantial burden on Plaintiffs' ability to conduct themselves in accordance with their sincerely held religious beliefs.

310.     Accordingly, RFRA requires that Defendants compensate them for any and all damages including compensatory damages, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

311.     WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A TWELFTH CAUSE OF ACTION
**(Violation of An Act Concerning Religious Freedom, the Connecticut Religious Restoration Act, C.G.S. §52-571b)**
**All Plaintiffs**

312.     Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

313.     The Connecticut Religious Restoration Act requires that "The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section."

AMENDED COMPLAINT AND JURY DEMAND - 115

314. Defendants are a state actor, entwined with the government and doing the work of the government.

315. Plaintiffs' beliefs about the Covid-19 vaccination and their objections to it set forth in this complaint are religious in nature.

316. Plaintiffs' beliefs are sincerely held.

317. Plaintiffs were terminated from their lifetime careers because of their religious beliefs.

318. Forcing Plaintiffs to choose between continuation of their employment and a violation of their religious beliefs in order to retain their livelihoods imposes a substantial burden on Plaintiffs' ability to conduct themselves in accordance with their sincerely held religious beliefs.

319. Due to Defendants' willful violations of the RRA, Plaintiffs were damaged and are entitled to recover compensatory damages, back and front pay, reputational damages, damages for emotional trauma and distress, punitive damages, reasonable attorneys' fees and costs of the action, pre- and post-judgment interest.

320. WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.


## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Violation of the Fifth and Fourteenth Amendments
### Pursuant to 42 USC §1983 - Equal Protection Clause)
### All Plaintiffs

321.     Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

322.     The vaccination rates for employees in the Disney/ESPN, professional sports media segment are not normal, they're extraordinarily high.[168]

323.     The vaccination rates in the Disney/ESPN media segment, professional sports, reflect the joint power of the government working with an uber-influencer (as detailed in the state action paragraphs 59 - 80).

324.     Had the government instituted a requirement that all professional athletes and personnel of leading media outlet are required to receive a vaccination, without rights to exemption, such an action would be subject to an equal protection challenge for its treatment of professional athletes and leading media differently than other similarly situated persons.

325.     Similarly, a state actor performing such a function is subject to an equal protection challenge on the same basis.

326.     Disney/ESPN entwined with the Defense Department, acts as an agent, arm of the Defense Department.

327.     Disney/ESPN, acting as an agent, arm, and effectively a department of the Defense Department, with tasks to perform, targeted a class of persons.

---

[168] *See supra* note 54.

328.    Disney/ESPN, working on behalf of the government, targeted the class of persons, media workers who oppose the vaccine mandate. The subset of media workers and athletes who oppose the vaccine mandate, the government could not reach through Executive Order 14042, which applied to Federal Contractors, and through 14043, which applied to Federal Employees. Disney/ESPN. Thus, targeting them, a private entity who would not, ordinarily, be subject to the Equal Protection clause, would bypass the stringent strict scrutiny applied to discrimination on the basis of religion[169] or would even bypass the rational basis requirement applied to any and all media workers.

329.    The class of individuals that Plaintiffs belong to that have been discriminated against are Disney/ESPN media personnel (a group with a huge influence over professional athletes and other non-Disney/non-ESPN media personnel) who oppose the vaccination, many on the basis of religion.

330.    The Disney/ESPN policy, on behalf of the government, again, creates a class and discriminates against that class, that class being Disney/ESPN media personnel. (It also influences others not in that class, such as professional sports athletes, though such influence is not within the protected class asserted here).

_____

[169] Note, the timing of the terminations were exactly temporally coincident with the height of the government's pressure and announcement of the three mandates, EO 14042, EO 14043 and the OSHA Emergency Temporary Standard.

AMENDED COMPLAINT AND JURY DEMAND - 118

331. The Constitution provides that the government, and state actors cannot take life, liberty or property without due process and equal protection of the law.

332. To understand how this class of similar persons is not being treated in a similar manner as those not in the class, we need only contrast the treatment of Disney/ESPN media personnel to treatment of individuals in other industries. But before doing so, it is helpful to distinguish related facts, both facts as to what the government did and did not do, as pertains to this case.

    a. The government did not mandate an across-the-board vaccination requirement of all employees of all businesses, public or private.

        i. An across-the-board mandate would raise substantive due process flags on the basis of (a) a right to privacy/right to bodily integrity and (b) a right to an occupation. But unlike that type of action (unlike an across-the-board mandate), instead the targeting of an extremely large but narrower occupational segment (Disney/media personnel) in part, to reach religious objectors, as was done here, by a state actor, is subject to a classification challenge.

        ii. The government created an OSHA Rule, an Emergency Temporary Standard (ETS) on businesses over 100 employees – that rule or mandate is *not* being challenged on equal protection grounds, here.

        iii. What is being challenged is the subset of employees who, through Disney's government entwinement, were singled out: Disney/ESPN

media employees who opposed vaccination and further those who did so on a religious basis. (Those employees who did not do so on a religious or medical basis were denied exemptions, and relatively easily).

    iv.   By contrast, we can see a myriad of places, including Yale University, Yale Hospital, and innumerous other health care environments, where religious exemptions were granted in large numbers.

    v.   Numerous industries reflect significantly lower vaccination uptake rates than Disney/ESPN media with relative ease and no court involvement.

        1.   By contrast, there are currently numerous individuals who opposed vaccination on a basis related to religion that were denied and have sued Disney and/or ESPN:

            a.   Sage Steele

            b.   Rockmund Dunbar

            c.   Barbara Andreas

            d.   Stephen J. Cribb

            e.   Adam Pajer

            f.   Steven Gibbons

            g.   Cheron Hayes

> h. Cathryn Koepke
>
> i. Seth Schmidt

2. Those are only some of the Disney/ESPN employees who opposed the policy, most on the basis of religion.[170]

3. The facts are that the Disney/ESPN motive and actions, as the facts support, were taken to work around the religious accommodation requirement of a religious exemption by denying this whole class of media personnel, with a huge influence on the public and on professional athletes, the

_____

[170] The same story is being told over and over again. For instance, in a lawsuit against Disney-owned ABC for General Hospital employees:

> "4.      The media has been among the most aggressive in mandating the Covid-19 shots for its employees. To that end, during the summer of 2021, Defendant American Broadcasting Companies., Inc. ("ABC"), a wholly owned subsidiary of The Walt Disney Company, ordered that anybody working on a television show it produced would have to get the Covid-19 shot (the "Covid Vaccine Mandate").
>
> …
>
> 32.      ABC said it would respect an individual's sincere religious objection to the Covid Vaccine Mandate. Therefore, during October 2021, Plaintiffs requested religious exemptions to the mandate.
>
> 33.      Rather than accept Plaintiffs' request for a religious exemption, ABC scheduled an interview between them and an ABC employee to discuss their requests. Although ABC described the interview as an "interactive process," the interview was conducted by a lawyer who works for Disney. It was a cross-examination designed to elicit information that ABC could use to deny Plaintiffs' requests for an exemption, as it denied almost all such requests during 2021."

exemption.

    a.   There was no business necessity for denying this class.

    b.   This group of individuals who opposed on religious grounds make up the largest percentage of those opposed to the mandate, but still make up a very small percentage of the Disney/ESPN workforce, small enough to not make it a business necessity to deny their exemption requests.

    c.   This entity, Disney/ESPN, the facts reflect, has a disproportionate impact and influence on society. The Disney/ESPN commentators essentially browbeat employees and professional athletes into taking the vaccine. Beyond browbeating employees and professional athletes, they effectively made sure those individuals were suspended and/or terminated for opposition.

    d.   At the same time, in so doing, they served the government's public relations campaign interest.

    e.   And Disney/ESPN was handsomely rewarded for

doing so.[171]

333.    The process utilized by Defendants to deny a legitimate religious exemption, while under Title VII must satisfy the unduly burdensome test, must under an equal protection challenge satisfy the much more difficult business necessity test.

334.    Under strict scrutiny, it also must be very narrowly tailored or the least restrictive means for achieving the compelling objective.

335.    Even under the rational basis standard, the targeting of one industry or industry subsegment for denial of religious accommodation is not rational.

336.    By failing to consider reasonable accommodations, Defendants have deprived Plaintiffs of their constitutionally protected rights to equal protection and religious exercise.

337.    Defendants have engaged in overt acts to deprive Plaintiffs of their civil rights by failing to engage in the interactive process and terminating Plaintiffs' employment.

338.    Classifications that "impinge upon the exercise of a fundamental right" are "presumptively invidious" and subject to strict scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

339.    "A statutory classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right." *Nordlinger v Hahn*, 505 U.S. 1, 10 (1992).

_____

[171] *See supra* note 21.

AMENDED COMPLAINT AND JURY DEMAND - 123

340. Defendants' actions in denying the religious exemptions deprive Plaintiffs of the equal protection of the laws guaranteed by the United States Constitution.

341. At all relevant times, Defendants' actions were taken under the color of state law, as state actors.

342. Plaintiffs are entitled to other such relief as this court deems appropriate.

343. WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### (Violation of the Connecticut Constitution Equal Protection Clause)
### All Plaintiffs

344. Plaintiffs repeat and re-allege the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

345. Defendants' actions intentionally treat the class of Disney/ESPN media religious employees differently than other similarly situated persons.

346. Classifications that "impinge upon the exercise of a fundamental right" are "presumptively invidious" and subject to strict scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

347. "A statutory classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right." *Nordlinger v Hahn*, 505 U.S. 1, 10 (1992).

348. Defendants' actions in denying the religious exemptions deprive Plaintiffs of the

equal protection of the laws guaranteed by both the Connecticut Constitution.

349.  At all relevant times, Defendants' actions were taken under the color of state law, as state actors.

350.  WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.


## AS AND FOR A FIFTEENTH CAUSE OF ACTION
**(Violation of the C.G.S. §31-51q by Terminating Employees for Exercising First Amendment Rights)**
**All Plaintiffs**

351.  On or about August 28, 2019, Plaintiff Ryan and ESPN entered into an Employment Agreement ("Ryan Agreement"), as subsequently extended for one year on or about August 28, 2020, via employer's option. The Ryan Agreement states that it "shall be construed according to the laws of the State of Connecticut." By entering into the Ryan Agreement, Ryan became Defendants' employee.

352.  On or about August 1, 2017, Plaintiff Williams and ESPN signed a three-year employment agreement ("Williams Agreement"). On August 15, 2020 the parties contract was renewed for one year. The Williams Agreement states that it "shall be construed according to the laws of the State of Connecticut." By entering into the Williams Agreement, Williams became Defendants' employee.

353.  In December 1991 Plaintiff Faber began working for Defendant, as an employee and she worked for Defendant for just shy of 31 years, working as a Producer from 2014-2021.

354. Pursuant to General Statutes § 31-51q, Connecticut law holds employers, public or private, liable for "disciplining or discharging" any employee as a result of that employee's exercise of his or her First Amendment rights, to free speech and free exercise, as protected under the federal and state constitutions.

355. Plaintiffs' speech, requesting a religious exemption, addressed matters of public concern, and was accordingly protected by both the First Amendment to the United States Constitution and Article First, Section 4 of the Connecticut Constitution.

356. Plaintiffs expressed at length their concerns based on their faith.

357. Fearing that Plaintiff Ryan would speak out further about the fact that the Defendants were already utilizing remote accommodations, they chose not to engage in an interactive process or discussion about possible accommodations, as evidenced by their curt and circumspect avoidance of his request and that topic.

358. Similarly, fearing that Plaintiffs Williams and Faber would speak out further, should they be awarded an exemption, or even about the fact that they were seeking a religious exemption, Defendants failed to properly engage in the interactive process and failed to properly accommodate them.

359. Plaintiffs' requests for a religious accommodation are protected by both the First Amendment to the United States Constitution and Article First, Section 4 of the Connecticut Constitution.

360. ESPN and Disney took adverse actions against Plaintiffs in the nature of discipline and/or discharge as a result of their exercise of his right to free speech under the state

and federal constitutions.

361.    ESPN and Disney took adverse actions against Plaintiffs in the nature of discipline and/or discharge as a result of their exercise of their right to free exercise under the state and federal constitutions.

362.    Plaintiffs were denied the opportunity to return to work with an accommodation.

363.    Plaintiffs' exercise of their religious rights did not substantially or materially interfere with their bona fide job performance or with their working relationship with their employer.

364.    Plaintiffs have suffered significant damages as a direct and proximate result of ESPN and Disney's adverse actions against them.

365.    By this action, Plaintiffs seek to recover not only the actual damages they have suffered as a result of ESPN and Disney's violation of Connecticut state law and their religious rights, but also punitive damages and reasonable attorney's fees, as provided by statute.

366.    WHEREFORE, Plaintiffs respectfully pray for relief against Defendants as hereinafter set forth in their prayer for relief.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against Defendants:

A.    Enter judgment on the First Cause of Action declaring that Defendants have

violated Title VII of the Civil Rights Act of 1964; declaring that Defendants had actual and constructive knowledge that violations of Title VII were occurring; declaring that Defendants' violations of Title VII were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

B.     Enter judgment on the Second Cause of Action declaring that Defendants have violated Title VII of the Civil Rights Act of 1964; declaring that Defendants had actual and constructive knowledge that violations of Title VII were occurring; declaring that Defendants' violations of Title VII were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

C.     Enter judgment on the Third Cause of Action declaring that Defendants have violated Title VII of the Civil Rights Act of 1964; declaring that Defendants had actual and constructive knowledge that violations of Title VII were occurring; declaring that

Defendants' violations of Title VII were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

D.       Enter judgment on the Fourth Cause of Action declaring that Defendants have violated Connecticut Fair Employment Practices Act (CFEPA); declaring that Defendants had actual and constructive knowledge that violations of CFEPA were occurring; declaring that Defendants' violations of CFEPA were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

E.       Enter judgment on the Fifth Cause of Action declaring that Defendants have violated Connecticut Fair Employment Practices Act (CFEPA); declaring that Defendants had actual and constructive knowledge that violations of CFEPA were occurring; declaring that Defendants' violations of CFEPA were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding

reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

F.      Enter judgment on the Sixth Cause of Action declaring that Defendants have violated Connecticut Fair Employment Practices Act (CFEPA); declaring that Defendants had actual and constructive knowledge that violations of CFEPA were occurring; declaring that Defendants' violations of CFEPA were willful; enjoining future violations of the law by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

G.      Enter judgment on the Seventh Cause of Action declaring that Defendants have violated the Americans with Disabilities Act (ADA) and the Americans with Disabilities Act Amendments Act (ADAAA); declaring that Defendants had actual and constructive knowledge that violations of ADA, ADAAA were occurring; declaring that Defendants' violations of ADA, ADAAA were willful; enjoining future violations of the law by Defendants; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such

other and further relief as the Court deems just and proper.

H.    Enter judgment on the Eighth Cause of Action declaring that Defendants have violated the CFEPA with respect to Plaintiff's disabilities; declaring that Defendants had actual and constructive knowledge that violations of CFEPA were occurring; declaring that Defendants' violations of CFEPA were willful; enjoining future violations of the law by Defendants; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

I.    Enter judgment on the Ninth Cause of Action declaring that the Defendants' mandate is unconstitutional because it violates the Plaintiffs' individual rights of free exercise under the U.S. Constitution; declaring that Defendants had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

J.    Enter judgment on the Tenth Cause of Action declaring that the Defendants'

mandate is unconstitutional because it violates the Plaintiffs' individual rights of free exercise under the Connecticut Constitution; declaring that Defendants had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

K.      Enter judgment on the Eleventh Cause of Action declaring that the Defendants' mandate is a violation of the Religious Freedom Restoration Act (RFRA) because it violates the Plaintiffs' individual right to free exercise of their religion; declaring that Defendants had actual and constructive knowledge that violations of RFRA were occurring; declaring that Defendants' violations of RFRA were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

L.      Enter judgment on the Twelfth Cause of Action declaring that the Defendants' mandate is a violation of Connecticut's Religious Restoration Act (RRA) because it violates

the Plaintiffs' individual right to free exercise of their religion; declaring that Defendants had actual and constructive knowledge that violations of RRA were occurring; declaring that Defendants' violations of RRA were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

M.     Enter judgment on the Thirteenth Cause of Action declaring that the Defendants' mandate is unconstitutional because it violates the Plaintiffs' equal protection rights under the U.S. Constitution; declaring that Defendants had actual and constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

N.     Enter judgment on the Fourteenth Cause of Action declaring that the Defendants' mandate is unconstitutional because it violates the Plaintiffs' individual rights to equal protection under the Connecticut Constitution; declaring that Defendants had actual and

constructive knowledge that violations of the Constitution were occurring; declaring that Defendants' violations of the Constitution were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

O.      Enter judgment on the Fifteenth Cause of Action declaring that the Defendants' mandate violates C.G.S. 31-51q because it violates the Plaintiffs' First Amendment rights under the U.S. Constitution and the Connecticut Constitution; declaring that Defendants had actual and constructive knowledge that violations of 31-51q and the Constitution were occurring; declaring that Defendants' violations were willful; enjoining future violations by Defendants; awarding Plaintiffs front and back pay; awarding Plaintiffs compensatory damages, including but not limited to damages for emotional pain and suffering; awarding reputational damages; awarding Plaintiffs punitive damages; awarding Plaintiffs pre- and post-judgment interest; awarding Plaintiffs reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 22, 2023.

LAW OFFICES OF SHELDON KARASIK, P.C.
Attorneys for Plaintiff

By:_____/s/ *Sheldon Karasik*___

Sheldon Karasik (SK-4020)
244 Fifth Avenue, Suite Q249
New York, New York 10001
Direct Dial: (917) 587-8153
Email: sheldon@karasiklawoffices.com

DUNN EMPLOYMENT LAW, LLC
Attorneys for Plaintiff

By:_____/s/ *Christopher Dunn*___

Christopher Dunn (ct30900)
P.O. Box 4124
Madison, Connecticut 06443
Direct Dial: (203) 903-7650
Email: christopherdunnlaw@gmail.com